UNITED STATES OF AMERICA and the
STATE OF NORTH CAROLINA,

            *Plaintiffs*,

   v.

THE CHARLOTTE-MECKLENBURG
HOSPITAL AUTHORITY, d/b/a
CAROLINAS HEALTHCARE SYSTEM,

            *Defendant.*

Case No.

# COMPLAINT

The United States of America and the State of North Carolina bring this civil antitrust action to enjoin Defendant, The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas HealthCare System ("CHS"), from using unlawful contract restrictions that prohibit commercial health insurers in the Charlotte area from offering patients financial benefits to use less-expensive healthcare services offered by CHS's competitors. These steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers.

### I.    CHS AND ITS UNLAWFUL STEERING RESTRICTIONS

1.    CHS is a North Carolina not-for-profit corporation providing healthcare services with its principal place of business in Charlotte. Its flagship facility is Carolinas Medical Center, a large general acute-care hospital located in downtown Charlotte. It also operates nine other general acute-care hospitals in the Charlotte area.

2. CHS is the dominant hospital system in the Charlotte area, with approximately a 50 percent share of the relevant market, and 2014 revenue of approximately $8.7 billion. Its closest competitor by size is Novant, which owns five general acute care hospitals in the Charlotte area and has less than half of CHS's revenue. After Novant, the next-largest hospital in the Charlotte area is CaroMont Regional Medical Center, which has less than one tenth of CHS's revenue.

3. CHS exerts market power in its dealings with commercial health insurers ("insurers"). CHS's market power results from its large size, the comprehensive range of healthcare services that it offers, its high market share, and insurers' need to include access to CHS's hospitals–as well as its other facilities and providers–in at least some of their provider networks in insurance plans that cover people in the Charlotte area. CHS's market power is further evidenced by its ability to profitably charge prices to insurers that are higher than competitive levels across a range of services, and to impose on insurers restrictions that reduce competition.

4. CHS's market power has enabled it to negotiate high prices (in the form of high "reimbursement rates") for treating insured patients. CHS has long had a reputation for being a high-priced healthcare provider. In a 2013 presentation, CHS's internal strategy group recognized that CHS "has enjoyed years of annual reimbursement rate increases that are premium to the market, with those increases being applied to rates that are also premium to the market."

5. Steering is a method by which insurers offer consumers of healthcare services options to reduce some of their healthcare expenses. Steering typically occurs when an insurer

offers consumers a financial incentive to use a lower-cost provider or lower-cost provider network, in order to lower their healthcare expenses.

6. Steering–and the competition from lower-priced healthcare providers that steering animates–threatens CHS's high prices and revenues. In 2013, CHS's internal strategy group surveyed a dozen of CHS's senior leaders, asking them to list the "biggest risks to CHS revenue streams." Nine of the twelve leaders polled identified the steering of patients away from CHS as one of the biggest risks to CHS's revenues.

7. To protect itself against steering that would induce price competition and potentially require CHS to lower its high prices, CHS has imposed steering restrictions in its contracts with insurers. These restrictions impede insurers from providing financial incentives to patients to encourage them to consider utilizing lower-cost but comparable or higher-quality alternative healthcare providers.

8. Tiered networks are a popular type of steering that insurers use in healthcare markets. Typically, insurers using tiered networks place healthcare providers that offer better value healthcare services (lower cost, higher quality) in top tiers. Patients who use top-tier providers pay lower out-of-pocket costs. For example, for a procedure costing $10,000, a patient might be responsible for paying $3,600 in coinsurance at a lower-tier hospital, but only $1,800 coinsurance to have the same procedure performed at a top-tier hospital.

9. Narrow-network insurance plans are another popular steering tool. Typically, narrow networks consist of a subset of all the healthcare providers that participate in an insurer's conventional network. A consumer who chooses a narrow-network insurance plan typically pays lower premiums, and lower out-of-pocket expenses than a conventional broad-

– 3 –
Case 3:16-cv-00311-RJC-DCK   Document 1   Filed 06/09/16   Page 3 of 14

network insurance plan as long as the consumer is willing to choose from the smaller network of providers for his or her healthcare needs.

10. Providers are motivated to have insurers steer towards them, including through an insurer's narrow or tiered network, because of the increased patient volume that accompanies steering. Thus, the ability of insurers to steer gives providers a powerful incentive to be as efficient as possible, maintain low prices, and offer high quality and innovative services. By doing so, providers induce insurers to steer patient volume to them. Individuals and employers that provide health insurance to their employees benefit tremendously from this because they can lower their healthcare expenses.

11. CHS has gained patient volume from insurers steering towards CHS, and has obtained higher revenues as a result. CHS encourages insurers to steer patients toward itself by offering health insurers modest concessions on its market-power driven, premium prices.

12. However, CHS forbids insurers from allowing CHS's competitors to do the same. CHS prevents insurers from offering tiered networks that feature hospitals that compete with CHS in the top tiers, and prevents insurers from offering narrow networks that include only CHS's competitors. By restricting its competitors from competing for–and benefitting from–steered arrangements, CHS uses its market power to impede insurers from negotiating lower prices with its competitors and offering lower-premium plans.

13. CHS also imposes restrictions in its contracts with insurers that impede insurers from providing truthful information to consumers about the value (cost and quality) of CHS's healthcare services compared to CHS's competitors. CHS's restrictions on insurers' price and quality transparency are an indirect restriction on steering, because they prevent

patients from accessing information that would allow them to make healthcare choices based on available price and quality information.

14. Because CHS's steering restrictions prevent its competitors from attracting more patients through lower prices, CHS's competitors have less incentive to remain lower priced and to continue to become more efficient. As a result, CHS's restrictions reduce the competition that CHS faces in the marketplace. In the instances in which insurers have steered in other markets and in the few instances in which insurers have steered in the Charlotte area despite CHS's restrictions, insurers have reduced health insurance costs for consumers.

15. Four insurers provide coverage to more than 85 percent of the commerically-insured residents of the Charlotte area. They are: Aetna Health of the Carolinas, Inc., Blue Cross Blue Shield of North Carolina, Cigna Healthcare of North Carolina, Inc., and United Healthcare of North Carolina, Inc.

16. CHS maintains and enforces steering restrictions in its contracts with all four of these insurers. In some instances, the contract language prohibits steering outright. For example, CHS secured a contractual obligation from one insurer that it "shall not directly or indirectly steer business away from" CHS. In other instances, the contract language gives CHS the right to terminate its agreement with the insurer if the insurer engages in steering, providing CHS the ability to deny the insurer and its enrollees access to its dominant hospital system unless the steering ends. Although the contractual language that CHS has imposed varies with each insurer, it consistently creates disincentives that deter insurers from providing to their enrollees truthful information about their healthcare options and the benefits of price and quality competition among healthcare providers that the insurers could offer if they had full freedom to steer.

– 5 –
Case 3:16-cv-00311-RJC-DCK   Document 1   Filed 06/09/16   Page 5 of 14

## II. RELEVANT MARKET AND COMPETITIVE EFFECTS

17. The sale of general acute care inpatient hospital services to insurers ("acute inpatient hospital services") is a relevant product market. The market includes sales of such services to insurers' individual, group, fully-insured and self-funded health plans.

18. The relevant market does not include sales of acute inpatient hospital services to government payers, *e.g.*, Medicare (covering the elderly and disabled), Medicaid (covering low-income persons), and TRICARE (covering military personnel and families) because a healthcare provider's negotiations with an insurer are separate from the process used to determine the rates paid by government payers.

19. Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual acute inpatient hospital services are not substitutes for each other (*e.g.*, obstetrics is not a substitute for cardiac services), insurers typically contract for the various individual acute inpatient hospital services as a bundle, and CHS's steering restrictions have an adverse impact on the sale of all acute inpatient hospital services. Therefore, acute inpatient hospital services can be aggregated for analytical convenience.

20. There are no reasonable substitutes or alternatives to acute inpatient hospital services. Consequently, a hypothetical monopolist of acute inpatient hospital services would likely profitably impose a small but significant price increase for those services over a sustained period of time.

21. The relevant geographic market is no larger than the Charlotte area. In this Complaint, the Charlotte area means the Charlotte Combined Statistical Area, as defined by the U.S. Office of Management and Budget, which consists of Cabarrus, Cleveland, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Stanly, and Union counties in North Carolina, and

Chester, Lancaster, and York counties in South Carolina. The Charlotte area has a population of about 2.6 million people.

22. Insurers contract to purchase acute inpatient hospital services from hospitals within the geographic area where their enrollees are likely to seek medical care. Such hospitals are typically close to their enrollees' homes or workplaces. Insurers who seek to sell insurance plans to individuals and employers in the Charlotte area must include Charlotte area hospitals in their provider networks because people who live and work in the Charlotte area strongly prefer to obtain acute inpatient hospital services in the Charlotte area. Charlotte area consumers have little or no willingness to enroll in an insurance plan that provides no network access to hospitals located in the Charlotte area.

23. For these reasons, it is not a viable alternative for insurers that sell health insurance plans to consumers in the Charlotte area to purchase acute inpatient hospital services from providers outside the Charlotte area. Consequently, competition from providers of acute inpatient hospital services located outside the Charlotte area would not likely be sufficient to prevent a hypothetical monopolist provider of acute inpatient hospital services located in the Charlotte area from profitably imposing small but significant price increases for those services over a sustained period of time.

24. An insurer selling health insurance plans to individuals and employers in the Charlotte area must have CHS as a participant in at least some of its provider networks, in order to have a viable health insurance business in the Charlotte area. This gives CHS the ability to impose steering restrictions in its contracts with insurers. When CHS negotiates with insurers for CHS's network participation, CHS typically negotiates the prices and terms of participation for acute inpatient hospital services and other healthcare services, such as

outpatient, ancillary, and physician services, at the same time, including services that are located outside the Charlotte area. As a result, CHS's anticompetitive steering restrictions typically apply to all the negotiated services.

25. CHS's maintenance and enforcement of its steering restrictions lessen competition between CHS and the other providers of acute inpatient hospital services in the Charlotte area that would, in the absence of the restrictions, likely reduce the prices paid for such services by insurers. Thus, the restrictions help to insulate CHS from competition, by limiting the ability of CHS's competitors to win more commercially-insured business by offering lower prices.

26. Insurers want to steer towards lower-cost providers and to offer innovative insurance plans that steer. For years, insurers have tried to negotiate the removal of steering restrictions from their contracts with CHS, but cannot because of CHS's market power. In the absence of the steering restrictions, insurers would likely steer consumers to lower-cost providers more than their current contracts with CHS presently permit.

27. As a result of this reduced competition due to CHS's steering restrictions, individuals and employers in the Charlotte area pay higher prices for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely. Deprived of the option to benefit from choosing more cost-efficient providers, Charlotte area patients incur higher out-of-pocket costs for their healthcare. Insurers are directly harmed by CHS's imposition of steering restrictions.

28. CHS restricts steering to help insulate itself from price competition, which enables CHS to maintain high prices and preserve its dominant position, and not for any procompetitive purpose. Indeed, when asked under oath whether CHS should limit the ability of insurers to offer tiered networks or narrow networks that exclude CHS, Carol Lovin, CHS's Chief Strategy Officer, said that CHS should not. And when asked her view about the possibility of eliminating CHS's steering restrictions, she testified, "Would I personally be okay with getting rid of them? Yes, I would." CHS's steering restrictions do not have any procompetitive effects. CHS can seek to avoid losses of revenues and market share from lower cost competitors by competing to offer lower prices and better value than its competitors, rather than imposing rules on insurers that reduce the benefit to its rivals from competing on price.

### III. JURISDICTION, VENUE AND INTERSTATE COMMERCE

29. The Court has subject-matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4 (as to the claim by the United States); Section 16 of the Clayton Act, 15 U.S.C. § 26 (as to the claim by the State of North Carolina); and 28 U.S.C. §§ 1331, 1337(a), and 1345.

30. The Court has personal jurisdiction over CHS under Section 12 of the Clayton Act, 15 U.S.C. § 22. CHS maintains its principal place of business and transacts business in this District.

31. Venue is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22. CHS transacts business and resides in this District and the events giving rise to the claims occurred in this District.

32. CHS engages in interstate commerce and in activities substantially affecting interstate commerce. CHS provides healthcare services for which employers, insurers, and individual patients remit payments across state lines. CHS also purchases supplies and equipment that are shipped across state lines, and it otherwise participates in interstate commerce.

### IV. CHS'S VIOLATION OF SECTION 1 OF THE SHERMAN ACT

33. Plaintiffs incorporate paragraphs 1 through 32 of this Complaint.

34. CHS has market power in the sale of acute inpatient hospital services in the Charlotte area.

35. CHS has and likely will continue to negotiate and enforce contracts containing steering restrictions with insurers in the Charlotte area. The contracts containing the steering restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

36. These steering restrictions have had, and will likely to continue to have, the following substantial anticompetitive effects in the relevant product and geographic market, among others:

   a. protecting CHS's market power and enabling CHS to maintain at supracompetitive levels the prices of acute inpatient hospital services;

   b. substantially lessening competition among providers in their sale of acute inpatient hospital services;

   c. restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for acute inpatient hospital services;

   d. reducing consumers' incentives to seek acute inpatient hospital services from more cost-effective providers; and

e. depriving insurers and their enrollees of the benefits of a competitive market for their purchase of acute inpatient hospital services.

37. Entry or expansion by other hospitals in the Charlotte area has not counteracted the actual and likely competitive harms resulting from CHS's steering restrictions. And in the future, such entry or expansion is unlikely to be rapid enough and sufficient in scope and scale to counteract these harms to competition. Building a hospital with a strong reputation that is capable of attracting physicians and patients is difficult, time-consuming, and expensive. Additionally, new facilities and programs, and typically the expansion of existing facilities and programs, are subject to lengthy licensing requirements, and in North Carolina, to certificate-of-need laws.

38. CHS did not devise its strategy of using steering restrictions for any procompetitive purpose. Nor do the steering restrictions have any procompetitive effects. Any arguable benefits of CHS's steering restrictions are outweighed by their actual and likely anticompetitive effects.

39. The challenged steering restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## V. REQUEST FOR RELIEF

40. The United States and the State of North Carolina request that the Court:

a. adjudge that all of the steering restrictions in the contracts between CHS and any insurer violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

b. enjoin CHS, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts an insurer from engaging, or attempting to engage, in steering towards any healthcare provider;

c. enjoin CHS from retaliating, or threatening to retaliate, against any insurer for engaging or attempting to engage in steering; and

d. award Plaintiffs their costs in this action and such other relief as the Court may deem just and proper.

Dated: June 9, 2016

Respectfully Submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**:

| | |
|---|---|
| *s/Renata B. Hesse* <br> RENATA B. HESSE <br> Principal Deputy Assistant Attorney General <br> for Antitrust <br><br> DAVID I. GELFAND <br> Deputy Assistant Attorney General <br><br> PATRICIA A. BRINK <br> Director of Civil Enforcement <br><br> PETER J. MUCCHETTI <br> Chief, Litigation I | *s/Paul Torzilli* <br> PAUL TORZILLI <br> KARL D. KNUTSEN <br> RICHARD MARTIN <br> JOHN R. READ <br> Antitrust Division <br> U.S. Department of Justice <br> 450 Fifth Street, N.W., Suite 4100 <br> Washington, D.C. 20530 <br> (202) 514-8349 (phone) <br> (202) 514-7308 (fax) <br> Paul.Torzilli@usdoj.gov |

JILL WESTMORELAND ROSE
United States Attorney

*s/Paul B. Taylor*
PAUL B. TAYLOR
Assistant United States Attorney
Chief, Civil Division
N.C. Bar Number 10067
Room 233, U.S. Courthouse
100 Otis Street
Asheville, NC 28801-2611
 (828) 271-4661(phone)
paul.taylor@usdoj.gov

**FOR PLAINTIFF THE STATE OF NORTH CAROLINA**:

ROY COOPER
Attorney General of North Carolina

*s/K.D. Sturgis*
K.D. STURGIS
Special Deputy Attorney General
North Carolina Department of Justice
N.C. Bar Number 9486
P.O. Box 629
Raleigh, NC 27602
Tel. 919-716-6011
Fax 919-716-6050
ksturgis@ncdoj.gov