UNITED STATES OF AMERICA and the
STATE OF NORTH CAROLINA,

Plaintiffs,

v.

THE CHARLOTTE-MECKLENBURG
HOSPITAL AUTHORITY d/b/a
CAROLINAS HEALTHCARE SYSTEM,

Defendant.

**DEFENDANT'S MEMORANDUM IN
SUPPORT OF MOTION FOR
JUDGMENT ON THE PLEADINGS**
**Fed.R.Civ.P. Rule 12(c)**

## Nature of Proceeding

The United States of America and the State of North Carolina ("the governments" or "the Plaintiffs"), effectively acting on behalf of four insurance companies which they contend control at least 85 percent of Charlotte's commercial health insurance market (Complaint, ¶15),[1] filed this lawsuit for equitable relief complaining that these insurance companies are the victims of the market power of the defendant ("the Hospital Authority"), a community-based and not-for-profit self-sustaining public hospital system that is dwarfed in comparison to these four insurance companies.[2]

---

[1] These are: United Healthcare of North Carolina, Inc., an affiliate of UnitedHealth Group, a for-profit company and the single largest healthcare company in the United States, which had gross revenues of $157.1 billion in 2015; Aetna Health of the Carolinas, Inc., an affiliate of Aetna, a for-profit company with gross revenues of $60.3 billion in 2015; Cigna Healthcare of North Carolina, Inc., an affiliate of Cigna, a for-profit company with gross revenues of $37.9 billion in 2015; and Blue Cross Blue Shield of North Carolina, the insurer covering the most commercial lives in North Carolina and in the Charlotte area, with $8.2 billion in gross revenues in 2015. Answer, ¶15, Exhibit 4.

[2] The Hospital Authority had net revenues of $5.4 billion in 2015 in its Primary Enterprise of owned hospitals and employed professionals. Answer, ¶2, Exhibit 1. By comparison, this figure

The governments' claims are based on the novel theory that provisions negotiated between sophisticated insurance companies and the Hospital Authority that permit both parties to realize the benefits of the bargain they have struck constitute an unreasonable restraint of trade for inpatient healthcare services in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. In reality, however, the provisions facilitate the Hospital Authority's ability to extend lower prices by helping to assure access to a larger patient population that justifies such pricing. Provisions of this nature, which the Complaint refers to as "steering restrictions," have never been challenged by the governments in the healthcare context. In fact, "steering restrictions" have only been challenged once before by the government, in a pending suit against American Express involving the credit card industry. *United States v. Am. Exp. Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015). The case has been argued before the Second Circuit, and a decision is pending.[3]

The theory of this Complaint is not just unprecedented; it is inadequate. The Complaint fails to sufficiently allege actual competitive harm to the marketplace. What the Complaint does allege constitutes nothing more than procompetitive activity or conjecture and supposition. Dismissal of this Complaint as pleaded is thus warranted. *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir, 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570, 127 S.Ct. 1955, 1974 (2007).

---

represents approximately two percent of the combined gross revenues of $258 billion for these four insurance companies.

[3] Although an injunction was issued by the District Court following trial, the Second Circuit lifted that injunction the day after hearing the parties' oral arguments. *United States v. Am. Exp. Co.*, No. 15-1672, Dkt. No. 332 (2d Cir. Dec. 18, 2015).

## Factual Background

On June 9, 2016, the Plaintiffs filed a 40-paragraph Complaint, alleging that the Hospital Authority has violated Section 1 of the Sherman Act, 15 U.S.C. §1, based on portions of its negotiated agreements with each of these four insurance carriers. The Complaint begins with the premise that by virtue of the size and scope of the Hospital Authority in the Charlotte area, it has "market power" and can dictate terms to the four largest insurance companies doing business in the area. Complaint, ¶¶ 2,3.[4] As a result of this alleged market power, the Plaintiffs claimed that the Hospital Authority is able to charge "premium" prices. Complaint, ¶4. The Complaint further alleges that the Hospital Authority has imposed restrictions on "steering" in its contracts with insurers -- that is, restrictions that "impede" these insurers from providing financial incentives to patients "to encourage them to consider utilizing lower-cost" providers. Complaint, ¶7. According to the Complaint, hospital systems seek to have insurers "steer" patients to them and steerage creates "a powerful incentive to be as efficient as possible." This efficiency, in turn, "can lower healthcare expenses." Complaint, ¶10.

According to the Complaint, the Hospital Authority "forbids" insurers from allowing other hospital systems to steer patients to them, resulting in the Hospital Authority facing less competition. Complaint, ¶ 12, 14. However, the Complaint is internally inconsistent: While the Complaint alleges that the Hospital Authority "forbids" and "prevents" insurance companies from steering to other hospital systems, it nonetheless concedes that insurance companies do steer to other local hospital systems (which presumably have steering restrictions of their own). Complaint, ¶14.

---

[4] To illustrate its size, the governments alleged that the Hospital Authority had $8.7 billion in revenues in 2014. Complaint, ¶2. In fact, in the Charlotte area (which is the central focus of the governments' Complaint), the Hospital Authority's revenues for 2014 were less than $3.3 billion. Answer, ¶2, Exhibit 1.

The central premise of the Complaint is that the "maintenance and enforcement of . . . steering restrictions lessen competition . . . in the Charlotte area that would, in the absence of the restrictions, likely reduce the prices paid for such services by insurers," and that "Charlotte area patients incur higher out of pocket costs for their healthcare." Complaint, ¶¶25, 27. The Complaint then alleges, based solely on selective quotes from one employee of the Hospital Authority, that there is no procompetitive justification for such restrictions and that, in her personal opinion, she does not care if they are removed. Complaint, ¶28.

The Complaint is notable for what it does not allege. While the Complaint claims that the Hospital Authority imposes steering restrictions, it fails to allege a single instance in which an insurer has asked that these terms be excluded. The Complaint does not allege any instance in which the Hospital Authority has refused to eliminate these terms during a negotiation. The Complaint does not allege that the Hospital Authority has ever refused to negotiate or enter into a contract with an insurer because it refused to agree to these terms. While the Complaint claims that the insurance companies could potentially pay less but for these provisions, there is no specific allegation that patients would actually derive some economic benefit from their elimination -- that is, that insurance companies would actually secure lower rates and pass along savings to their customers, as opposed to simply applying them to their bottom line. Critically, the Complaint, while alleging that the Hospital Authority's prices are "premium," fails to allege that these provisions have **caused** the "premium" prices. The Complaint also fails to allege that the prices charged by the Hospital Authority are a function of market power rather than its ability to offer a broader range and depth of services or better quality or access to such services.

Today, the Hospital Authority filed its Answer. In its Answer, the Hospital Authority appended relevant portions of its agreement with Blue Cross Blue Shield of North Carolina

(BCBS-NC), the largest commercial insurance company in both North Carolina and the Charlotte area. Answer, ¶16, Exhibit 5. Contrary to the allegations of the Complaint, the agreement with BCBS-NC does not "prohibit" or "forbid" steering.[5] Indeed, it is undisputed that BCBS-NC has established a "narrow network" in the Charlotte area that features one of the Hospital Authority's strongest competitors, Novant, and excludes the Hospital Authority. The pleadings thus reveal that the largest commercial insurer serving the Charlotte area can direct - - and indeed has directed - - its members to providers as it sees fit. In addition, the Answer provides a more complete context for the statements attributed to one of the Hospital Authority's employees, revealing that she does not negotiate the Hospital Authority's insurance contracts, has no managerial responsibility for that operation, and, in fact, had never read any of the Hospital Authority's contracts before she was asked to give her personal opinion on the provisions at issue. Answer, ¶28, Exhibit 7.

Believing that the Plaintiffs failed to plead sufficient facts to demonstrate that there has been actual competitive harm - - as opposed to theoretical supposition - - resulting from the alleged steering restrictions, the Hospital Authority has moved for Judgment on the Pleadings under Fed.R.Civ.P. Rule 12(c).

### Question Presented:

Does a Complaint Under Section 1 of the Sherman Act Fail When It Is Based on a Novel Theory that Provisions of Agreements Negotiated by Large and Sophisticated Companies are Anticompetitive When Those Provisions Do Not

---

[5] The agreement does provide that if either party -- BCBS-NC or the Hospital Authority -- engages in particular business practices that might have a material impact on the economics of the agreement above an agreed-upon threshold, the parties will meet to negotiate the net impact of the changed circumstances on reimbursement rates going forward. BCBS-NC's development of narrow and tiered network products -- those steering devices that are central to the Complaint -- is *not* among the business practices that would factor into the material impact determination. *See* Answer, ¶16, Exhibit 5.

Bar Access to the Market and Where There are Insufficient Allegations of Actual Competitive Harm?

## **Summary of Argument**

To prevail in this case, the governments must show that the provisions at issue have caused actual competitive harm in the Charlotte area. To do so, the Plaintiffs must allege with specificity either (1) the direct competitive harm that has actually occurred and been caused by the provisions in question; or (2) that the Hospital Authority possesses such significant market power that it is able to impose these provisions on unwilling buyers with specific anticompetitive effects, that is, to maintain its market power in order to raise prices or reduce output.

The Complaint fails to do either. Rather, the Complaint strings together a series of theoretical suppositions concerning the potential effect of these clauses, surrounded by conclusory allegations. While the Complaint makes the conclusory allegation that the Hospital Authority has market power, nowhere does it specifically allege that the steering restrictions were imposed by the Hospital Authority against the will of three of the largest commercial insurers in the country.[6] Mere assertions that the Hospital Authority's prices are "high," "supracompetitive," or at a "premium" are not enough. Plaintiffs must allege with specificity how such prices are a direct result of the steering provisions rather than market forces such as superior quality, more convenient access, or a broader range of service offerings.

As the Hospital Authority's agreement with BCBS-NC shows, Plaintiffs' claim that the Hospital Authority imposes anti-steering provisions on the market as a whole is off the mark. Moreover, each of the contracts at issue was the product of intense and lengthy negotiations with

---

[6] In fact, one of the largest insurance companies recently took measures that would suggest that it does not even need the Hospital Authority in its provider network: In 2015, United Healthcare permitted its contracts with the Hospital Authority to expire, relegating the Hospital Authority to out-of-network status for approximately two months. Answer, ¶24, Exhibit 6. This event is further proof that the Hospital Authority lacks the market power the governments allege.

powerful insurance companies that have immense resources at their disposal (indeed, far more than the Hospital Authority). Before the Plaintiffs are permitted to embark on extensive discovery - - with the ultimate design of rewriting these contracts for the benefit of those insurance companies - - they must allege specific facts demonstrating the plausibility of their novel theory of law. This they have not done.

## **Argument**

### *Standard of Review*

To survive a motion for judgment on the pleadings, a plaintiff must allege "enough facts to state a claim to relief that is *plausible* on its face." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570, 127 S.Ct. 1955, 1974 (2007) (emphasis in original). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1974. In making this determination, the Court assumes the Complaint's well-pleaded facts are true and draws all reasonable inferences from pleadings in the plaintiff's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

In assessing the adequacy of the Complaint in light of the pleadings, this Court must engage in a "two-pronged" approach under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). First, this Court must identify those allegations in the Complaint that are merely legal conclusions, for conclusory allegations "are not entitled to the assumption of truth." 556 U.S. at 664. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (the Court need not accept as true those factual allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). Put simply, plaintiff has the burden of pleading "more than a sheer possibility that a defendant acted unlawfully." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). While

"hyper-technical" pleadings of prior eras are not required, the Plaintiff must make more than "naked assertions of wrongdoing" without any "factual enhancement." *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1955. As the Supreme Court explained in *Iqbal*, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Second, once a court has identified allegations that are merely conclusory, *Iqbal* requires that the court review the remaining allegations in the light of "[judicial] experience and common sense" to determine whether a plausible case for relief has been shown in the complaint. 556 U.S. at 664. While "plausible" does not need to rise to the level of "probable," it requires more than the "possibility" that a claim exists. 556 U.S. at 669.

Significantly, *Twombly* was a complaint dealing with an allegedly unlawful agreement in restraint of trade. Since the assertion of an unlawful agreement was a "legal conclusion," the Court was not entitled to construe the assertion as true. Rather, the Court focused on the non-conclusory factual allegations of the Complaint to determine whether it was sufficient to demonstrate a plausible claim of conspiracy. Even though the Complaint alleged conduct consistent with an unlawful conspiracy in restraint of trade, it was nonetheless dismissed as insufficient because it failed to plead facts that demonstrated that the conduct was also not consistent with free-market behavior.

In making this two-pronged inquiry, the Court can consider any exhibits attached to either the Answer or the Complaint. *Eagle Nation, Inc. v. Mkt. Force, Inc.*, 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001); *see Mendehall v. Hanesbrands, Inc.*, 856 F. Supp. 2d 717, 724 (M.D.N.C. 2012) ("documents attached to the Answer are part of the pleadings for Rule 12(c) purposes . . . if the documents are central to the Plaintiff's claim and the authenticity is not challenged");

*see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016) (same).

Allegations that represent unwarranted inferences, unreasonable conclusions, arguments, or mere legal conclusions, need not be accepted as true. *Blankenship v. Manchin,* 471 F.3d 523, 529 (4th Cir. 2006) ("We must accept the allegations in the complaint . . . unless they . . . contradict matters properly subject to judicial notice or by exhibit."); *Veney*, 293 F.3d at 730. In addition, and as this Court has previously noted, in the context of "a Rule 12(c) motion, the court may consider the answer as well." *Massey v. Ojaniit*, No. 3:11-CV-477-RJC, 2013 WL 1320404, at *7 (W.D.N.C. March 29, 2013) (dismissing complaint based upon analysis of exhibits attached to answer under Rule 12(c)) *affirmed* 759 F.2d 343 (4th Cir. 2014). Thus, as this Court has held, "the applicable test on a motion for judgment on the pleadings is whether, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law." *Id.* (reversing refusal of Magistrate Judge to dismiss and dismissing Complaint under Fed.R.Civ.P. 12(c)).

## I.     *The Complaint Challenges Provisions of Insurance Contracts that are Designed to Secure the Economic Benefit of the Contract for Both Parties*

The Complaint challenges a variety of selected provisions in highly intricate contracts between the Hospital Authority and insurers, which have existed, in some cases, for more than a decade. *See* Complaint ¶24 (acknowledging that the challenged provisions are part of the Hospital Authority's "negotiat[ions] with insurers"). Though the provisions vary in significant respects by virtue of such negotiations, they serve a common purpose: to preserve the benefit of the bargain for the Hospital Authority when it extends lower prices to the insurers.

The Hospital Authority extends significant discounts to insurance companies in order to gain in-network status. By participating in an insurance company's network, the Hospital Authority is effectively assured of serving a substantial portion of the insurer's members. *See*

Complaint ¶11 (explaining that the Hospital Authority offers insurers "concessions on its . . . prices" in exchange for patient volume).  Patient volume is critical to the Hospital Authority (and any other full-service health system) because of high fixed costs in the form of buildings, equipment and employees and because it operates many of its facilities around-the-clock.  By serving a larger patient population, the Hospital Authority can achieve economies of scale and can effectively improve quality and lower its costs of providing services.  *See United States v. Carilion Health Sys.*, 707 F. Supp. 840, 845 (W.D. Va.), *aff'd*, 892 F.2d 1042 (4th Cir. 1989) ("Hospitals have high fixed costs, and their financial health depends on high occupancy.").

As part of the contract negotiation process, the Hospital Authority makes projections about the patient population it is likely to serve and the range of services likely to be provided under a given contract.  The magnitude of the overall price discount that the Hospital Authority offers an insurer is based, in part, on such projections.  Generally, insurance companies with larger memberships tend to receive deeper overall discounts.

Once the Hospital Authority secures in-network status, it competes vigorously with other health systems to attract the insurer's members.  It does so by, among other things, offering a broader range of services than its competitors and making continual capital investments in clinical programs and technology.  Absent contractual protections, an insurer could unilaterally destroy the value of the contract by selectively steering its members away from the Hospital Authority after both parties have agreed to the discounted rates.  In that scenario, the insurer would receive the full benefit of the overall discount while the Hospital Authority would likely derive insufficient revenue from the contract to support or expand its clinical programs and outreach to the community as a whole.  Such a scenario would be financially disastrous for the

Hospital Authority and, ultimately, harmful to all the patients the Hospital Authority serves, including those who use its facilities as the safety net healthcare provider in the community.

To mitigate this risk, the Hospital Authority has negotiated provisions with the large insurers to deter the selective steering of patients away from it once a contract has been executed. Without some modicum of contractual protection, the Hospital Authority would have little incentive to offer the overall discounted prices that insurance companies have come to expect. As such, the provisions in question - - which the governments flatly characterize as anticompetitive - - are, in fact, essential to price competition. Indeed, as recently explained by a former chief antitrust economist for the Department of Justice, these provisions serve to undergird the essential economics of the bargain, for "the provider needs the referrals from one service to the other. If you take away broken legs, then somehow that impacts referrals into more fancy orthopedic services. The provider needs scale in order to keep average costs down. And if you take away some part of the business, then the rest of the business has to cover that same set of fixed costs." Fed. Trade Comm'n & U.S. Dep't of Justice, Examining Health Care Competition, at 34, *available at* https://www.ftc.gov/system/files/documents/public_events/618591/transcript-day1.pdf. And, as explained by another expert panelist at the government-sponsored workshop on healthcare competition:

> …[A]s a provider going into [a] narrow network, … let's say I'm willing to drop my rates, but I'm anticipating a certain increase in volume. I probably want to be sure that there won't be other members of the network who, unbeknownst to me, are getting incentives to drive patients who have signed up for that network to get care there that's going to throw off my rate and volume projections. **So this is an area, perhaps, where a surgical use of anti-steering or prevention of carve-outs could actually be pro-competitive, in the sense of enticing a provider to come into a**

> **narrow network, accept a certain cut in rates, and have some validity to their volume projections.**

*Id.* at 37-38 (emphasis added).

## II. The Complaint Fails to Allege Facts (as Opposed to Conclusory or Theoretical Statements) that Demonstrate Actual Competitive Harm

The fundamental problem with the Complaint is that it presents a theory in search of actual competitive harm.[7]  Indeed, the Complaint is unable to articulate the precise economic harm that these provisions have actually caused, choosing instead to rely upon a series of allegations of theoretical harm that might have occurred.  The Complaint, for example, claims that these clauses could "impede" the introduction of other products which might have lower costs, products which the insurance companies could use to "encourage" its customers to seek cheaper care with fewer options.  Complaint, ¶7.  The Complaint further claims that employers, if presented with additional options, could offer these options or accept them - - but there is no allegation that this would happen or that lower prices would ensue or that, absent these offerings, these restrictions have caused higher prices.[8]

---

[7] Indeed, in April 2012, the Department of Justice's chief antitrust economist conceded that in the area of health care,  "[t]here is no academic work to my knowledge that focuses on the welfare impact of CRRs [contracts that reference rivals] that restrict the networks insurers or providers can create.").  Fiona Scott-Morton, Deputy Assistant Att'y Gen., Remarks at Georgetown Univ. Law Ctr. Antitrust Seminar (Apr. 5, 2012), *available at* https://www.justice.gov/atr/speech/contracts-reference-rivals.  Others have found that these provisions cause no harm.  *See, e.g.*, Jonathan M. Jacobson & Daniel P. Weick, *Contracts That Reference Rivals as an Antitrust Category*, THE ANTITRUST SOURCE (Apr. 2012) ("In health care, a provider's 'no steering' clause does not prevent the payer from negotiating whatever reimbursement rates with the provider it may choose; does not prevent the insurer from bargaining to pay lower (or higher) rates to other providers; and does not prevent the provider from negotiating different rates with other insurers.").

[8] The Complaint does not, and cannot, allege that the steering restrictions prevent or impede in any way employers from contracting directly with health systems on behalf of their employees and dependents.

If the provisions at issue caused marketwide harm, one would expect the Complaint to allege the usual indicia of such harm. It does not. There are no allegations, for example, that other hospital systems serving patients in the Charlotte area have been marginalized as competitors or are suffering financially. Nor are there allegations that the quality or output of care provided in the Charlotte area has been diminished by such restrictions. There are no allegations that competitors of the Hospital Authority are curtailing their operations or investments as a result of steering restrictions. In short, the Complaint offers no discrete, factual allegations of competitive harm directly attributable to the provisions in question.

**Vertical Restraints and the Rule of Reason**

Section 1 of the Sherman Act "only outlaws restraints that are unreasonably restrictive of competitive conditions." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002); *see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (same). To establish a violation of Section 1, therefore, the Government must show that the restraint at issue is "unreasonable, *i.e.*, [that] its anticompetitive effects outweigh its procompetitive effects." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341 (1990); *see Cont'l Airlines*, 277 F.3d at 508 ("a plaintiff must show that the net effect of a challenged restraint is harmful to competition").

While certain restraints, such as "horizontal" price fixing (i.e., price-fixing between competitors), are so inherently anticompetitive as to be deemed illegal per se, *see Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 345-47, the prevailing standard for adjudging restraints is the rule of reason. *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 59 (1977); *see also Petrie v. Va. Bd. of Med.*, No. 15-1007, 2016 WL 2851166, at *3 (4th Cir. May 16, 2016) ("the full 'rule of reason'" should be used "for restraints whose net impact on

competition is particularly difficult to determine.").  Here, the challenged restraint is part of a "vertical" agreement between a supplier (the Hospital Authority) and a buyer (an insurance company) related to purchasing inpatient services.  As such, it clearly falls within the rule of reason.  *See GTE Sylvania*, 433 U.S. at 57-58 ("[Vertical] restrictions, in varying forms, are widely used in our free market economy. As indicated above, there is substantial scholarly and judicial authority supporting their economic utility. There is relatively little authority to the contrary."); *United States v. Am. Exp. Co.,* 21 F. Supp. 3d 187, 194 (E.D.N.Y. 2014) ("All parties agree that Amex's anti-steering rules constitute a vertical agreement between Defendants and participating merchants."); *see also Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 888 (2007) ("Our recent cases formulate antitrust principles in accordance with the appreciated differences in economic effect between vertical and horizontal agreements.").

To prevail under the rule of reason, Plaintiffs "must have sufficient evidence to show **actual** anticompetitive effects within [the relevant] markets."  *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 575 (W.D. Va. 2000) (emphasis supplied) (internal citation omitted); *see Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) ("To prevail, plaintiffs must prove that the [restraint] caused anticompetitive harms which outweighed any procompetitive justification."); *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 684 (4th Cir. 1982) ("under the rule of reason, [a restraint]'s anticompetitive impact must be proven"); *see also Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413, 419 (4th Cir. 2005) (the plaintiff is "required to show harm to competition," i.e. that "[d]efendants' actions reduced the output and quality of radiology services").

In the context of a motion to dismiss, there are only "two avenues" available to Plaintiffs to claim an adverse effect to competition.  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d

90, 96 (2d Cir. 1998) (citations omitted). Plaintiffs can either (1) allege "an actual adverse effect on competition, such as reduced output" or (2) allege an adverse effect indirectly by using market power as "a proxy for adverse effect." *Id.* at 96-97. If relying on indirect evidence, Plaintiffs must allege "a relevant market, facts demonstrating that trade was restrained in that market, and that the defendants played a significant role in restraining trade." *Patel v. Scotland Memorial Hosp.*, 91 F.3d 132 (Table), 1996 WL 383920, at *4 (4th Cir. 1996). Put simply, the governments must either allege *direct evidence* of actual and real competitive harm that resulted from the challenged provisions or it must allege *indirect evidence* consisting of **both** market power **and** the "significant role" the provisions in question play in restraining competition. Plaintiffs have done neither. *First*, they fail to sufficiently allege direct evidence of anticompetitive effects on output, price, or quality. *Second*, the Complaint itself renders implausible the notion that the Hospital Authority had sufficient market power to "impose" anti-steering provisions, and Plaintiffs fail to show that the provisions have played any "significant role in restraining trade." *Patel*, 1996 WL 383920 at *4.

### A. The Complaint Fails to Sufficiently Allege Direct Evidence of Harm

Plaintiffs meet their burden if they allege facts sufficient to prove direct competitive effects, such as a reduction in output below competitive levels or an increase in price above competitive levels. *See Fed. Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986). Yet, the governments fail to sufficiently allege direct competitive effects. The closest they come is to assert that, "CHS's market power is further evidenced by its ability to profitably charge prices to insurers that are higher than competitive levels across a range of services, and to impose on insurers restrictions that reduce competition." Complaint, ¶3.

However, Plaintiffs make no specific factual allegations supporting this conclusory statement. Notably, they do not detail how the provisions in question have led to higher prices, nor do they dismiss the possibility that the higher prices are a function of consumers' perception that the Hospital Authority provides superior quality, service, and access.

The Plaintiffs, moreover, concede that these contracts are separately negotiated, that the alleged steering provisions vary from contract to contract, and that the nature and scope of price concessions are an important element of such negotiations. Complaint, ¶¶ 11, 16, 24. The law is clear that Plaintiffs cannot allege direct effects simply by asserting higher prices: they must explain how the challenged conduct has led to prices that are higher than those which would have existed in the absence of such conduct. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) ("Higher prices alone are not the 'epitome' of anticompetitive harm . . . . Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act."). For example, in *American Express*, the governments asserted that prices had increased as result of the implementation of the provisions. *Am. Exp. Co.,* 21 F. Supp. 3d at 197 ("Plaintiffs cite evidence of the world before the anti-steering rules, when card brands engaged in merchant preference campaigns. . . . Plaintiffs point to credit card preference programs that were prevalent in the 1990s, before American Express resorted to tighter restrictions on merchants."). Here there are no specific allegations as to how prices have actually increased or how output has been reduced from a competitive level as result of the challenged provisions. Nor have the governments alleged - - as was done in *American Express* - - that prices were lower prior to the advent of the steering provisions. The Complaint is devoid of any allegation as to the specific types of insurance products that would have been introduced but for the existence of the provisions in question, the magnitude of savings that consumers would have

received if such products had been introduced, or, even, that consumers would have actually purchased such products as opposed to merely "considering" them. There are only conclusory allegations that competition is reduced and that prices would decrease but for the provisions. *See, e.g.*, Complaint ¶14 ("CHS's competitors have less incentive to remain lower priced"), ¶25 (the provisions "lessen competition . . . that would . . . *likely* reduce the prices paid") (emphasis added), ¶26 ("In the absence of steering provisions, insurers would *likely* steer consumers to lower-cost providers more . . . .") (emphasis added), ¶27 ("reduced competition" causes "higher prices" for "individuals and employers"), ¶36.

**B. The Complaint's Alleged Indirect Evidence of Harm Based on "Market Power" is Insufficient**

If, as in this Complaint, the Plaintiffs are unable to allege direct evidence of competitive harm, they may allege the existence of market power as a proxy for adverse effects. But a mere allegation of market power, without more, is not enough. To establish adverse effects through indirect evidence, Plaintiffs must establish both market power and "the significant role" the challenged provisions have played in restraining competition. *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991).

*1. Many of the allegations in the Complaint are consistent with a lack of market power*

Plaintiffs allege that the Hospital Authority has market power as a result of its "large size, the comprehensive range of healthcare services that it offers, its high market share, and insurers' need to include access to CHS's hospitals . . . in at least some of their provider networks." Complaint, ¶3. This emphasis on the Hospital Authority's size, range of services, and the desire of patients that the Hospital Authority be included in the payers' networks is misplaced: market power cannot be inferred from a high market share if consumer preference stems from a comprehensive range of services, quality or other competitive attributes. *See, e.g.*, *United States*

*v. Eastman Kodak*, 63 F.3d 95, 108 (2d Cir. 1995) (67% market share did not equate to market power where it was based on strong customer loyalty and customers could easily switch in the face of a price increase). The Complaint, however, does nothing to dispel the possibility that the Hospital Authority's prices are indicative of superior value in the form of better quality, a broader and deeper range of specialties and services, advanced technology, or overall access to care. In short, there are no allegations that dismiss the possibility of procompetitive or other explanations for higher prices, if such prices indeed exist.

Moreover, the Plaintiffs' bald assertion of market power cannot be reconciled with factual allegations in the Complaint. The pleadings reveal that the largest insurer in the Charlotte area, BCBS-NC, is not subject to an outright prohibition on steering in its agreement with the Hospital Authority. *See* Answer, ¶16, Exhibit 5. In fact, it is undisputed that BCBS-NC and United Healthcare have established and now operate precisely the type of narrow and/or tiered networks with the Hospital Authority's competitors that the Plaintiffs contend are "forbidden" by the provisions at issue. Answer, ¶14, Exhibit 3.

Other indicia of an exercise of market power are absent from the Complaint. For example, there is no allegation that the Hospital Authority has ever refused to contract with an insurance company that would not agree to a prohibition on steering (and the BCBS-NC contract proves the opposite). There is no allegation that the Hospital Authority has ever terminated a contract over a violation of steering provisions. Nor is it alleged that the Hospital Authority has sought to impose a "one size fits all" provision against steering. In fact, the provisions at issue differ from contract to contract in both their nature and scope. There are no allegations that the Hospital Authority has refused to embrace lower cost, innovative insurance products, such as those offered by Aetna and BCBS-NC. Taken as a whole, these omissions underscore that it is

not plausible that steering provisions were "imposed" through market power as the Complaint alleges, but rather are the result of arms-length negotiations between the Hospital Authority and powerful, sophisticated insurers.

The Complaint alleges that because employers and other consumers insist on having available the comprehensive range of healthcare services offered by the Hospital Authority in the Charlotte area, the Hospital Authority has market power. Complaint, ¶3. In essence, the Plaintiffs allege that the insurers cannot have a successful network without the Hospital Authority and, thus, have no choice but to accede to its demands. This assertion flies in the face of pleadings that reveal that one of the largest insurance companies serving the Charlotte area recently allowed its contract with the Hospital Authority to expire. Answer, ¶24, Exhibit 6. The Complaint itself alleges that four companies control at least 85 percent of the commercial insurance market in the Charlotte area, and the pleadings show that BCBS-NC has no outright prohibitions on steering in its contract. *See* Answer, ¶16, Exhibit 5. It is therefore not plausible that the Hospital Authority possesses market power, so as to "impose" network restrictions on insurers against their will. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 (4th Cir. 2002) ("market power" is the "ability . . . to force a purchaser to do something that he would not do in a competitive market"); *see also Ill. Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 36 (2006) (same); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516 (3d Cir. 1998) ("Market power is defined as the ability to . . . require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.") (internal quotation marks omitted).

   2. *The Complaint fails to adequately allege the "significant role" the provisions play in restraining competition.*

However, even assuming that market power may be inferred from the fact that the Hospital Authority is the overwhelming choice of consumers because of its quality, range of services and providers, "[m]arket power, while necessary to show adverse effect indirectly, alone is insufficient." *Tops Mks., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 97 (2d Cir. 1998); *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129-30 (2d Cir. 1995) ("[A] showing of market power, while necessary to show adverse effect indirectly, is not sufficient."). *See Dickson*, 203 F.3d at 209 (plaintiffs must allege that the restraint "itself affected competition in ways that would not have obtained absent" the restraint). "A plaintiff seeking to use market power as a proxy for adverse effect must show market power, *plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior . . . .*" *Tops Mkts*, 142 F.3d at 97 (emphasis added). *See also* Jacobs *v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (Plaintiffs must make "specific allegations linking market power to harm to competition in that market."); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 596 (7th Cir. 1984) ("[I]f it seems the defendant does have the power to restrain trade substantially, then inquiry proceeds to the question whether the challenged practice was likely . . . to help rather than hurt competition."). Thus, beyond alleging market power, Plaintiffs must allege facts sufficient to show that anti-steering provisions are, on balance, anticompetitive.

When viewing the Complaint as a whole, it is simply not plausible that the provisions in question have had the alleged effect of reducing the incentives of competing providers to offer lower prices. The Complaint does not include any specific, factual allegations as to whether or how such an alleged reduction in incentives has led to an actual increase in prices marketwide. Competitors of the Hospital Authority can and do contract with insurers -- in some instances, to

the exclusion of the Hospital Authority. The Complaint itself alleges that such contracting does in fact occur -- that insurers have reduced costs to consumers by steering to competitors of the Hospital Authority in the Charlotte area. Complaint, ¶ 14. Plaintiffs offer no explanation of how, in light of such initiatives, any provider's incentive to compete on price has been reduced.

Moreover, the Complaint does not allege that the provisions have resulted in substantial competitive foreclosure. It is undisputed that these provisions are not "exclusive" -- that is, they do not bar non-Hospital Authority providers from contracting with insurers. But even if they were, contracts that exclude competitors do not necessarily violate the rule of reason under Section 1 of the Sherman Act. Courts have routinely acknowledged that exclusivity secured through lower prices can be efficiency-enhancing in many respects. *See, e.g., Tampa Elec. Co.*, 365 U.S. at 334-35 (finding that consumer benefits outweighed the potential anticompetitive effects of a 20-year exclusive contract); *Sterling Merchandising, Inc. v. Nestle, S.A*., 656 F.3d 112, 122 (1st Cir. 2011) (finding that exclusive contracts may have contributed to reduction in pricing); *Sewell Plastics v. Coca-Cola Co*., 720 F. Supp. 1196, 1210-14 (W.D.N.C. 1989), *aff'd mem.*, 912 F.2d 463 (4th Cir. 1990) (finding that partial exclusive contracts led to lower prices and increased output). Accordingly, a plaintiff must plead and prove that the arrangement has substantially foreclosed competition and that such harm outweighs the procompetitive benefits of the arrangement. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc*., 199 F. Supp. 2d 362, 387-88 (M.D.N.C. 2002) ("There can be no adverse effect if competition is not foreclosed from a substantial portion of the relevant market.").

The provisions in question pose a much greater challenge for the Plaintiffs in pleading competitive harm: They fall far short of an exclusive arrangement, inasmuch as they do not - - either explicitly or implicitly - - prohibit insurers (or employers) from contracting with non-

Hospital Authority providers. The Complaint, in fact, expressly recognizes that insurers have had occasion to steer patients to competitors of the Hospital Authority. Complaint, ¶14. The contract between the Hospital Authority and BCBS-NC, moreover, provides that BCBS-NC may effectively steer patients to other providers without any remedial consequences so long as such steering does not exceed an annual net revenue loss to the Hospital Authority of a predetermined, negotiated amount; even then, once that amount is realized, the only obligation is for the parties to attempt to address the impact of the change on the economics of their agreement. *See* Answer, ¶16, Exhibit 5.

Perhaps mindful of these deficiencies, the Plaintiffs resort to paraphrasing the testimony of one employee of the Hospital Authority to the effect that she, personally, would "be okay with getting rid of them." Complaint, ¶28. The governments purport to use this testimony as support for the conclusory allegation that the Hospital Authority "restricts steering to help insulate itself from price competition, which enables [it] to maintain high prices and preserve its dominant position." The pleadings, however, show that this employee has no involvement with payor contracting whatsoever and in fact **had never even read the contracts or contract provisions at issue in this case.** Answer, ¶28, Exhibit 7. The employee told the governments these facts repeatedly in her deposition, but the attorney for the United States nonetheless insisted that she give personal opinions on matters in which she was not involved, on matters which she did not oversee, and on contract provisions which she had never read. Answer ¶28, Exhibit 7. In context, her opinion not only does not plausibly establish that the Hospital Authority is imposing terms to insulate itself from competition, but should not even be considered by this court. The fact that the Plaintiffs felt compelled to rely on such testimony suggests that they are desperate to obscure the deficiencies of the Complaint in pleading harm to competition.

## Conclusion

The Complaint presents nothing more than an academic theory that a government economist has espoused on the potential effects of restrictions on patient steering. It does not allege facts on how that theory has actually played out in the marketplace. A conclusory allegation that an agreement "reduces price competition," without more, "is precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*. It provides no basis on which a court could determine *how* harm to competition results from" the agreement. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).

This the 8th day of August, 2016.

/s/ James P. Cooney
James P. Cooney III (N.C. Bar No. 12140)
Debbie W. Harden (N.C. Bar No. 10576)
Mark J. Horoschak (N.C. Bar No. 22816)
Brian Hayles (N.C. Bar No. 33971)
Michael Fischer (N.C. Bar No. 47029)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
E-mail: jcooney@wcsr.com
E-mail: dharden@wcsr.com
E-mail: mhoroschak@wcsr.com
E-mail: bhayles@wcsr.com
E-mail: mfischer@wcsr.com

Hampton Dellinger (N.C. Bar No. 19903)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC 20015
(202) 274-1152 (direct)
hdellinger@bsfllp.com

Richard A. Feinstein*
Nicholas A. Widnell*
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800

Washington DC  20015
rfeinstein@bsfllp.com
nwidnell@bsfllp.com
(202) 895-5243 (Richard Feinstein – direct)
(202) 274-1153 (Nicholas Widnell – direct)

*Attorneys for Defendant The Charlotte-Mecklenburg
Hospital Authority d/b/a Carolinas Healthcare System*

*Subject to Pro Hac Vice Application

<u>**CERTIFICATE OF SERVICE**</u>

     I HEREBY CERTIFY that on this 8th day of August, 2016, the foregoing **Memorandum in support of Motion for Judgment on the Pleadings** was served via the Court's CM/ECF system as follows:

Paul John Torzilli
United States Department of Justice
Antitrust Division
450 5th Street, NW
Washington, DC 20530
Paul.Torzilli@usdoj.gov

Paul B. Taylor
United States Attorney Office
U. S. Courthouse, Room 233
100 Otis Street
Asheville, NC 28801
paul.taylor@usdoj.gov

*Attorneys for the United States of America*

K. D. Sturgis
North Carolina Attorney General's Office
114 W. Edenton Street
Raleigh, NC 27603
ksturgis@ncdoj.gov

*Attorneys for Plaintiff*

                          /s/ James P. Cooney _____
                          James P. Cooney III