UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA and the
STATE OF NORTH CAROLINA,

                        Plaintiffs,

        v.                                              Case No. 3:16-cv-00311-RJC-DCK

THE CHARLOTTE MECKLENBURG
HOSPITAL AUTHORITY, d/b/a
CAROLINAS HEALTHCARE SYSTEM,

                        Defendant.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S RULE 12(c)
MOTION FOR JUDGMENT ON THE PLEADINGS**

        The United States and the State of North Carolina brought this antitrust action to protect

Charlotte healthcare consumers from the higher prices and other anticompetitive harm that result

from Defendant Carolinas Healthcare System's ("CHS") imposition of contractual restrictions on

steering. The contract terms effectively shield CHS–which controls about half of the market for

the sale of general acute care inpatient hospital services in the Charlotte area–from having to

compete on price and quality with its rivals. The Court should deny CHS's motion for judgment

on the pleadings because the Complaint's detailed allegations about the anticompetitive nature

and effects of CHS's contractual provisions more than plausibly state that the restrictions

unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1

## SUMMARY OF THE ARGUMENT

CHS is the dominant hospital system in the Charlotte area and uses its dominance to command higher prices and insulate itself from competition. CHS reduces competition between it and other Charlotte healthcare providers by using contract terms, called "steering restrictions," that deter insurers from offering health plans designed to encourage patients to use lower-priced, higher-quality medical services that CHS's competitors offer. As a result, consumers pay more for medical services. In addition to leading to higher prices, CHS's steering restrictions block consumers from making better-informed choices about which providers to use because the restrictions limit health insurers' ability to share truthful information with consumers about the price and quality of competing hospital services.

In moving for judgment on the pleadings, CHS effectively makes two critical concessions. First, CHS concedes that its contracts restrain trade when it admits that it "has negotiated provisions with the large insurers to deter the selective steering of patients away from it." Def. Br. 11. Second, CHS's brief does not address the allegation that it "imposes restrictions in its contracts with insurers that impede insurers from providing truthful information to consumers about the value (cost and quality) of CHS's healthcare services compared to CHS competitors." Compl. ¶ 13. Thus, even though CHS is more expensive to insurers than rival hospitals, insurers cannot direct patients to cheaper or higher-quality options, or even inform patients of the consequences of choosing the highest-priced option. Consequently, CHS effectively acknowledges that its agreement interferes with the ability of competitive forces to lower prices and improve quality, an ability the Sherman Act protects.

Asserting that its discounts are in exchange for its steering restrictions, CHS urges the Court to balance those supposed discounts against the anticompetitive effects of the restrictions. But, to determine the existence and size of any such supposed discounts attributable to CHS's

2

steering restrictions requires fact and expert discovery. Thus, CHS's own arguments establish that its motion should be denied.

## SUMMARY OF FACTS

CHS generated $8.7 billion in revenues in 2014. Compl. ¶ 2. CHS offers a wide variety of healthcare services, including general acute care inpatient hospital services throughout the Charlotte area. *Id.* ¶¶ 1, 3. In the Complaint, Plaintiffs allege that: (i) CHS has substantial market power, (ii) steering (that is, providing financial incentives and information to consumers) helps insurers lower costs and prices, (iii) CHS's restrictions on steering hurt competition, and (iv) CHS's steering restrictions have no procompetitive effects.

*CHS Has Substantial Market Power*

CHS is the dominant hospital in the relevant market and has substantial market power because it has approximately a 50% share in the market for the sale of general acute care inpatient hospital services to health insurers in the Charlotte area, and each of CHS's competitors has a materially smaller market share than CHS. *Id.* ¶¶ 2, 3. Barriers to entry or expansion make significant changes to this market structure unlikely. *Id.* ¶ 37. These barriers include the need for large capital investments, the significant number of years required to design and construct facilities that meet safety and industry standards, the challenges of hiring and retaining highly skilled employees, and the lengthy process of obtaining the necessary licenses and certificates of need. *Id.*

CHS has exercised its market power by negotiating with health insurers to secure prices (known in the industry as "reimbursement rates") above competitive levels.[1] Compl. ¶¶ 4, 7, 25. CHS acknowledges that its reimbursement rates are above competitive levels: CHS's internal

---

[1] *Cf. Promedica Health Sys. v. FTC*, 749 F.3d 559, 570 (6th Cir. 2014) ("Thus, in this market, the higher a provider's market share, the higher its prices.").

strategy group recognized that CHS "has enjoyed years of annual reimbursement rate increases that are premium to the market, with those increases being applied to rates that are also premium to the market." *Id*. ¶ 4 (quoting CHS document). Notably, a full copy of an exhibit to CHS's Answer suggests that CHS demands rates that are 150% greater than those of its rivals. Pls. Ex. 1.[2]

CHS has bargaining power over health insurers because they need CHS in order to offer attractive health insurance plans. A health insurer in Charlotte that does not include CHS in any plan would not be attractive to many potential customers and is therefore unlikely to have a viable health insurance business in the Charlotte area. Compl. ¶¶ 3, 24.[3]

*Steering Benefits Consumers*

Steering occurs in healthcare markets when insurers identify lower-cost and/or higher-quality providers, and give patients financial incentives to use them, thereby providing consumers with more information and the ability to save money. Compl. ¶ 5. Steering takes a variety of forms. It can include narrow-network plans in which, for a lower premium, a patient may have only the steered providers as in-network choices. *Id*. ¶ 9.[4] Or it can include tiered plans in which a patient pays lower co-payments when he/she uses a provider in the tier with the higher-quality/lower-cost providers.[5] Compl. ¶ 8. Insurers have reduced costs for consumers in

---

[2] As supposed evidentiary support for its motion, CHS provided only the headline of a newspaper article discussing CHS's and United Healthcare's contract negotiations. Ans. at Ex. 6, p. 3. Under the "rule of completeness," Plaintiffs attach the entire article here as Ex. 1. *See Beech Aircraft v. Rainey*, 488 U.S. 153, 171-72 n.14 (1988).

[3] *Cf. ProMedica*, 749 F.3d at 570 (holding that "a network which does not include a hospital provider that services almost half the county's patients in one relevant market . . . would be unattractive to a huge swath of potential members").

[4] Ans. ¶ 9 (Narrow networks typically offer "fewer choices of providers historically in exchange for lower premiums."); *id*. at Ex. 3, p. 4 (Blue Cross sales brochure indicating the customer can choose a "[l]imited network" if you "Want to save on monthly premiums").

[5] Ans. at Ex. 3, p. 6 ("You may choose from either tier, but for the highest quality and the most savings, choose from Tier 1.").

the few instances in which they have steered towards CHS's competitors in the Charlotte area despite CHS's restrictions. *Id*. ¶ 14.

CHS itself engages in steering arrangements with insurers and benefits from those arrangements. CHS has increased its revenues and the volume of patients that it serves by offering price reductions to participants in steered plans. *Id*. ¶ 11. But CHS believes that while it should be able to steer, its competitors should not. Thus, CHS's contracts with insurers restrict them from making similar arrangements with other healthcare providers, including Novant and Caromont, two of CHS's principal competitors. CHS has imposed steering restrictions in its contracts with each of the four principal health insurers operating in Charlotte, which collectively represent 85% of the commercially-insured residents of Charlotte. *Id.* ¶¶ 15-16. While the specific wording varies, CHS's steering restrictions serve "a common purpose," of deterring health insurers from sending patients to CHS's lower-cost competitors. Def. Br. 9-11. These insurers do not want their contracts with CHS to include steering restrictions; instead, they would prefer the freedom to develop arrangements that steer consumers to CHS's lower-priced competitors. Compl. ¶ 26. That the insurers derive large revenues from their national operations does not protect them from CHS's control of the local market.[6]

*CHS's Restrictions on Steering Harm Competition*

CHS's steering restrictions reduce price competition between CHS and its competitors. Compl. ¶¶ 25, 27. These provisions restrict insurers' ability to offer CHS's competitors the opportunity for additional patient volume in exchange for lower prices. Because this lessens the incentives of CHS's competitors to lower their prices, CHS has little need to respond to price-cutting competition that otherwise would put downward pressure on its own premium rates. *Id.*

---

[6] *See Promedica*, 749 F.3d at 570 (holding that merger of two local hospitals would enhance the larger hospital's market power over health insurers "even more").

¶¶ 14, 25. Ultimately, CHS's steering restrictions harm consumers of healthcare services in the Charlotte area because the restrictions deprive consumers of the significant benefits of price competition. *Id.* ¶ 27.

CHS's steering restrictions also impair insurers' efforts to provide accurate information to consumers about how the cost and quality of CHS's healthcare services compare to CHS's competitors. *Id.* ¶ 13. By restricting insurers from sharing such information, CHS impairs patients' ability to make fully-informed decisions about healthcare services for themselves and their families. *Id.*

*CHS's Restrictions Have No Pro-Competitive Effects*

CHS does not use steering restrictions to drive prices down. Instead, CHS uses the restrictions to protect its revenues from lower-priced competition, which CHS's top executives identified as one of the "biggest risks to CHS revenue streams." *Id.* ¶ 6 (quoting CHS document). Moreover, CHS's steering restrictions are not necessary to achieve any strategic vision for the CHS enterprise. CHS's Chief Strategy Officer, Carol Lovin, testified that she would be comfortable eliminating these contract provisions from CHS's contracts. *Id.* ¶ 28.

## APPLICABLE PLEADING STANDARD

In evaluating a Rule 12(c) motion, a court may consider the complaint, the answer, matters of public record whose authenticity is not in dispute, and exhibits attached to the complaint or answer so long as they are "integral to the complaint and authentic." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of a plaintiff's claims or any factual disputes. *Massey*, 759 F.3d at 353.

A complaint must provide a short and plain statement that provides the defendant with notice of the claim being asserted, and supply enough factual matter, taken as true, to suggest a violation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007). The Supreme Court explained in *Twombly* that a complaint is "not require[d] [to include] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In determining whether a complaint alleges a plausible claim, a court must accept as true all well-pled facts and draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). At the pleadings stage, a court may not weigh the anticompetitive effects of a restraint against a claimed justification. *See Robertson v. Sea Pines Real Estate Co*. 679 F.3d 278, 291-92 (4th Cir. 2012).[7]

## ARGUMENT

The Complaint alleges that CHS's steering restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act. Compl. ¶ 39. To state a Section 1 violation, a plaintiff must plead the following elements: (1) a contract or agreement; (2) an unreasonable restraint of trade; and (3) an effect on interstate commerce. *See N. Carolina Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 371 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc). CHS has admitted that Plaintiffs have adequately alleged the first and third elements. *See* Ans. ¶¶ 13, 16, 32. Thus, the only question before the Court is whether the Complaint plausibly alleges that CHS's steering restraints are unreasonable. As detailed below, it plainly does so by alleging that CHS's steering restrictions

---

[7] Throughout its brief, CHS cites cases describing what must be "shown," "demonstrated," "established," or "proven" in response to a summary judgment motion or at trial. *E.g.*, Def. Br. 6, 14, 17, 21. But, "courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage." *SD3, LLC v. Black & Decker Inc.*, 801 F.3d 412, 425 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 2485 (2016).

protect it from the competitive process, stifle the disclosure of accurate information about health care costs, and result in higher prices.

## I. CHS's Steering Restrictions Unreasonably Restrain Trade

CHS asks the Court to apply the "rule of reason" to evaluate CHS's steering restrictions. Def. Br. 13-14. The rule of reason requires Plaintiffs to allege at least one "'anticompetitive effect,' resulting from the agreement in restraint of trade." *Robertson*, 679 F.3d at 290 (some internal quotation marks omitted). Under the rule of reason, Plaintiffs have "two avenues" to allege an anticompetitive effect. *See* Def. Br. 14-15. First, Plaintiffs may allege that the restraint has produced an anticompetitive effect, such as higher prices, reduced output, lower quality, or interference with the competitive process. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998); *see also Oksanen*, 945 F.2d at 709 (4th Cir. 1991) ("[A] detailed inquiry into a firm's market power is not essential when the anticompetitive effects of its practices are obvious."). This is the direct approach to anticompetitive effects. Alternatively, Plaintiffs may allege that CHS possesses market power, and that there are "other grounds to believe that [CHS's] behavior will harm competition marketwide." *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg.*, 61 F.3d 123, 129 (2d Cir. 1995). This is the indirect method. The Complaint contains sufficient allegations on both the direct and indirect methods.

### A. The Complaint Plausibly Alleges that CHS's Steering Restrictions Directly Cause Actual Anticompetitive Harm

Contrary to CHS's claim that Plaintiffs have failed to allege "actual competitive harm – as opposed to theoretical supposition," Def. Br. 5, the Complaint alleges in detail that CHS's steering restrictions interfere with the competitive process, deny consumers access to truthful information, lead to higher raise prices, and restrict healthcare options for patients.

### 1. CHS's Interference with the Competitive Process is Actual Competitive Harm

Courts recognize that protecting the competitive process is a principal objective of the antitrust laws. *See, e.g.*, *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 489 (2d Cir. 2004) ("The antitrust laws . . . safeguard consumers by protecting the competitive process."); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir. 1986) (Posner, J.) ("The purpose of antitrust law, at least as articulated in the modern cases, is to protect the competitive process as a means of promoting economic efficiency.").

Courts also recognize that harm to the competitive process amounts to an anticompetitive effect. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-62 (1986) (holding that "disrupt[ing] the proper functioning of the price-setting mechanism of the market" is an anticompetitive effect); *Dickson v. Microsoft*, 309 F.3d 193, 206 (4th Cir. 2002) ("To have an anticompetitive effect, conduct must harm the competitive process and thereby harm consumers.") (internal citations and quotation marks omitted); *Sullivan v. NFL*, 34 F.3d 1091, 1096-97 (1st Cir. 1994) (defining "anticompetitive effects" as "injury to competition" or "harm to the competitive process") (internal citations and quotation marks omitted).

### a. The Competitive Process is Grounded in Firms Having the Freedom to Steer Consumers

Steering is a normal and important part of competition. Sellers constantly try to steer buyers toward their products. Those efforts can take a variety of forms–such as offering lower prices, additional features, or a greater variety of choices–but they all involve providing buyers with the information they need to make their own decisions about which seller to choose. Buyers reward sellers offering the most compelling products with additional sales and punish those with inferior products with fewer sales. This open and vigorous competition pushes all sellers to improve their offerings to the benefit of consumers.

9

In most markets in the American economy, the individual deciding to buy a product or service is the same one who must pay for it. Healthcare service markets diverge from that standard model. Patients choose the service but do not (typically apart from a co-payment) directly pay for it; the patient's insurance company does that. Health insurers' outlays therefore are determined by the purchasing decisions of their enrollees, who are not sensitive to the differences in providers' prices.

Insurers have the incentive and ability to reduce their costs by steering consumers to lower-cost and higher-quality healthcare providers. When consumers respond to insurer steering, higher-cost providers will likely lose business to lower-cost providers, thus creating incentives for higher-cost providers to lower their costs. Consumers will benefit not only from the financial incentives that insurers use to steer them to low-cost providers, but also from lower premiums, lower out-of-pocket expenses, and (in the case of Charlotte employers who self-fund their employee's healthcare benefits) lower direct costs that are made possible through steering.

These basic economic principles are neither "novel" nor "unprecedented," as CHS claims. Def. Br. 2. To the contrary, a federal district court explicitly relied on these principles in another hospital case: "[w]hen faced with price increases, . . . [t]he primary mechanism by which [health plans] keep prices low is through the 'steering' of patients." *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1129-30 (N.D. Cal. 2001). "Steering has been quite effective in disciplining prices because hospitals are sensitive to declines in volume." *Id.* at 130. "When faced with rising prices, [health plans] can attempt to steer patients to lower cost health care providers and away from the hospital imposing a price increase, thereby pressuring the hospital to eliminate the price increase." *Id.*

10

### b. The Complaint Alleges How CHS's Steering Restrictions Interfere with the Competitive Process

The Complaint alleges that steering can facilitate price and quality competition among healthcare providers, so that consumers can save money and obtain the highest quality heathcare. Some common methods of steering include health plan designs that allow a consumer to pay "lower out-of-pocket costs" for using "top tier" providers that "offer better value healthcare services," and others that allow consumers to pay "lower premiums" in exchange for accessing a narrow network of providers. *Id.* ¶¶ 8-9. Insurers provide these financial incentives to consumers who select these types of plans in order to steer them towards providers that are as "efficient as possible," "maintain low prices, and offer high quality and innovative services." *Id.* ¶ 10. Healthcare providers want to participate in these types of plans because they "increase[ ] patient volume." *Id.*

But CHS's steering restrictions limit the four insurers that cover more than 85% of commercially-insured Charlotte residents from offering, among other things, both "tiered networks that feature hospitals that compete with CHS in the top tiers" and "narrow networks that include only CHS's competitors." *Id.* ¶¶ 12, 15. As a result, "CHS's competitors have less incentive to remain lower priced." *Id.* ¶ 14. Consequently, insurers pay higher prices and Charlotte consumers "incur higher out-of-pocket costs for their healthcare." *Id.* ¶¶ 25, 27.

Another court recently held that steering restrictions "impaired the competitive process" because they "suppress . . . competitors' incentive to offer lower prices . . ., vitiating an important source of downward pressure on Defendants' . . . pricing, and resulting in higher profit-maximizing prices across the [relevant] market." *United States v. Am. Express Co.*, 88 F. Supp.3d 143, 208, 209 (E.D.N.Y. 2015) (appeal pending). The plaintiffs in that case challenged steering restrictions that blocked merchants from steering their customers to lower-cost credit cards.

Similarly, Plaintiffs here challenge steering restrictions that block insurers from steering their customers to use lower-cost health care providers. Despite vigorously maintaining that its steering restrictions were legal, the defendant in *Am. Express Co.*–unlike CHS–never argued that those steering restrictions could not violate the Sherman Act as a matter of law.

Academic research also supports the conclusion that steering lowers prices and improves the quality of healthcare services.[8] Indeed, a scholar who appeared at the same conference that CHS references, Def. Br. 11-12, warned that steering restrictions employed by dominant healthcare providers (including those impeding the implementation of tiered networks) would harm competition.[9]

### c. CHS's Steering Restrictions Resemble Other Judicially-Recognized, Plausibly Anticompetitive Contract Provisions

Courts have recognized that contractual provisions between health insurers and hospitals were plausibly anticompetitive at the pleading stage in antitrust enforcement actions. CHS's steering restrictions resemble the "most favored nation" (MFN) clauses that courts have found capable of violating the antitrust laws. An insurer with a large share in the local market may require a healthcare provider to accept an MFN clause that requires the provider to offer the insurer the lowest prices that the provider offers any insurer.

---

[8] *See, e.g.,* Scanlon, Dennis P., Richard Lindrooth, and Jon B. Christianson, "*Steering Patients to Safer Hospitals? The Effect of a Tiered Hospital Network on Hospital Admissions*" Health Services Research 43:5, Part II (October 2008) (more patients chose safer hospital when insurer allowed to provide financial incentive); McKinsey Center for U.S. Health System Reform, "*Hospital Networks: Evolution of the Configurations on the 2015 Exchanges*" (premiums 15-23% higher for broad-network plans); The Kaiser Family Foundation and Health Research and Educational Trust, "*Employer Health Benefits: 2014 Annual Survey*" (to reduce costs, nationally 19% of employers that offer health benefits have high performance or tiered networks in the most heavily-enrolled plan, identifying providers offering higher quality care and promising financial incentives to use them); Brown, Timothy T. and James C. Robinson. "*Reference Pricing with Endogenous or Exogenous Payment Limits: Impacts on Insurer and Consumer Spending*" Health Economics (2015) (finding lower costs when pension fund steered through use of reference price on joint replacements); McKinsey Center for U.S. Health System Reform, "*Hospital Networks: Updated National View of Configurations on the Exchanges*" (June 2014) (nationally nearly 70% of lowest-price products built around narrow or tiered networks). Copies are attached as Pls. Ex. 2.

[9] *See* February 24, 2015 Workshop Transcript: Examining Healthcare Competition at 20 (remarks of Prof. Paul Ginsburg) (https://www.ftc.gov/system/files/documents/public_events/618591/transcript-day1.pdf).

MFNs can diminish a provider's incentives to cut prices to other insurers because, if it were to do so, it also would have to reduce prices to the insurer with the large market share. For that reason, the United States has sued a number of insurers over MFN clauses.[10] In two of the cases, the court denied the defendant's motion to dismiss, recognizing that this type of contractual provision can impede competition among insurers. *See United States v. Blue Cross Blue Shield of Michigan*, 809 F.Supp.2d 665, 674 (E.D. Mich. 2011) (holding complaint adequately pled "anticompetitive effects as to other health insurers and the cost of health services"); *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 179 (D.R.I. 1996) (emphasizing allegation that MFN clause had "a negative impact on all existing and potential competing plans, and ultimately, the consumer"). Like MFNs, steering restrictions imposed by healthcare providers with market power can harm consumers by dampening the incentives of healthcare competitors to lower prices.

### 2. CHS's Steering Restrictions Deny Consumers Truthful, Comparative Information, Which Constitutes Actual Competitive Harm

The Complaint alleges that CHS's steering restrictions "impede insurers from providing truthful information to consumers about the value (cost and quality) of CHS's healthcare services compared to CHS's competitors." Compl. ¶ 13. By suppressing the availability of such useful comparative information–known in the industry as "transparency tools"–CHS places "an indirect restriction on steering, because [it] prevent[s] patients from accessing information that would allow them to make healthcare choices based on available price and quality information." *Id.* CHS's brief nowhere addresses this disruption of the competitive process. CHS's failure to challenge the adequacy of these allegations is not surprising because Plaintiffs have clearly pled

---

[10] Contrary to CHS's opening assertion in its brief, Plaintiffs did not bring this suit "acting on behalf" of the insurance companies. Def. Br. at 1. Where required to preserve competition, Plaintiffs have sued health insurers, and currently have ongoing suits against four of them. *See* https://www.justice.gov/opa/pr/justice-department-and-state-attorneys-general-sue-block-anthem-s-acquisition-cigna-aetna-s.

a plausible claim that blocking consumers from receiving truthful, comparative information is a Section 1 violation, as the Supreme Court recognized, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986). On this ground alone, the Court can deny CHS's motion.

In *Indiana Federation of Dentists*, the Court condemned a restraint that, like CHS's steering restrictions, prevented dissemination of useful information. The case involved a group of dentists that agreed to deny insurers access to x-rays that the insurers requested to evaluate dental claims. *Id.* at 448-53. Although there was no "proof that [the restraint] resulted in higher prices," the Court reasoned that the restraint harmed competition because it "disrupt[ed] the proper functioning of the price-setting mechanism of the market." *Id*. at 447, 461-62. The Court then unanimously held that harming the competitive process through an effort to "withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified" is an anticompetitive effect. *Id*. at 461-62. Similarly, in *National Society of Prof. Engineers v. United States*, 435 U. S. 679 (1978), the Court condemned a restraint that "prohibit[ed] the submission of any form of price information to a prospective customer" because it "deprive[d] the customer of the ability to utilize and compare prices." *Id.* at 683, 692-93 (internal quotation markets omitted). These Supreme Court decisions demonstrate that CHS's attempt to withhold truthful, comparative information from consumers is anticompetitive.

### 3. CHS's Steering Restrictions Result in Higher Prices and Other Competitive Harm

CHS suggests that only allegations of "a reduction in output *below competitive levels* or an increase in price *above competitive levels*" are sufficient to state a plausible Section 1 claim based on a restraint's direct anticompetitive effects. Def. Br. 15 (emphasis added). But the only case that CHS cited for this proposition holds that a restraint's anticompetitive effects can be

14

shown "even absent proof that it resulted in higher prices," *Ind. Fed'n of Dentists*, 476 U.S. at 462. And the Fourth Circuit recognizes that "[a]ctual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality," without requiring allegations about competitive price or output levels. *Black & Decker*, 801 F.3d at 432-33 (internal quotation marks omitted); *see also Robertson*, 679 F. 3d at 291 (rejecting argument that complaint is deficient for failing to allege the price levels that existed "before, during or after" the agreement at issue).

The Complaint clearly and repeatedly alleges that CHS's steering restrictions force Charlotte consumers to pay higher prices. For instance, it explains that, "in the absence of the restrictions," Charlotte hospitals would "likely reduce the prices paid for [their] services by insurers." Compl. ¶ 25. Charlotte-area patients likewise "incur higher out-of-pocket costs for their healthcare" because of CHS's steering restrictions. *Id*. ¶ 27. The Complaint also alleges that "individuals and employers in the Charlotte area pay higher prices for health insurance coverage" as a result of the restrictions. *Id*. The Complaint further alleges that "in the few instances in which insurers have steered in the Charlotte area despite CHS's restrictions, insurers have reduced health insurance costs for consumers."[11] *Id*. ¶ 14.

In addition to higher prices, the Complaint alleges that CHS's steering provisions cause other actual competitive harm, including restricting competition among Charlotte hospitals, reducing choice among fewer insurance plans, offering fewer price-shopping and other comparison tools, and reducing output. *Id.* ¶ 27. Indeed, CHS's Answer concedes that its own steering efforts with health insurers enhanced output by bringing otherwise uninsured patients

---

[11] The fact that there are currently a small number of health plans offered in the Charlotte area that steer to CHS's competitors does not preclude harm from CHS's steering restrictions. To the contrary, CHS's restrictions have the effect of deterring insurers from providing the amount of steering that consumers demand and would prevail in a market free from CHS's steering restrictions. Compl. ¶ 26.

15

into the commercial health insurance system. Ans. ¶ 11. CHS's prevention of its competitors from offering similar plans that would bring additional uninsured patients into the healthcare system is an anticompetitive restriction on output.

CHS asserts that its steering restrictions allow it "to extend lower prices." Def. Br. 2. However, at the appropriate time, Plaintiffs will present the Court with CHS's internal documents showing the opposite is true: CHS raises prices at the same time it imposes steering restrictions. At this stage, the Complaint's allegations are taken as true and CHS's unfounded assertions should be ignored. In any event, CHS's claim is contrary to the logic behind the health insurers' desire to steer. The insurers' ability to steer–not the insurers' *inability* to steer–is what induces providers like CHS to lower their prices. The court in *Sutter* explained it this way: "When faced with rising prices, [health plans] can attempt to steer patients to lower cost health care providers and away from the hospital imposing a price increase, thereby pressuring the hospital to eliminate the price increase." *Sutter*, 130 F.Supp.2d at 1130. At most, CHS's brief raised a factual dispute about the effect of its steering restrictions on price levels, which requires discovery to resolve.

### 4. CHS's Defense of Its Steering Restrictions Shows That They Harm Competition

CHS attempts to justify its steering restrictions by asserting that they are necessary to secure "the benefit of the bargain" it struck with insurers because, "[a]bsent contractual protections, an insurer could . . . steer[ ] its members away from [CHS]," resulting in "financially disastrous" consequences. Def. Br. 9-11. CHS's attempted justification is both factually and legally flawed.[12]

---

[12] CHS also makes the baseless assertion that "other local hospital systems" "presumably have steering restrictions of their own." Def. Br. at 3. The Court should indulge no such presumption, but rather enable discovery to determine

CHS's attempted justification is factually flawed because, far from preventing financial disaster, CHS's steering restrictions are not needed to achieve CHS's strategy as a healthcare system. CHS's Chief Strategy Officer admitted this very point under oath. *See* Compl. ¶ 28. Contrary to the impression CHS seeks to create, Ms. Lovin is not just a "manager." Ans. ¶ 28. She is an executive vice-president who reports to the CEO of CHS and heads a 300-member Strategic Services organization within CHS. Her responsibilities are first and foremost for the development of strategy. Pls. Ex. 3. But the Court need not decide today how much weight to afford Ms. Lovin's testimony. The allegations are taken as true for purposes of CHS's motion.

As a legal matter, CHS's contention that it needs its steering restrictions to "protect[]" its "[p]atient volume," Def. Br. 10-11, all but concedes that the steering restrictions interfere with competition among healthcare providers to attract patients. After all, CHS's argument assumes that, without the restrictions, patients would have more information about costs and quality and that some of those patients would choose to seek medical services from CHS's competitors. By admitting that the steering restrictions block CHS's competitors from attracting additional patients by offering lower prices and better quality, CHS emphasizes precisely why its steering restrictions violate Section 1. *See Hospital Bldg. Co. v. Trustees of the Rex Hosp.*, 691 F.2d 678, 686 (4th Cir. 1982) (Under Sherman Act, a restraint is "not 'reasonable' if its purpose or effect is only to protect existing health care providers from the competitive threat of potential entrants into or expanders within the same 'market.'").

---

what, if any, other steering restrictions exist in the Charlotte area, beyond what CHS has already conceded in its Answer and Brief.

For decades, the Supreme Court has rejected justifications like the one that CHS proffers here. In *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), the Supreme Court reviewed an NCAA rule that restricted the number of televised college football games. The NCAA attempted to justify the restraint by arguing that it was "necessary to protect live attendance." *Id.* at 116. The Court, however, found a "fundamental reason for rejecting this defense":

> The NCAA's argument . . . is . . . based on . . . a fear that the product will not prove sufficiently attractive to draw live attendance when faced with competition from televised games. At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market. . . . By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act. The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.

*Id.* at 116-17 (footnote, internal quotation marks, and alteration omitted). Just as the NCAA feared that its football games would not attract enough spectators to the stadium if fans were able to watch more games on television, CHS fears that its hospitals would not attract enough patients if insurers offered more plans that encouraged consumers to visit its competitors.

In *Indiana Federation of Dentists*, the Supreme Court also rejected a defense akin to what CHS tries here. In that case, the dental federation tried to defend a "work rule" that prohibited its members from competing over whether to submit dental x-rays requested by insurers by arguing that "if insurance companies are permitted to determine whether they will pay a claim for dental treatment on the basis of x-rays [alone], there is a danger that they will erroneously decline to pay for treatment that is in fact in the interest of the patient. . . ." 476 U.S. at 451, 462-63. The Court, however, held that the dentists' argument was legally flawed:

18

The premise of the argument is that, far from having no effect on the cost of dental services chosen by patients and their insurers, the provision of x-rays will have too great an impact: it will lead to the reduction of costs through the selection of inadequate treatment. . . . The argument is, in essence, that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices. Such an argument amounts to nothing less than a frontal assault on the basic policy of the Sherman Act.

*Id.* at 463 (internal quotation marks omitted). Like the dentists in *Indiana Federation*, CHS appears to suggest that insurers' freedom to provide financial incentives to use lower-cost healthcare providers would have "too great an impact" and that it would "lead to the reduction of costs" through a series of "unwise . . . choices." *Id.* But *Indiana Federation* establishes that such an argument cannot justify CHS's anticompetitive steering restrictions.

At bottom, CHS's argument amounts to a claim that it fears the prospect of competing with other hospitals in a free market. But that view cannot be reconciled with its claim that it offers attractive acute inpatient hospital services. If insurers and consumers receive enough value from CHS to justify its higher prices, *see* Compl. ¶ 4, CHS will continue to thrive without its steering restrictions. If not, the Supreme Court has long foreclosed any defenses based on "[r]uinous competition, financial disaster, evils of price cutting and the like." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940).

**B.    The Complaint Plausibly Alleges That CHS's Steering Restrictions Indirectly Harm Competition**

Even if the Complaint lacked any allegation that the steering restrictions caused actual anticompetitive harm, CHS concedes that its motion must be denied if the Complaint (1) "allege[s] the existence of market power as a proxy for adverse effects"; and  (2) provides other grounds for believing that the steering restraints harm competition. Def. Br. 17. Notwithstanding CHS's contrary claims, the Complaint, in fact, contains plausible allegations on both points.

19

### 1. CHS Possesses Market Power

"In typical cases, market power analysis is straightforward and hinges on whether a company has a large enough market share to control prices in the relevant market."[13] *Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp.*, 748 F.Supp. 344, 355 (M.D.N.C. 1990), *aff'd*, 964 F.2d 335 (4th Cir. 1992), *aff'd sub nom. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (U.S. 1993); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 470 n.15 (1992) ("market power is often inferred from market share").

The Complaint alleges– and CHS does not dispute in its motion–that it "is the dominant hospital system in the Charlotte area, with approximately a 50 percent share of the relevant market." Compl. ¶ 2. Courts have found market power for shares well below 50%. *See, e.g., United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 239-40 (2d Cir. 2003) (market power "jointly and separately" with 47% and 26% market share); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) (market power with 20-49% share). As the Complaint further alleges, other hospitals are unlikely to threaten CHS's dominant market position because there are high barriers to entry and expansion. Compl. ¶ 37.

### 2. CHS's Fact-Bound and Legally Irrelevant Arguments About Market Power Provide No Basis for Dismissing the Complaint

CHS argues that "market power cannot be inferred from a high market share if consumer preference stems from a comprehensive range of services, quality or other competitive attributes." Def. Br. 17. This argument lacks merit because companies that have high market share invariably offer goods or services that consumers prefer. It also relies on a misreading of *United States v. Eastman Kodak*, 63 F.3d 95 (2d Cir. 1995), the sole case that CHS cites for its assertion. *Eastman Kodak* involved a factual dispute over the scope of the relevant geographic

---

[13] For purposes of its motion, CHS does not contest the Complaint's allegation that the relevant market is the sale of general acute care inpatient hospital services in the Charlotte area. Compl. ¶¶ 17, 21.

market. After a nine-day evidentiary hearing, the district court found that the relevant market was world-wide and that Kodak's share of that market was only 36%. In the alternative, the district court held that, even if the relevant market included only the United States, Kodak's 67% market share did not compel a market power finding in light of the other record evidence. *Id.* at 99-100. On appeal, the Second Circuit emphasized that "another fact-finder might have weighed the evidence differently," but deferred to the district court's fact finding because of "empirical evidence" that consumers were "price sensitive." *Id.* at 104, 107-08.

Here, however, CHS's steering restrictions are designed to make patients *insensitive* to the reimbursement rates that CHS obtains from insurers. Additionally, *Eastman Kodak* cannot support CHS's 12(c) motion because the district court's analysis of market power followed a *nine-day* evidentiary hearing.

In an attempt to disprove the Complaint's market-power allegations and avoid the obvious need for discovery and trial, CHS points to its contractual impasse with United Healthcare. Def. Br. at 6, n.6. As evidence of this impasse, CHS submitted only a portion of a document to support its argument. *See* Ans. ¶ 24; *id.* at Ex. 6, at 3. However, the full document implies that United Healthcare broke off negotiations because CHS was insisting "to be paid up to 150 percent more than other hospitals in the Charlotte area for providing the same services." Pls. Ex. 1. CHS's ability to take such a tough bargaining position is consistent with the Complaint's allegations and the definition of market power: the "ability to profitably charge prices to insurers that are higher than competitive levels across a range of services." Compl. ¶ 3; *NCAA*, 468 U.S. at 108 n.38 ("Market power is the ability to raise prices above those that would be charged in a competitive market."). And after a short lapse, United Healthcare was ultimately forced to accept a contract with CHS that had higher prices than those charged by other hospitals,

and also included the steering restrictions that limit the ability of consumers to save money by obtaining care from CHS's lower-cost competitors. *See* Compl. ¶¶ 4, 15, 16.

CHS also submits an excerpt from its contract with Blue Cross Blue Shield of North Carolina ("BCBS-NC") in an attempt to show that "the largest insurer in the Charlotte area . . . is not subject to an *outright* prohibition on steering." Def. Br. 18 (emphasis added). But even CHS's own description admits that CHS has contractually allowed BCBS-NC to steer only "so long as such steering does not exceed an annual net revenue loss" of an amount explicitly identified in the contract. Def. Br. at 22. If steering causes CHS to lose more revenue, the contract provides CHS with an automatic increase of its reimbursement rates to fully offset CHS's lost revenue. Ans. at Ex. 5, p. 11 (under seal). Such a financial penalty significantly diminishes BCBS-NC's incentives to steer more fully and often.

In the end, CHS's anecdotes about United Healthcare and BCBS-NC ultimately serve to bolster the Complaint's allegations that CHS possesses and exercises market power.

> **3.** **In Addition to Market Power, the Complaint Provides Plausible Grounds for Believing CHS's Steering Restrictions Can Harm Competition**

The allegations describing how CHS's steering restrictions interfere with the competitive process, prevent the dissemination of truthful information, raise prices, and reduce choice also provide ample "ground[s] for believing that the challenged behavior could harm competition in the market." *Tops Markets*, 142 F.3d at 97.

CHS contends that these allegations are insufficient because the Complaint does not allege that the steering restrictions "resulted in substantial competitive foreclosure" and because the steering restrictions are supposedly less restrictive than exclusive dealing agreements. Def. Br. 21. But CHS cites no authority to support its assertion that a restraint cannot violate Section 1 unless it forecloses rivals. Even for exclusive dealing contracts, all that is required at the

pleading stage is a set of allegations suggesting that the exclusive contract resulted in anticompetitive effects, with foreclosure being one method to help determine such effects. *See E.I. du Pont de Nemours v. Kolon Indus.*, 637 F.3d 435, 452 (4th Cir. 2011) (reversing dismissal of exclusive dealing claim even though plaintiff "did not allege a specific percentage of market foreclosure"); *McWane, Inc. v. FTC*, 783 F.3d 814, 835–36 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1452 (2016) (foreclosure is not an end in itself but is a "proxy for anticompetitive harm"). Here, Plaintiffs alleged that CHS has imposed its steering restrictions on health insurers representing 85% of the commercially-insured patients in the market, Compl. ¶¶ 15-16, indicating the ongoing harm to competition is likely significant.

## II. Judgment on the Pleadings is Inappropriate Because CHS's Motion Raises a Number of Disputed Factual Issues that Require Factual Discovery

CHS's brief lists a variety of facts it claims the Complaint did not allege. *See, e.g.*, Def. Br. 4, 13, 16, 18-19. This argument conveniently ignores various allegations in the Complaint. For example, CHS claims that the Complaint "fails to allege a single instance in which an insurer has asked" CHS to remove its contractual restraints, when Plaintiffs explicitly alleged that, "[f]or years, insurers have tried to negotiate the removal of steering restrictions from their contracts with CHS, but cannot because of CHS's market power." *Compare* Def. Br. 4 *with* Compl. ¶ 26. CHS also asserts that Plaintiffs "nowhere . . . specifically allege that the steering restrictions were imposed by the Hospital Authority," even though Plaintiffs allege that "CHS has imposed steering restrictions in its contracts with insurers." *Compare* Def. Br. 6, *with* Compl. ¶ 7. In any event, CHS cites no cases suggesting that the facts it claims should have been alleged are necessary to state a plausible Section 1 claim, and the cases cited above demonstrate that the Complaint's detailed factual allegations are more than sufficient state such a claim.

23

More fundamentally, in arguing that the Complaint should have included certain allegations, CHS's brief foreshadows many factual disputes that are likely to arise as this case proceeds. Such disputes include:

- the degree to which steered plans benefit consumers and are less expensive, *compare* Def. Br. at 4 ("[T]here is no specific allegation that patients would actually derive some economic benefit from [steering]."), *with* Compl. ¶ 9 ("A consumer who chooses a narrow-network insurance plan typically pays lower premiums, and lower out-of-pocket expenses than a conventional broad-network insurance plan.");

- the effect of the steering restrictions on other local hospitals, *compare* Def. Br. at 13 (asserting that Plaintiffs make no allegations "that other hospital systems serving patients in the Charlotte area have been marginalized as competitors"), *with* Compl. ¶ 25 (CHS's steering restrictions "limit[] the ability of CHS's competitors to win more commercially-insured business by offering lower prices.");

- the importance to insurers of contracting with CHS, *compare* Def. Br. 6, n.6 ("In fact, one of the largest insurance companies recently took measures that would suggest that it does not even need the Hospital Authority in its provider network."), *with* Compl. ¶ 24 ("An insurer selling health insurance plans to individuals and employers in the Charlotte area must have CHS as a participant in at least some of its provider networks, in order to have a viable health insurance business in the Charlotte area."); and

- the purpose of the steering restrictions and their linkage to CHS' alleged discounts, *compare* Def. Br. 2 ("[T]he provisions facilitate the Hospital Authority's ability to extend lower prices"), *with* Compl. ¶ 28 ("CHS restricts steering to help insulate itself from price competition, which enables CHS to maintain high prices and preserve its dominant position, and not for any procompetitive purpose.").

Only fact and expert discovery will allow for the development of a sufficient evidentiary record for the Court to resolve these factual disputes, and many others that are likely to arise. *See Robertson*, 679 F.3d at 292 (explaining that the "rule of reason inquiry is best conducted with the benefit of discovery"). The Complaint's allegations combined with CHS's Answer leave no room for doubt that this case cannot be resolved on the pleadings. The Court should deny the motion for judgment on the pleadings.

24

Date: August 31, 2016

Respectfully submitted,

FOR PLAINTIFF                                    FOR PLAINTIFF
UNITED STATES OF AMERICA:                        STATE OF NORTH CAROLINA:

_s/John R. Read_                                 ROY COOPER
JOHN R. READ                                     Attorney General of North Carolina
KARL D. KNUTSEN
RICHARD MARTIN                                   _s/K.D. Sturgis_
PAUL TORZILLI                                    K.D. STURGIS
Antitrust Division, U.S. Department of Justice   Special Deputy Attorney General
450 Fifth Street, N.W., Suite 4100               North Carolina Department of Justice
Washington, D.C. 20530                           N.C. Bar Number 9486
(202) 307-0468 (phone)                           P.O. Box 629
John.Read@usdoj.gov                              Raleigh, NC 27602
                                                 Tel. 919-716-6011
                                                 Fax 919-716-6050
JILL WESTMORELAND ROSE                           ksturgis@ncdoj.gov
United States Attorney

_s/Paul B. Taylor_
PAUL B. TAYLOR
Assistant United States Attorney
Chief, Civil Division
N.C. Bar Number 10067
U.S. Courthouse, 100 Otis Street
Rm. 233
Asheville, NC 28801-2611
(828) 271-4661(phone)
Paul.Taylor@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on August 31, 2016, I served the foregoing "Plaintiffs' Opposition to

Defendant's Rule 12(c) Motion for Judgment on the Pleadings" via the Court's CM/ECF system

as follows:

James P. Cooney III
Debbie W. Harden
Mark J. Horoschak
Brian A. Hayles
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4980
E-mail: jcooney@wcsr.com
E-mail: dharden@wcsr.com
E-mail: mhoroschak@wcsr.com
E-mail: bhayles@wcsr.com

Richard A. Feinstein
Nicholas A. Widnell
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC 20015
(202) 274-1152 (direct)
Email: rfeinstein@bsfllp.com
Email: nwidnell@bsfllp.com
*Attorneys for Defendant The Charlotte-Mecklenburg*
*Hospital Authority d/b/a Carolinas Healthcare System*

**/s Paul Torzilli**
Paul Torzilli
