| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF NORTH CAROLINA,<br><br>                    Plaintiffs,<br><br>    v.<br><br>THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a CAROLINAS HEALTHCARE SYSTEM,<br><br>              Defendant. | **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

## Overview and Summary of Argument

The dispute before this Court is a simple one: Does the government[1] have to plead facts in its claim for violations of Section 1 of the Sherman Act that show that the Hospital Authority's agreements with insurance carriers have caused actual harm in the marketplace. The government effectively says that it does not—that theoretical harm to the "competitive process" is sufficient even if it does not allege facts that link the contractual provisions it challenges to actual injury by virtue of foreclosure (i.e., denying a market participant access to a segment of the market that otherwise would be open to it so as to act as a "clog on competition"[2]) in the form of supracompetitive prices, reduced output, or lower quality. In so arguing, the government argues for a lesser standard of liability under Section 1 that NO court has ever adopted in a case

---

[1] Since this case is brought by the government of the United States as well as the government of the State of North Carolina, and since the claims of North Carolina rest entirely on the claims of the United States, both governments will be referred to in the singular as "the government."

[2] *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) (quoting *Standard Oil Co. of California v. U.S.*, 337 U.S. 293, 314 (1949)).

involving "vertical" agreements and, in the process, displays a fundamental misunderstanding of the scope of Section 1.

The government's misunderstanding of Section 1 is best illustrated by what it claims is a "critical concession" by the Hospital Authority: "its contracts restrain trade." (Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings, Doc. No. 25 (hereinafter "Opp.") at 2.) To characterize this truism as a "concession" is nonsensical for the simple reason that *every contract restrains trade. See, e.g.*, *Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."). This fundamental point was discussed at length more than 100 years ago in *Standard Oil v. United States*, 221 U.S. 1 (1911), when the Court wrestled with the fact that, read literally, Section 1 is "broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce . . . and thus caused any act done by any of the enumerate methods anywhere in the whole field of human activity to be illegal." 221 U.S. at 60. *Standard Oil* thus imposed a "standard of reason" on Section 1 "for the purpose of determining whether, in a single case, a particular act had or had not brought about the wrong against which the statute provided." *Id.* Thus, claiming that an agreement restrains trade is simply sophistry; the issue is whether the agreement unreasonably restrains trade in a way barred by Section 1, a point which the courts have made repeatedly over the last century. *See, e.g.*, *Chicago Board of Trade*, 246 U.S. 231, 238 (1918); *National Society of Prof. Engineers v. United States*, 435 U.S. 679, 688 (1978) ("[R]estraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law.").

Because every contract restrains trade and, read literally, Section 1 would outlaw every contract, the courts have crafted standards that create a spectrum of analysis. At one end of the

spectrum are agreements that are *per se* illegal, such as price fixing between competitors ("horizontal agreements").  At the other end are agreements between market participants on different levels of the supply chain, such as buyers and sellers ("vertical agreements").  Vertical agreements almost always have some procompetitive aspect and are therefore examined under a far more lenient standard known as full "rule-of-reason" analysis. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54-55, 59 (1977). Under that standard, anticompetitive effects must be shown by actual evidence of harm and such harm must outweigh any procompetitive benefit from the agreement.

As a matter of law, these agreements are vertical by definition and thus are not anticompetitive on their face—indeed, there is no allegation otherwise in the Complaint.  As such, the government must allege that these particular provisions have caused actual harm in the form of supracompetitive prices or have reduced quality by foreclosing the ability of others to compete in the marketplace, and these allegations must present more than speculation or theory.  Not only has the government failed to make the types of particularized allegations necessary for this type of case, it makes a critical concession to the contrary when it argues that "companies that have high market share invariably offer goods or services that consumers prefer."  (Opp. at 20.)  In other words, the government concedes that higher prices and higher market share are just as likely the result of the offering services that consumers want as they are the result of these contract provisions.  Unless the government can allege with particularity that these contract provisions plausibly caused "higher" prices,[3] the Complaint fails under *Twombly*, for the prices

--------

[3] In this regard, the government repeatedly implies that "premium" prices are necessarily anticompetitive prices.  This is simply incorrect.  As noted by one District Court in granting summary judgment, the fact that prices may be high (or higher than what the Plaintiff believes they should be) is not proof of conduct in violation of the Sherman Act:

"could just as well be" the result of permitted competitive conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

The government, in tacit recognition of the plain deficiencies in its Complaint, resorts to two tactics to avoid dismissal. First, it invokes a nebulous claim that harm "to the competitive process" is sufficient to violate Section 1 in lieu of alleging actual harm from competitive foreclosure in the form of supracompetitive prices, reduced output, or decreased quality. Second, it cites precedent relating to **horizontal** rather than vertical restraints to suggest that it is entitled to a "quick look" standard rather than the comprehensive rule-of-reason analysis. No court—including the court in *American Express*[4] on which the government relies—has ever applied this standard to vertical agreements like the ones challenged in this case.[5]

Thus, the Complaint in this case—absent a fundamental change in law or the creation of a new standard of review—is deficient as a matter of law and should be dismissed because:

- The government has failed to allege facts indicative of actual harm to competition and substitutes for such allegations an economic theory of harm.

- The government relies on cases dealing with horizontal agreements to justify adoption of something other than a comprehensive rule-of-reason analysis applicable to vertical agreements.

---

Plaintiffs have failed to prove the existence of supracompetitive prices. Although Plaintiffs contend that PM's list prices are artificially high . . . Plaintiffs have failed to provide any evidence that PM's prices are supracompetitive. Plaintiffs state simply that PM's prices are higher than necessary and conclude that PM prices must be too high.

*Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 382 (M.D.N.C. 2002); *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA*, 67 Fed. Appx. 810 (4th Cir. 2003).
[4] *United States v. Am. Express Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015) (appeal pending).
[5] The government attempts a third tactic late in its Opposition, claiming that the presence of "factual disputes," render Judgment on the Pleadings inappropriate. This is beside the point because the issue before the Court is not whether the parties will dispute facts, but whether the government has pleaded sufficient facts even to state a viable claim, regardless of whether those facts are in dispute.

- The government fails to address the reality that vertical agreements that foreclose competition (i.e., exclusive agreements) are routinely upheld under the rule of reason and are by definition more restrictive than the agreements at issue.

- The allegations concerning the communication of information fundamentally ignore the actual functioning of the marketplace.

- The government ignores the competitive dynamics of managed care contracting, in general, and the workings of this marketplace, in particular, by contending that these agreements violate Section 1.

## The Government Failed to Allege Actual Harm to Competition and Instead Merely Asserts an Economic Theory of Harm.

The government fails to allege actual harm to competition or consumers caused by the provisions it challenges. Instead, the government advances a *theory* of *possible* harm—a set of qualified claims that fail to plausibly allege actual foreclosure of competitors or actual price increases. What is missing from the Complaint is the allegation of *actual*, rather than possible, harm in the form of supracompetitive prices, decreased output, deterioration in quality as a result of substantial foreclosure of competitors attributable to the restraints at issue in this case. As such, the government has "not nudged [its] claims across the line from *conceivable* to plausible." *Twombly*, 550 U.S. at 570 (emphasis added).

First, the government has not alleged actual harm in the form of foreclosure from which to establish price increases, decrease in output, or deterioration in quality. In fact, "foreclosure" is not even mentioned in the Complaint. (Complaint, Doc. No. 1 (hereinafter "Compl.").) A fair reading of the Complaint confirms that the government consistently offers equivocal allegations and fails to draw a causal connection between the provisions in question and actual harm. For example, the Complaint alleges that the provisions "lessen competition . . . that would, in the absence of the restrictions, _likely_ reduce the prices paid . . . by insurers," (Compl. ¶ 25), because

"the ability of insurers to steer gives providers a powerful incentive to be as efficient as possible." (*Id.* ¶ 10.) Each successive allegation of competitive harm rests on supposition and guess-work:

- "Steering *typically* occurs when an insurer offers consumers a financial incentive to use a lower-cost provider or lower-cost provider network, in order to lower their healthcare expenses." (*Id.* ¶ 5);

- "[T]he ability of insurers to steer gives providers a powerful *incentive* to be as efficient as possible . . . ." (*Id.* ¶ 10);

- "CHS's competitors have less *incentive* to remain lower priced and to become more efficient. As a result, CHS's restrictions reduce the competition that CHS faces in the marketplace." (*Id.* ¶ 14);

- "CHS's maintenance and enforcement of its steering restrictions lessen competition . . . that would, in the absence of the restrictions, *likely* reduce the prices paid . . . by insurers." (*Id.* ¶ 25);

- "In the absence of the steering restrictions, insurers would *likely* steer consumers to lower-cost providers more than their current contracts with CHS presently permit." (*Id.* ¶ 26);

- "Nor do the steering restrictions have any procompetitive effects." (*Id.* ¶ 38.)

As the above excerpts demonstrate, the government alleges what amounts to a *theory* of *possible* harm that *might* flow from the Hospital Authority's restraints. Even accepting the allegations as true, it does not allege that the steering restrictions have resulted in *actual* price increases, *actual* deterioration in output or quality, or *actual* foreclosure of a single competitor.

The closest the Complaint even comes to alleging actual harm is paragraph 27, which appears at first glance to allege higher prices and less consumer choice. But paragraph 27 ties those purported harms to the "result" of "this reduced competition due to CHS's steering restrictions." That "reduced competition" is itself a reference to the theoretical allegations (excerpted above) that competition has *likely* been reduced because of purported changes to *incentives*. Thus, this allegation is effectively the qualified restatement of earlier qualified

statements. The Complaint's "few stray statements" in paragraph 27—which appear at first glance to "speak directly" of actual harm—are "on fair reading . . . merely legal conclusions resting on the prior allegations." *Twombly*, 550 U.S. at 564. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (quoting that language in *Twombly* and rejecting allegations that amounted to "only an opportunity" for illegal conduct); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (quoting the same and rejecting allegations of "only ultimate facts" that did not provide "the necessary evidentiary facts to support" legal conclusions).

Second, the Complaint has not plausibly or specifically alleged *any* substantial foreclosure of competitors attributable to the restraints at issue. Indeed, the government impliedly concedes as much. (Opp. at 22-23.) The Complaint conclusorily alleges that "CHS's maintenance and enforcement of its steering restrictions lessen competition between CHS and other providers," (Compl. ¶ 25), that "CHS's competitors have less incentive to remain lower priced and to continue to become more efficient," (*id.* ¶ 14), and that the restraints "limi[t] the ability of CHS's competitors to win more commercially-insured business by offering lower prices," (*id.* ¶ 25). But the Complaint lacks a single specific allegation that a single competitor has been foreclosed from the market as a result of the restraints at issue. *See R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387-88 (M.D.N.C. 2002), *aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 Fed. App'x 810 (4th Cir. 2003) ("There can be no adverse effect if competition is not foreclosed from a substantial portion of the relevant market.). *See also Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987) ("[T]he plaintiff must show that the opportunities for other traders to enter into or remain in that market must be significantly limited.") (internal quotation marks omitted).

The government does not identify a single case in which an assault on a steering provision survived a motion to dismiss.[6]  Instead, the government attempts to analogize the steering provisions in this case to "most-favored nation" ("MFN") provisions that require a healthcare provider to offer a "favored" insurer the lowest price it contracts for with any other insurer.  MFNs are not equivalent to restrictions on steering.[7]  But to the extent that MFNs are an appropriate analogy, the complaints in the two cases relied upon by the government well illustrate the paltry and insufficient nature of the allegations here.

In *United States v. Blue Cross Blue Shield of Michigan*, the United States' 37-page complaint included a detailed description of allegations establishing actual harm in the form of price increases as well as foreclosure of competitors.  Complaint, Doc. 1, *United States v. Blue Cross Blue Shield of Michigan*, No. 2:10-cv-14155-DPH-MKM (E.D. Mich., Oct. 18, 2010).  The Complaint alleged and explained, for example, *specific instances* in which MFNs had led to actual harm to competition, including foreclosure of competitors:

- "In 2008, Blue Cross entered into a provider agreement with Marquette General Hospital that contained an MFN-plus requiring Marquette General to charge other insurers at least 23% more than it charges Blue Cross – a cost differential that would severely limit a competitor's ability to compete with Blue Cross." *Id.* ¶ 49;

- "Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to enter the market for commercial health insurance in the Upper Peninsula and compete with Blue Cross. Without the Blue Cross MFN-plus, Marquette General would have given Priority a discount that would have allowed Priority to compete with Blue Cross, and Priority would have marketed and provided commercial health insurance in the Upper Peninsula. However, Marquette General told Priority it would not offer Priority rates less than those required by Blue Cross' MFN-plus.  Marquette General

---

[6] There is only one case that has challenged steering provisions—*American Express*—and the court there was not asked to test the sufficiency of the complaint on a motion to dismiss.

[7] For example, and unlike MFNs, steering restrictions do not restrict negotiations regarding price terms that a payor offers to competitors.

accordingly gave Priority a revised offer with significantly higher rates to comply with Blue Cross' MFN-plus." *Id.* ¶ 55;

- "Priority . . . concluded that it could not compete with rates at the Upper Peninsula's principal hospital at the level required by Blue Cross' MFN-plus. Priority therefore declined to contract with Marquette General at the rates required by the MFN, and did not enter the market for commercial health insurance in the Upper Peninsula. As a result, Blue Cross maintained its leading market share in the commercial health insurance market in the central and western Upper Peninsula." *Id.* ¶ 56.

Thus, the *BCBS* complaint contains detailed and specific factual elaboration about how the MFN clauses directly caused actual harm to competition—the kind of factual support missing in this case. *See United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (noting that the complaint sets forth various examples, "such as the Upper Peninsula, Alpena County and the Lansing area" where the use of the provisions raised competitors' costs and directly increased costs to self-insured employers).

Similarly, in *United States v. Delta Dental of Rhode Island*, No. CA 96 113, D. R.I., Feb. 29, 1996, the government alleged instances of actual harm and foreclosure:

- "Identifying Dental Blue PPO as a long-run competitive threat . . . Delta's senior management met on or around December 9, 1993, and agreed to pursue three related tactics: . . . (b) to apply Delta's MFN clause to all dentists who had agreed to join Dental Blue PPO in order to, in the words of Delta's Vice President for Strategic Planning, 'send a strong message to the provider community' . . . ." Compl., ¶ 21.

- "Soon after, Delta implemented its second tactic by informing the Rhode Island dentists, who it knew were participating in the Dental Blue PPO, of its intent to apply its MFN clause . . . . Following up on telephone conversations with many of the dentists, on December 30, 1993 . . . Delta sent letters to these dentists, informing them that their payment levels would be lowered to the amounts that they had agreed to accept from Dental Blue PPO." *Id.* ¶ 23.

- "All of the Rhode Island dentists contacted by Delta disaffiliated from Dental Blue PPO, some of them making clear to Delta at the time that their reason for resigning was Delta's decision to apply its MFN clause." *Id.* ¶ 24.

- "Delta's MFN clause prevented Dental Blue PPO from developing a marketable network of Rhode Island dentists willing to accept fees

substantially below those paid by Delta. By doing so it denied Raytheon employees and their families a meaningful choice of dental coverage through Dental Blue PPO, and the substantial savings that it represented to them." *Id.* ¶ 25.

Here, by contrast, the Complaint fails to specify how the challenged provisions directly caused even a *single* instance of actual harm. The courts, in fact, have repeatedly rejected antitrust claims involving MFNs where competitive harm has not been shown. *See, e.g.*, *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("a policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary."); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), as amended on denial of reh'g (Oct. 13, 1995) (Posner, C.J.) ("Most favored nations' clauses are standard devices by which buyers try to bargain for low prices . . . ."); *see also Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) (Breyer, J.) ("[E]ven if the buyer has monopoly power, an antitrust court . . . will not interfere with a buyer's (nonpredatory) determination of price."). Without plausible allegations of actual anti-competitive effects that support the government's theory of harm, the Complaint cannot survive the standards set forth in *Twombly* and *Iqbal*.

### The Government Relies on Cases Dealing with Horizontal Agreements to Argue for a "Quick Look" Standard that is Not Applicable to Vertical Agreements

The government contends that "the direct approach to anticompetitive effects" permits it to survive a motion to dismiss if it shows "higher prices, reduced output, lower quality, *or interference with the competitive process*." (Opp. at 8 (emphasis added).) To support its claim, the government cites a string of cases involving horizontal restraints where courts have permitted a truncated "quick look" analysis instead of the full rule-of-reason analysis that is otherwise

employed. *See, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (explaining when "quick-look" analysis is appropriate).

In *Cal. Dental,* the Supreme Court catalogued the same "quick-look" cases that the government relies upon in its opposition. However, each case identified invokes horizontal—not vertical—restraints. For example, in *FTC v. Ind. Federation of Dentists,* 476 U.S. 447 (1986), an organization of competing dentists promulgated a policy requiring its members to withhold x-rays from dental insurers in connection with evaluating patients' claims for benefits. *Id.* at 449-51 (1986). The horizontal nature of the conduct was central to the Court's finding that the Federation had violated Section 5 of the Federal Trade Commission Act: "The policy of the Federation with respect to its members' dealings with third-party insurers resembles practices that have been labeled 'group boycotts'; the policy constitutes a concerted refusal to deal on particular terms with patients covered by group dental insurance." *Id.* at 458. Similarly, in *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, the court applied a truncated rule-of-reason analysis to a naked horizontal restraint on price and output. 468 U.S. 85, 109 (1984). The Fourth Circuit has expressly rejected extending these cases to vertical restraints. *R. J. Reynolds*, 199 F. Supp. 2d at 387 (Plaintiffs cite to *Indiana Federation* while contending that the vertical restraint is "anticompetitive even without proof of higher prices or reduced output" but in "cases involving vertical non-price restraints . . . anticompetitive effects must be proven.").

The law is clear that a "quick look" analysis is inappropriate in the context of ***vertical*** restraints. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) (holding that the rule of reason is the appropriate standard by which courts should judge vertical price restraints); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977) ("When

anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason."); *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 287 (4th Cir. 2009) ("[V]ertical price restraints are to be judged according to the rule of reason."). While a bare allegation of an abstract interference with the competitive process might suffice when assaulting a ***horizontal*** restraint, the same is not true with respect to ***vertical*** restraints—and the provisions challenged here are indisputably vertical in nature.[8] To survive a motion to dismiss in this case, therefore, the government must instead show an actual—not theorized—harm caused by the restraint as manifested by price increases, deterioration of quality, reduction in output, or substantial foreclosure.

In the "quick-look" cases, "the anticompetitive impact of a restraint is clear." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002) (analyzing horizontal restraint). In other words, in those cases the courts need not inquire into actual harm because "the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least a quicker) look, in place of a more sedulous one." *N.C. State Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 373-74 (4th Cir. 2013). The abbreviated inquiry rests on the assumption that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," and so therefore "the great likelihood of anticompetitive effects can easily be ascertained." *Cal. Dental*, 526 U.S. at 770.

---

[8] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

By contrast, vertical arrangements such as those in question in this case are generally exempt from the deep suspicion attached to horizontal restraints and, accordingly, are judged by the full rule of reason. *See GTE Sylvania*, 433 U.S. at 59 ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason."); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) ("[v]ertical restraints of trade . . . are evaluated under the rule of reason"); *Acton v. Merle Norman Cosmetics, Inc.*, 1995 WL 441852, at *8 (C.D. Cal. May 16, 1995) ("this Circuit has never approved the use of [the 'quick look'] approach for analyzing a vertical nonprice restraint such as an exclusive dealing arrangement").[9]

Antitrust doctrine recognizes that vertical restraints require a full rule-of-reason analysis because, as the Fourth Circuit has explained, "[v]ertical pricing agreements . . . can often have procompetitive effects." *Valuepest*, 561 F.3d at 287. "Not surprisingly given their procompetitive characteristics, vertical integration and vertical contracts are common and accepted practices in the American economy." *Comcast Cable Commc'ns LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013); *see id.* ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies – and thus reduce prices and lead to better goods and services for consumers."). Under the full rule of reason, the government must plausibly allege actual harm in the form of higher prices, lower output, deteriorated quality, or substantial foreclosure. As the Ninth Circuit explained in a vertical-restraint case:

---

[9] *See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 (3d Cir. 2010) ("[Plaintiffs] claim instead that defendants' behavior . . . is susceptible to condemnation under a 'quick look' analysis. Plaintiffs do not dispute that in order to succeed . . . they need to show *the existence of a horizontal agreement*, that is, an agreement between 'competitors at the same market level.' ") (emphasis added).

[T]his so-called "quick look" analysis is the exception, rather than the rule. Proving injury to competition in a rule of reason case almost uniformly requires a claimant . . . to show the effects of competition within that market. For many of the same reasons used to apply the rule of reason analysis, the present case does not present the type of naked restraint on price or output that would justify a "quick look." Accordingly, the district court was correct in requiring proof of the relevant geographic and product markets, *as well as proof of the effects* within these markets.

*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789-90 (9th Cir. 1996) (citation and internal quotation marks omitted omitted) (emphasis added).

## These Agreements Are Less Restrictive than Exclusive Contracts, Which Courts Have Routinely Held To Be Lawful

It is useful to consider the challenged provisions in light of a related form of vertical arrangements: exclusive contracts. Exclusive contracts are common in many industries, including healthcare. For example, a hospital may enter into an agreement with a physician group (e.g., anesthesiologists) to provide services on an exclusive basis. Likewise, a health plan may contract with a hospital to provide healthcare services to its members on an exclusive basis. Under these circumstances, patients have no effective in-network option but to receive care from the provider holding the exclusive contract. **In that sense, exclusive contracts are the ultimate steering device.** Yet, they are not presumed to be unlawful under the Sherman Act. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 437 (2014); *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987) ("Such exclusive dealing arrangements have never been per se illegal under the antitrust laws"); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 65 (1st Cir. 2004) ("Because [exclusive dealing] agreements can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices), no presumption against such agreements exists today."); *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 736 (7th Cir. 2004) ("Rather than condemning exclusive dealing, courts often approve them

14

because of their procompetitive benefits."). To the contrary, they regularly withstand antitrust challenges under rule-of-reason analysis. *See, e.g.*, *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 (1961)*; Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1220 (W.D.N.C. 1989), *aff'd and remanded*, 912 F.2d 463 (4th Cir. 1990) (applying rule-of-reason analysis to find that even if the supply contracts at issue were exclusive dealing arrangements, the contracts were reasonably justified means of achieving legitimate, procompetitive ends); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enterprises, Inc.*, 672 F. Supp. 1489, 1515-1516 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988) (applying rule of reason to find as a matter of law that the hospital contract at issue was not an impermissible exclusive dealing arrangement); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 65 (1st Cir. 2004); *Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*, 158 Fed. Appx. 413 (4th Cir. 2005).

The government does not even expressly allege foreclosure or that the provisions in question confer exclusivity on the Hospital Authority. To the contrary, the Complaint acknowledges that patients obtain healthcare services from the Hospital Authority's competitors. (Compl. ¶¶ 2, 14.) As such, the provisions in question do not even rise to the level of an exclusive contract in terms of their capacity to foreclose competition. Accordingly, because the fact of foreclosure is not evident here—and certainly not as clear as in cases involving exclusive contracts—Plaintiffs must allege, with specificity, whether, how, and to what extent the steering restrictions foreclose hospitals from competing with the Hospital Authority for commercially insured patients. This, the Complaint does not do.

**The Government Fails to Allege a Plausible Antitrust Claim Based on the Confidentiality Provisions of Contracts Between the Hospital Authority and Insurers**

As a claimed second "critical" concession, the government contends that the allegations regarding the confidentiality clauses entered into by the parties were not challenged in the Answer, and this, somehow, represents an admission that consumers are deprived of information. (Opp. at 2.)  This "concession" is no more critical under the Sherman Act than the government's claim that the Hospital Authority conceded that its contracts restrain trade.

First, these agreements do contain confidentiality clauses, clauses that are both unremarkable as a matter of contract law and which the Answer alleges are industry standard. (Answer, Doc. No. 8, ¶ 13.)  Confidentiality provisions benefit both the Hospital Authority and the insurance carrier by protecting both from the disclosure of proprietary information, and invariably are sought by both parties.  *Id.*  Such protection by definition runs both ways and is valuable to both parties irrespective of their size or market position.  Indeed, it is unremarkable that an insurance company would not want its competitors to know the price it was paying, and equally unremarkable that the Hospital Authority would not want its competitors (or other insurance companies), to know the price it agreed to accept.  Moreover, these nondisclosure provisions are obviously procompetitive, for they reduce the risk of unlawful collusion.[10]

---

[10]  Indeed, when asked to analyze the antitrust considerations of vertical confidentiality agreements, the FTC has set forth serious concerns about the anticompetitive effects of eliminating such provisions.  In 2007, New Jersey's legislature considered a proposal to regulate the contractual relationship between Pharmacy Benefits Manangers ("PBMs") and health plans, including mandatory disclosure of financial information by PBMs to health plans.  LETTER FROM FTC STAFF TO THE HON. NELLIE POU (APR. 17, 2007), *available at* https://www.ftc.gov/policy/policy-actions/advocacy-filings/2007/04/ftc-staff-comment-hon-nelie-pou-concerning-new-jersey.  The FTC viewed such disclosure as risky from an antitrust perspective, noting that "such disclosures may facilitate collusion, raise price, and harm the patients the bill is supposed to protect."  *Id.* at 10.  The FTC cautioned the New York legislature regarding similar legislation considered in 2009, which would have required PBMs to disclose sensitive pricing information to health plans and providers.  LETTER FROM FTC STAFF TO THE HON. JAMES SEWARD (MAR. 31, 2009), *available at*

The Complaint ignores this obvious fact, however, and alleges, without elaboration, that consumers are deprived of price and quality information as a result of these confidentiality provisions. There are, however, no factual allegations as to exactly how consumers might be denied access to meaningful price or quality information. Conspicuously absent from the Complaint are allegations of a course of conduct by the Defendant to thwart consumers from obtaining meaningful information on pricing or quality. Thus, the Complaint *does not* allege that these agreements prohibit employers or their brokers from obtaining comparative price information when selecting an insurance carrier to administer or provide their health plans. Similarly, there is *no* allegation that a patient is prevented from obtaining information from her insurance carrier to determine what her out-of-pocket costs will be under a health plan for a hospital stay at one of the Hospital Authority's facilities, for a hospital stay at one of the Hospital Authority's competitors, or from comparing the two. Further, there is no allegation that these provisions bar or discourage a patient from calling the Hospital Authority to request information on what the cost of a projected hospital stay might be under his or her plan. Nor does the Complaint allege that insurers have had no choice but to accede to the confidentiality provisions at issue. The Complaint does not allege that, in the ordinary course of negotiations, an insurance carrier has ever communicated that renewal of an agreement was conditioned on the modification of such provisions.

The government cites no case authority that confidentiality provisions in a vertical agreement between a supplier (the Hospital Authority) and a customer (the insurance carrier) are

---

https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comment-honorable-james-l.seward-concerning-new-york-senate-bill-58-pharmacy-benefit-managers-pbms/v090006newyorkpbm.pdf. In response to a request for guidance, the FTC warned that mandatory transparency could lead to increased costs and "have the unintended consequence of publicizing proprietary business information in a way that could foster collusion among third parties." *Id.* at 4.

sufficient to give rise to a plausible antitrust claim. Instead, and as with the government's "quick look" argument, the government cites cases—*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), and *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978)—which involve horizontal agreements among suppliers to suppress customers' access to meaningful information. In *Indiana Federation*, the Supreme Court held that a conspiracy among competing dentists to withhold x-rays to dental insurers violated Section 5 of the Federal Trade Commission Act. 476 U.S. at 465-66. Following an adjudicative proceeding, the Commission found proof of anticompetitive effects in the form of less competition among dentists for patients. *Id.* at 452. In *National Society*, the Supreme Court held that a canon of ethics which prohibited members of an engineering association from engaging in competitive bidding violated Section 1 of the Sherman Act. 435 U.S. at 698-99. Consumers of engineering services were denied <u>any</u> information on comparative pricing for professional services, an extreme position which required consumers to engage an engineer with a high degree of economic uncertainty. *Id.* at 684. In both cases, the Supreme Court employed a truncated analysis in holding that an agreement among competitors to control or withhold information violated the antitrust laws.

Such an analysis does not apply to vertical agreements. Indeed, the government can cite no case authority for the proposition that the confidentiality provisions of a vertical agreement can be struck down under a truncated rule-of-reason analysis, because there is none. The government has thus failed to allege a plausible antitrust claim based on the confidentiality provisions in the insurance carriers' contracts with the Hospital Authority. The "catch phrases" in the Complaint are not sufficient, as a matter of law, to spell out how provisions of this

nature—an industry norm—have been implemented to cause competitive harm. Once again, theoretical concerns are not supported by factual allegations of misconduct and resultant harm.

## The Government Ignores the Existence of Competition for the Contract in the Context of Vertical Agreements

The government's argument for a reduced pleading standard also highlights another conflict with well-established antitrust precedent. The government asserts that CHS' ability to offer *lower* prices to payors in exchange for the provisions in question are "unfounded assertions" that "should be ignored." (Opp. at 16.)[11] But in the context of a vertical restraint, it is the government that has the burden to allege an *overall* effect on competition, not just that a restraint in an executed contract restrains competition. By seeking to establish "harm to the competitive process" based solely on the effect of a provision in an executed contract, the government ignores the competition that occurs *before* the contract is executed—and the benefit that payors receive from that competition.

In the context of vertical contracts, courts routinely admonish plaintiffs not to disregard the essential form of competition that takes place *before* execution of the contract:

> Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. Every year or two, General Motors, Ford, and Chrysler invite tire manufacturers to bid for exclusive rights to have their tires used in the manufacturers' cars. Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run, and competition of this kind drives down the price of tires, to the ultimate benefit of consumers.

---

[11] Notably, at least one of the "academic" papers the government submitted with its opposition specifically noted that, "[f]or strategic or financial reasons, a health system may opt to trade price for volume, thereby gaining disproportionate access to the exchange, or it may choose to maintain price and forgo this volume." Thus, the government's own "academic" paper validates the discounting that occurs in connection with a contract premised on increased volume. *McKinsey Center for U.S. Health System Reform*, *"Hospital Networks: Updated national view of configuration on the exchanges."* (Opp., Exhibit 2, Doc. No. 25-3, at 298.)

*Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (Easterbrook, J.); *see also Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (Easterbrook, J.) ("[C]ompetition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress."); *Digene Corp. v. Third Wave Techs., Inc.*, 323 Fed. App'x 902, 911-12 (Fed. Cir. 2009) ("The existence of competition for the contract, even though [cross-appellant] lost that competition, demonstrates a lack of anticompetitive effect."); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d at 381 ("Plaintiffs, however, compete for the same merchandising space as does PM, and Plaintiffs are often successful in signing retailers to merchandising contracts with favorable terms."); *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1326 (4th Cir. 1995) ("The evidence shows that these contracts are negotiated in a competitive context"); *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enterprises, Inc.*, 672 F. Supp. 1489, 1516 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988) (noting that plaintiffs alleging Section 1 violation "participated in a competitive bidding process to obtain the exclusive" and lost).

The government has expressly recognized the benefit of competition for the contract in the context of healthcare providers seeking exclusive contracts with payors. For example, in a complaint challenging the acquisition by Reading Health System ("RHS") of Surgical Institute of Reading ("SIR"), the FTC noted that RHS was the dominant healthcare provider with 42% of the market for inpatient orthopedic services. *In the Matter of Reading Health System*, Docket No. 9353 (F.T.C. Nov. 16, 2012), Complaint ¶ 59. Prior to the proposed acquisition, "RHS offered discounted rates to several major health plans in exchange for excluding SIR from their provider networks." *Id.* ¶ 27. In stark contrast to the government's position here, the FTC regarded Reading's efforts as procompetitive competition for the contract: "Accordingly, due to

competition between SIR and RHS, health plans in the Reading area had a choice between two beneficial options: (1) to exclude SIR from their provider network and receive a discount from the more expensive, dominant RHS; or (2) to contract with SIR at significantly lower rates than RHS, lowering costs and increasing access for their membership." *Id*.

Competition for the contract is particularly relevant where, as here, several of the contracts are terminable at will upon written notice to be provided in advance. *Paddock*, 103 F.3d at 47 ("Contract terms are short, so competition for the contract can flourish."); *R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 391 ("The Fourth Circuit has held that exclusive contracts terminable after thirty days to one year do not have substantial anticompetitive effects.") (citing *Thompson Everett*, 57 F.3d at 1326)). It is well-established by the fact that, when United Healthcare reached an impasse in its contract negotiations with the Hospital Authority, United terminated the agreement. While the government ignores competition for the contract, it necessarily concedes that United Healthcare was engaged in just this type of competition when it terminated the agreement with the Hospital Authority, which, of course, is precisely the way in which a market works.[12]

## <u>Conclusion</u>

At the heart of the government's plea for a reduced pleading burden is its apparent conviction that steering is an absolute competitive "good," so important that there cannot be competition in its absence. The government thus claims that applying a "quick look" analysis to steering restrictions is appropriate given the economic theory it has enunciated. According to

---

[12] The government does quote from a newspaper article which mistakenly claimed that the Hospital Authority charged rates 150 percent higher than its competitors. United Healthcare's Regional CEO, in an interview, admitted that the Hospital Authority's pricing was between 15 percent to 25 percent higher "based on the latest proposals." *Why United Healthcare And Carolinas Healthcare System Couldn't Reach a Deal* (WFAE 90.7 radio broadcast Mar. 5, 2015) http://wfae.org/post/why-united-healthcare-and-carolinas-healthcare-system-couldnt-reach-deal

government, this theory "is neither 'novel' nor 'unprecedented.' " (Opp. at 10.) However, as the courts have instructed, it would be a novel and unprecedented decision for this Court to apply a quick-look analysis to the vertical restraint challenged here, and relieve the government of its burden of pleading facts that show actual harm.

In support of its argument, the government, inappropriately[13], sought to append a variety of papers to its Opposition and cite *dicta* in a hospital merger case, *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001), that "[s]teering has been quite effective in disciplining prices because hospitals are sensitive to declines in volume." *Id.* at 1130. To the extent that the Court considers the papers, it is worth noting that **none** dealt with the alleged cost of restrictions on steering such as those challenged here. Indeed, the central point of the longest paper submitted was that only six percent of employers offering health benefits to more than fifty people believed that "narrow networks" "are a very effective strategy to contain cost," and only eleven percent thought "tiered provider networks" would be "very effective at containing health care costs." More than twice as many employers believed that wellness programs were more effective at containing costs than the programs that the government claims are limited (but not foreclosed or eliminated) by these restrictions. With respect to the dicta in *Sutter*, if the Court elects to consider it, the Court should consider that this decision has since been called into question by a working paper prepared as part of a hospital merger retrospective study conducted by the FTC. *See* Steve Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction, Working Paper No. 293* (Nov. 2008) *available at* https://www.ftc.gov/sites/default/files/documents/reports/price-effects-hospital-mergers%C2%A0-case-study-sutter-summit-transaction/wp293_0.pdf ("Our results show that

---

[13] Contemporaneously with this Reply, the Hospital Authority has filed a Motion to Exclude or in the Alternative to Strike many of these materials from consideration by the Court.

Summit's price increase was among the largest of any comparable hospital in California, indicating this transaction may have been anticompetitive.").  Indeed, in subsequent health care merger cases, steering has been found unlikely to effectively constrain prices.  For example, in *ProMedica Health System*, the FTC found that "[t]he evidence shows that MCOs [Managed Care Organizations] have not employed steering in the past to discipline Lucas County hospital prices, including ProMedica's already-high prices.  MCOs testified that patients dislike steering and hospitals resist it."  *In the Matter of Promedica Health Sys., Inc.*, 2012-1 Trade Cas. (CCH) ¶ 77840, 2012 WL 1155392 at *46 (FTC Mar. 28, 2012); *aff'd*, *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 562 (6th Cir. 2014); *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015) ("The court was unconvinced by evidence that insurers could defend against a SSNIP by steering consumers to non-Nampa PCPs."); *In the Matter of Evanston Nw. Healthcare Corp.*, 9315, 2007 WL 2286195, at *59 (FTC Aug. 6, 2007) ("[I]t is 'very, very difficult' for an MCO to steer its PPO members to particular in-plan hospitals through differential pricing.).

Of course the fact that the government spends pages pleading for a lesser burden is necessarily a tacit admission that it cannot meet the burden imposed by the rule of reason to plead actual economic harm to consumers, and thus must create an exception for this case.  Thus, in a novel case based upon an untried economic theory in the context of healthcare, the government asks this Court to disregard long-standing antitrust analysis, adopt a standard of review that has never been applied to this type of vertical arrangement, and relieve the government of any obligation to plead facts that show a causal connection between its theory and harm in the marketplace.  This Court should reject this invitation to make new law and, instead, hold the government to the same standard as any plaintiff-litigant in a civil case.

This 21st day of September 2016.

/s/ Debbie W. Harden
James P. Cooney III (N.C. Bar No. 12140)
Debbie W. Harden (N.C. Bar No. 10576)
Mark J. Horoschak (N.C. Bar No. 22816)
Brian Hayles (N.C. Bar No. 33971)
Michael Fischer (N.C. Bar No. 47029)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone:  (704) 331-4900
E-mail: jcooney@wcsr.com
E-mail: dharden@wcsr.com
E-mail: mhoroschak@wcsr.com
E-mail: bhayles@wcsr.com
E-mail: mfischer@wcsr.com

Hampton Dellinger (N.C. Bar No. 19903)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC  20015
(202) 274-1152 (direct)
hdellinger@bsfllp.com

Richard A. Feinstein*
Nicholas A. Widnell*
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC  20015
rfeinstein@bsfllp.com
nwidnell@bsfllp.com
(202) 895-5243 (Richard Feinstein – direct)
(202) 274-1153 (Nicholas Widnell – direct)

*Attorneys for Defendant The Charlotte-Mecklenburg*
*Hospital Authority d/b/a Carolinas Healthcare System*

*Admitted Pro Hac Vice

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this the 21st day of September 2016, the foregoing **DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** was served via the Court's CM/ECF system as follows:

Paul John Torzilli
United States Department of Justice
Antitrust Division
450 5th Street, NW
Washington, DC 20530
Paul.Torzilli@usdoj.gov

Paul B. Taylor
United States Attorney Office
U. S. Courthouse, Room 233
100 Otis Street
Asheville, NC 28801
paul.taylor@usdoj.gov

*Attorneys for the United States of America*

K. D. Sturgis
North Carolina Attorney General's Office
114 W. Edenton Street
Raleigh, NC 27603
ksturgis@ncdoj.gov

*Attorney for the State of North Carolina*

/s/ Debbie W. Harden
Debbie W. Harden