UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:16-cv-00311-RJC-DCK

UNITED STATES OF AMERICA and the
STATE OF NORTH CAROLINA,

      Plaintiffs,

      v.

THE CHARLOTTE-MECKLENBURG
HOSPITAL AUTHORITY d/b/a
CAROLINAS HEALTHCARE SYSTEM,

      Defendant.

## DEFENDANT'S SUPPLEMENTAL MEMORANDUM: *United States v. Am. Express Co.*, 2016 WL 5349734 (2d Cir. Sept. 26, 2016)

In a unanimous opinion, the Second Circuit has flatly rejected the legal arguments at the core of the government's claims against the Hospital Authority. The decision in *American Express* now shows, as the Hospital Authority has argued, that the Complaint in this matter is inadequate and should be dismissed under Fed.R.Civ. P. Rule 12(c). In *American Express,* the Second Circuit rejected the four central arguments made by the government in this case. First, the Second Circuit rejected the government's argument that restrictions on steering are inherently anticompetitive and violate § 1 of the Sherman Act. Rather, the *American Express* court expressly found that the restrictions on steering challenged by the United States were legitimate and had procompetitive effects. Second, the Second Circuit found that a challenge to restrictions on steering must be evaluated under the full-blown rule of reason and not the "quick look" approach urged by the government here. Third, in applying the rule of reason standard, the Second Circuit held that in order for the government to directly prove that restrictions on steering violate Section 1, there must be "an *actual* adverse effect on competition as a whole in the

relevant market," in the form of "reduced output, decreased quality, [or] supracompetitive pricing." *Id.* at *10. Here, the government has failed to allege facts that, if proven, would show such harm, instead relying on theoretical "harm to the competitive process." Finally, the Second Circuit held that to indirectly prove that restrictions on steering violate Section 1, the government could not simply allege that a defendant had "market power" solely on the basis of market share, barriers to entry and consumer loyalty. Rather, the government must show (and allege) that the challenged conduct is inherently anticompetitive or offer another reason to believe that the challenged restrictions could harm competition. Here, the government claims steering restrictions are inherently anticompetitive, a position now repudiated by the Second Circuit.

The *American Express* case is the **_only_** other case in which the government has challenged steering restrictions as anticompetitive under § 1 of the Sherman Act. Its holdings are a major blow to the government's theory of this case and make clear that the government's sparse, untethered allegations of harm in this proceeding are insufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). The government — which embraced *American Express* as analogous to this case in its opposition, *see* Opposition [Doc. #25] at 11-12 (citing *American Express* as "simila[r]" to this case) — cannot disavow *American Express* simply because the Second Circuit has rejected its position. *Cf. United States v. Aidoo*, 670 F.3d 600, 615 (4th Cir. 2012) (emphasizing that "the instant matter bears striking resemblance to our sister circuit's decision" and finding it "certainly persuasive").

## *The Decision in **American Express***

The credit-card industry functions by making it possible for cardholders to use their cards at many different merchants. Amex's "revenues are primarily dependent" on fees it charges to merchants, because "merchants who accept Amex gain access to 'marquee' cardholders who

2

Case 3:16-cv-00311-RJC-DCK   Document 37   Filed 10/12/16   Page 2 of 12

tend to spend more . . . than customers using alternative payment methods." *Id.* at *5.  Amex imposed steering restrictions in its contracts "to ensure that merchants could not state a preference for any payment-card network other than Amex." *Id.* at *7.  Amex sought to prevent stores from advertising their acceptance of the American Express card but then encouraging customers at the time of sale to use another card — such as MasterCard or Visa — that charged lower fees to the stores.  The government argued that such restrictions prevented merchants from being "able to use steering 'at the point of sale to foster competition on price and terms among'" credit-card companies "by encouraging customers to use less expensive or otherwise preferred cards." *Id.* at *8.  The District Court found in favor of the government, concluding that (1) the restrictions had caused actual anticompetitive effects on interbrand competition by "short-circuit[ing] the ordinary price-setting mechanism"; and (2) Amex possessed sufficient market power in the network services market to harm competition.  *Id.* at *8.  The Second Circuit reversed and entered judgment for Amex, holding that the government had not shown:  (1) Amex had market power and that the restrictions were inherently anticompetitive; and (2) the steering restrictions caused actual anticompetitive harm.  *Id.* at *15-18, *18-20.

The Second Circuit observed that steering restrictions were vertical restraints and therefore subject to a full rule of reason analysis.  *Id.* at *11.  Moreover, Amex's steering restrictions were found to be consistent with — rather than contrary to — competition among credit card companies:

> The [steering restrictions] prevent a merchant from seeking high-end clientele by advertising acceptance of Amex cards but then, at the critical point of sale, offering that clientele a discounted price for not using the Amex card. . . .  Amex has a legitimate interest in seeing that cardholders who take advantage of amenities offered to Amex cardholders simply by virtue of owning the card are not enticed to use their Visa or MasterCard by card-connected discounts from merchants.

*Id.* at *18.

Under the full rule of reason analysis applicable to vertical restraints, the government was required to provide direct evidence of actual competitive harm, or present sufficient indirect evidence from which to infer such harm. The Second Circuit, however, rejected the government's theories under both the direct and indirect approaches to showing harm under § 1.

Under the direct approach, the Second Circuit found that the government failed to show "an actual adverse effect on competition *as a whole* in the relevant market." *Id.* at *18. The Second Circuit found that the government utterly failed to show "that cardholders engaged in fewer credit-card transactions (*i.e.*, reduced output), that card services were worse than they might otherwise have been (*i.e.*, decreased quality), or that Amex's pricing was set above competitive levels within the credit-card industry (*i.e.*, supracompetitive pricing)." *Id.* at *19. Indeed, there was evidence that market-wide output and quality had increased. Moreover, the government failed to show Amex's prices were above a competitive level. *Id.* at *19-20.

In assessing the government's attempt to show harm via the indirect approach — by focusing on market power — the Second Circuit first explained that the government failed to establish that Amex had market power, that is, "the power to ***force*** a purchaser to do something that he would not do in a competitive market." *Id.* at *15 (emphasis added). Amex had a 26.4 percent market share in an industry where there were high barriers to entry in the industry, and had increased merchant fees over time. But these price increases were merely "concomitant of a successful investment in creating output and value." *Id.* at *16. Moreover, the district court's reliance on "cardholder insistence" — that is, consumer preference for Amex cards — as an indicator of market power was "problematic" because consumer loyalty to Amex "results not from market power, but instead from competitive benefits on the cardholder side of the platform and . . . to merchants who choose to accept Amex cards." *Id.* at *17. In other words, consumer

4

loyalty to Amex was the result of the quality and range of benefits that it offered through its "robust rewards program," and such consumer loyalty was "precisely what makes accepting Amex cards worthwhile for those merchants that do." *Id.* The Second Circuit explained that Amex invested in consumer loyalty by making "continuing investment[s] in cardholder benefits," which indicated that it did *not* have market power. Amex's steering restrictions thus served "a legitimate interest" in preventing merchants from steering their customers away from Amex after benefiting from attracting Amex's cardholder base. The Second Circuit held:

> We conclude that, so long as Amex's market share is derived from cardholder satisfaction, there is no reason to intervene and disturb the present functioning of the payment-card industry. Whatever market power Amex has appears, on this record, to be based on its rewards program and perceived prestige . . . . The [steering restrictions] protect that program and that prestige.

*Id.* at *18.

### *Applying American Express to this Case*

The relevance of *American Express* to this case is plain. Like Amex, the Hospital Authority extends favorable contractual terms — in this case discounts to insurers — with the expectation that their insureds will opt to use the Hospital Authority's facilities and services. Rather, than paying merchant fees on each consumer purchase, here the insurers negotiate discounted rates for access to the Hospital Authority's facilities and services on behalf of a large group of potential patients. That negotiation, as conceded by the government, involves both a price component (the discount negotiated by the insurer) and a quality component (the value that having the Hospital Authority as part of a network will bring). This "competition before the contract" among credit card companies for merchant contracts was critical to the findings in *American Express* that there was no actual competitive harm, but, as the Hospital Authority has argued, the similar competition among hospitals for contracts with insurers is utterly ignored by

5

the government here.  Similarly, and like the market faced by Amex, the Hospital Authority must also encourage ultimate consumers — its prospective patients — to use its services as opposed to the services of its competitors.  However, having competed for network status with insurers, the Hospital Authority must also compete for potential patients.  As such, the Hospital Authority — like Amex — sought to prevent insurers from engaging in opportunistic behavior that would undercut the benefit of the negotiated bargain by steering patients to those competitors.  Because the restrictions on steering were part of a contractual agreement that discounted rates in the first instance, they are procompetitive — that is, in their absence the Hospital Authority's incentive to provide rate discounts would be significantly diminished.

The fatal flaws in the government's legal theory in *American Express* are also evident here.  Both cases hinge on a theory that a vertical restraint affecting one element of a much broader competitive dynamic can be sufficient to establish harm without examining the market-wide effects of the restraint.  In both cases the government has contended that steering restrictions harm "the competitive process" by interfering with incentives for price reduction, but has failed to carry its burden with respect to plausibly alleging (and in *American Express*, proving) *actual* harm attributable to the steering restrictions.  Compare, for example, some of the government's (now-rejected) submissions in *American Express* with its submissions here:

- **Government in *American Express***: There are "actual adverse effects" on "the competitive process" because Amex's "Anti-Steering Rules" harm "*the incentives* for networks to compete on pricing."  U.S. Proposed Conclusions of Law ("PCOL"), 1:10-cv-04496-NGG-RER, Doc. 602, at 5, 7 (emphasis supplied).  "Amex's Anti-Steering Rules impermissibly harm the competitive process by impeding *the incentives* and efforts of Amex's network rivals to promote lower-priced choices to merchants and their customers at the point of sale."  *Id.* at 7 (emphasis supplied).

- **Government in this case**:  Steering restrictions "impede insurers from providing financial *incentives* to patients to encourage them to consider utilizing lower-cost but comparable or higher-quality alternative healthcare providers."  Complaint ¶ 7 (emphasis supplied).

6

- **Government in this case**: "CHS's maintenance and enforcement of its steering restrictions lessen competition between CHS and other providers of acute inpatient hospital services in the Charlotte area that would, in the absence of the restrictions, <u>likely</u> reduce the prices paid for such services by insurers." Complaint ¶ 25.

- **Government in *American Express***: "Restraints that impede responses to changes in price are anticompetitive, <u>regardless of their precise effect on price</u> . . . To demonstrate competitive harm, plaintiffs need not establish precisely what choices consumers would have made absent the challenged restraint, how Amex's network rivals would have viewed for consumer preference, or how the competitive battle would have resolved. It is sufficient that the restraint had a significant adverse impact on the competitive process by <u>disrupt[ing] the proper functioning of the price-setting mechanism</u> of the market." PCOL at 8 (internal quotation marks omitted).

- **Government in this case**: "'[D]isrup[ting] the proper functioning of the price-setting mechanism of the market' is an anticompetitive effect." Opp. at 9.

- **Government in *American Express***: "Because Amex's Anti-Steering Rules prevent most merchants from even disclosing price differences among card brands to their merchants' customers, they harm the competitive process." PCOL at 9.

- **Government in this case**: "CHS also imposes restrictions in its contracts with insurers that impede insurers from providing truthful information to consumers about the value (cost and quality) of CHS's healthcare services compared to CHS's competitors. CHS's restrictions on insurers' price and quality transparency are an indirect restriction on steering, because they prevent patients from accessing information that would allow them to make healthcare choices based on available price and quality information." Complaint ¶ 13.

The Second Circuit's standard for a showing of direct competitive harm applies to the government's allegations here. The Second Circuit explained that steering restrictions must be assessed under the full rule-of-reason analysis (not the quick-look analysis urged by the government here). 2016 WL 5349734, at *9-10. As the Hospital Authority explained in its briefing — an explanation now validated by the Second Circuit — the government cannot prevail under the direct approach by simply alleging "interference with the competitive process." It must allege both that the provisions caused *actual* harm to the market as a whole, in the form of "reduced output," "decreased quality," or "supracompetitive pricing," *id.* at *10, and specific

facts that plausibly support that conclusion. The government has failed to make such allegations. *See* CHS Opening Br. at 12-17; CHS Reply Br. at 5-14. Rather, as in *American Express*, the government has advanced a theory of harm based on a hypothetical impact on the competitive process. The Complaint is devoid of allegations of actual anticompetitive effects caused by the restrictions.

Similarly, with respect to the indirect approach, *American Express* exposes equally fatal flaws in the government's Complaint. The government has maintained that the Hospital Authority has market power because the Complaint alleges that it has a 50 percent share of a market with high barriers to entry and expansion, and that consumer loyalty to the Hospital Authority proves market power because businesses with high market share "invariably offer goods or services that consumers prefer." Opp. at 19-20. The Second Circuit rejected precisely this argument in *American Express.* As in *American Express*, consumer loyalty here supports a *lack* of market power: the government's concession that Hospital Authority "offer[s] goods [and] services that consumers prefer" is fatal to its argument that the Hospital Authority has market power. Consumer loyalty implies that the Hospital Authority's market share is based on its ability to offer output and quality that are valued in the market, not that it imposes prices a competitive market would not bear. *See Am. Express*, 2016 WL 5349734, at *17 (consumer loyalty "results not from market power, but instead from competitive benefits on the cardholder side").

Nor does the allegation that the Hospital Authority's prices are "premium," standing alone, support a finding of market power, Complaint ¶ 4, particularly where prices are "a concomitant of a successful investment in creating output and value" and consumer loyalty. *Cf.* Opp. at 20 (Hospital Authority "invariably offer[s] goods or services that consumers prefer").

8

Moreover, where the Hospital Authority offers *discounts* to "encourage" insurers to agree not to steer to other providers (as the Complaint alleges, ¶ 11), "evidence showing that [it] must compete on price in order to attract consumers does not show that [it] has the power to increase prices to supracompetitive levels." *Am. Express*, 2016 WL 5349734, at *17. The government does not contend that the Hospital Authority has secured steering restrictions through coercion. Rather, what the government does point to is the Hospital Authority earning consumer loyalty and discounting prices. These activities are the hallmark of competition — the polar opposite of an exercise of market power.

The government relied upon the district court's decision in *American Express* for the proposition that "steering restrictions impai[r] the competitive process because they suppress . . . competitors' incentive to offer lower prices." Opp. at 11 (internal quotation marks omitted). The Second Circuit has now, unambiguously, rejected that conclusion. As the Second Circuit explained, steering restrictions protect a company's "legitimate interest" in the benefit of its bargain with a counter-party. 2016 WL 5349734, at *18. While the government dismissed this in its Opposition, Opp. at 11-12, the throwaway "catch phrases" it relied on in the Complaint are no substitute for a coherent theory of liability and factual allegations of harm to support such a theory after *American Express*.

The steering restrictions in *American Express* protected Amex's bargains with its merchants; in exchange for the benefits merchants received by attracting Amex's cardholder base, merchants agreed not to impede consumers from using Amex cards (which protects Amex's revenue). Similarly, the Hospital Authority's steering restrictions are a legitimate contractual mechanism that ensures that insurers do not benefit from exacting discounted rates from the Hospital Authority, advertising the inclusion of the Hospital Authority as an in-network

9

provider to attract consumers who place value on having access to the extensive care and services offered by the Hospital Authority, but then steering those same consumers to other providers. *Cf.* Defendant's Opening Br. 10-11.

### *Conclusion*

The Second Circuit's decision in *American Express* highlights the flaws in the Complaint described by the Hospital Authority:

> [T]here is no specific allegation that patients would actually derive some economic benefit from [the steering restrictions'] elimination — that is, that insurance companies would actually secure lower rates and pass along savings to their customers, as opposed to simply applying them to their bottom line. Critically, the Complaint, while alleging that the Hospital Authority's prices are "premium," fails to allege that these provisions have **caused** the "premium" prices. The Complaint also fails to allege that the prices charged by the Hospital Authority are a function of market power rather than its ability to offer a broader range and depth of services or better quality or access to such services.

Defendant's Opening Br. at 4. Notwithstanding over two years of investigation, the government has made no specific allegations of harm in the form of lower output or quality or supracompetitive pricing through market foreclosure or otherwise. Moreover, the economic theory the government puts forward here — that anti-steering provisions are inherently anticompetitive — was just dealt a fatal blow. This Court should heed the judgment of the only appellate court to have considered anti-steering provisions and grant the Rule 12(c) motion.

This the 12TH day of October, 2016.

/s/ Debbie W. Harden
James P. Cooney III (N.C. Bar No. 12140)
Debbie W. Harden (N.C. Bar No. 10576)
Mark J. Horoschak (N.C. Bar No. 22816)
Brian Hayles (N.C. Bar No. 33971)
Michael Fischer (N.C. Bar No. 47029)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
E-mail: jcooney@wcsr.com
E-mail: dharden@wcsr.com
E-mail: mhoroschak@wcsr.com
E-mail: bhayles@wcsr.com
E-mail: mfischer@wcsr.com

Hampton Dellinger (N.C. Bar No. 19903)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC 20015
(202) 274-1152 (direct)
hdellinger@bsfllp.com

Richard A. Feinstein*
Nicholas A. Widnell*
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC 20015
rfeinstein@bsfllp.com
nwidnell@bsfllp.com
(202) 895-5243 (Richard Feinstein – direct)
(202) 274-1153 (Nicholas Widnell – direct)

*Attorneys for Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System*

*Admitted Pro Hac Vice

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of October, 2016, the foregoing **DEFENDANT'S SUPPLEMENTAL MEMORANDUM:** *United States v. Am. Express Co.*, **2016 WL 5349734 (2d Cir. Sept. 26, 2016)** was served via the Court's CM/ECF system as follows:

> Paul John Torzilli
> United States Department of Justice
> Antitrust Division
> 450 5th Street, NW
> Washington, DC 20530
> Paul.Torzilli@usdoj.gov
>
> Paul B. Taylor
> United States Attorney Office
> U. S. Courthouse, Room 233
> 100 Otis Street
> Asheville, NC 28801
> paul.taylor@usdoj.gov
>
> *Attorneys for the United States of America*
>
> K. D. Sturgis
> North Carolina Attorney General's Office
> 114 W. Edenton Street
> Raleigh, NC 27603
> ksturgis@ncdoj.gov
>
> *Attorney for the State of North Carolina*

           /s/ Debbie W. Harden
           Debbie W. Harden