UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF NORTH CAROLINA,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE CHARLOTTE MECKLENGURG HOSPITAL AUTHORITY, d/b/a CAROLINAS HEALTHCARE SYSTEM,<br><br>*Defendant*. | Case No. 3:16-cv-00311-RJC-DCK |

PLAINTIFFS' RESPONSE TO DEFENDANT'S
SUPPLEMENTAL BRIEFING ON *UNITED STATES v. AMERICAN EXPRESS*

After nearly 60 pages of briefing relating to its Rule 12(c) motion, Defendant Carolinas HealthCare System ("CHS") uses its additional 10-page supplemental briefing to make the baseless assertion that the Second Circuit's decision in *United States v. American Express Co.*, No. 15-1672, 2016 WL 5349734 (2d Cir. Sept. 26, 2016) ("*Amex*"), deals a "fatal blow" to the "economic theory the government puts forward" in this case. But far from delivering a fatal blow, *Amex* is inapplicable to the issues that this Court must resolve prior to ruling on CHS's motion. Therefore, though *Amex* is wrongly decided, this Court can deny CHS's motion without considering, much less resolving, the errors in the *Amex* decision.

To start, the court in *Amex* had the benefit of a detailed factual record compiled *after* the close of lengthy fact and expert discovery and a seven-week trial on the merits; nothing in that opinion can be read to justify denying Plaintiffs the opportunity to develop and present facts on their well-pled Sherman Act Section 1 claim, which is what CHS seeks to accomplish here.

Moreover, *Amex* did not consider, let alone decide, the pleading standards that a plaintiff alleging a Section 1 claim must satisfy to survive a motion for judgment on the pleadings, because neither the district court nor the Second Circuit was ever asked to determine whether the pleadings in *Amex* were sufficient to state a claim.

CHS also conspicuously fails to disclose that the Second Circuit decided *Amex* on grounds that are entirely distinct from the issues in this case. The Second Circuit's decision is based primarily on the panel's view that the district court should have defined a market that includes both the merchant and cardholder sides of a two-sided credit-card platform. *Amex* at *11 ("The District Court's definition of the relevant market in this case is fatal to its conclusion that Amex violated § 1."). This issue is not present here because Plaintiffs have alleged (and CHS does not dispute) a general acute care inpatient hospital services market, which is not a two-sided platform. Consequently, the decision in *Amex* has no bearing on this Court's resolution of CHS's Rule 12(c) motion.

CHS's brief does more than miscomprehend *Amex*'s procedural posture, principal holding, and underlying rationale. CHS also raises a variety of straw arguments that it erroneously styles as Plaintiffs' "central arguments." First, CHS wrongly asserts that Plaintiffs have claimed that steering restrictions "are inherently anticompetitive." Second, CHS falsely asserts that Plaintiffs have "urged" this Court to apply a "quick-look" analysis when assessing the legality of CHS's steering restrictions. Third, CHS incorrectly claims that Plaintiffs have not pleaded actual anticompetitive effects. Fourth, CHS misstates the standards for what Plaintiffs must plead in order to ultimately prevail on their claim.

CHS also continues to insist that the higher prices for healthcare services that Charlotte families and businesses are paying as a result of the loss of competition attributable to CHS's

2

steering restrictions are a "hypothetical impact." CHS Br. at 8. But as alleged in the Complaint, Plaintiffs brought this case for injunctive relief to protect Charlotte healthcare consumers from the higher prices and other anticompetitive harm *that are now occurring* because of CHS's imposition of contractual restrictions on steering. These restrictions, as detailed in the Complaint, insulate CHS from competition with its rivals on price and quality, while impeding insurers' ability to provide consumers with additional low-cost healthcare plans and information about the cost and quality of a healthcare provider's services.

### I. *Amex* Reviewed a District Court Opinion – Developed After Lengthy Discovery and a Seven-Week Trial – and Does Not Support CHS's Motion for Judgment on the Pleadings

According to CHS, *Amex* shows that Plaintiffs' Complaint fails to adequately allege a Section 1 claim. But the procedural posture of the two cases is materially different. The *Amex* court reviewed a 150-page district court opinion analyzing the extensive record of fact and expert testimony compiled during a seven-week trial. The panel concluded, based on the trial record, that the government had failed to prove the steering restrictions in that case were unlawful.

Here, there is no record at all – much less one establishing that CHS's steering restrictions are lawful.[1] Plaintiffs have made detailed allegations in their Complaint about CHS's use of steering restrictions and their anticompetitive effects (*see, e.g.,* Compl. ¶¶ 14, 27), but have not yet been afforded the opportunity to present the extensive evidence, including expert testimony, that will be part of the Court's fact-finding process at trial. At this stage of the action, Plaintiffs' sole obligation is to allege a violation of Section 1 of the Sherman Act that is

---

[1] CHS also makes the unsupported claim that its steering restrictions are pro-competitive. CHS Br. at 6. The Court cannot resolve CHS's unsupported claim without a factual record that accounts for evidence of the restrictions' anticompetitive effects as well as evidence of their purported pro-competitive effects. *See Robertson v. Sea Pines Real Estate Co.*, 679 F.3d 278, 291-92 (4th Cir. 2012). Moreover, CHS's baseless claim directly conflicts with Plaintiffs' allegations, which must be accepted as true for purposes of adjudicating CHS's motion.

3

plausible, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and Plaintiffs have more than satisfied that obligation. CHS overreaches when it attempts to use *Amex*'s resolution of fully-litigated issues pertaining to the credit-card industry as a template for this Court to review the adequacy of Plaintiffs' allegations because, as Plaintiffs' opposition to CHS's Rule 12(c) motion shows (Pl. Opp. Br. at 23-24), CHS's motion raises highly fact-intensive arguments that cannot be resolved without fact and expert discovery, and an evidentiary record.

**II.     The Rationale of *Amex* Does Not Apply to this Case**

In *Amex,* the government challenged provisions in Amex's contracts with merchants that prevented merchants from using discounts and other incentives to steer customers to credit cards that are less costly for merchants. The district court found that the credit-card platform included "two distinct, yet interrelated markets" – a card market in which Amex competed with banks to issue cards to cardholders, and a network-services market in which Amex competed with other networks to serve merchants and issuing banks – and that the government had demonstrated harm to merchants in the network-services market. *See Amex* at *11. The Second Circuit disagreed. Citing the two markets' "interdependence," the Second Circuit found that the relevant market in *Amex* must include services provided to both merchants and cardholders. *Id.* at *14. As a result, the Second Circuit held that the government had to prove that the restrictions "made *all* Amex consumers on both sides of the platform–*i.e.,* both merchants and cardholders–worse off overall." *Id*. at *19 (emphasis in original).

The Second Circuit's analysis of the credit card industry's two-sided platform is flawed, but it would not apply to this case. Plaintiffs' Complaint alleges – and CHS does not dispute in this motion – that the relevant market is the sale of general acute care inpatient hospital services

4

to insurers. Compl. ¶ 17. In this market – which courts have upheld in numerous cases[2] – CHS is acting as a one-sided market provider of hospital services. CHS is the vendor of hospital services, and insurers and their insured customers are purchasers of CHS's services. Compl. ¶ 22. Significantly, CHS's motion papers do not raise any arguments related to the Complaint's relevant market allegations. And CHS has not argued that this case involves a two-sided platform, even in its extensive briefing devoted exclusively to the *Amex* decision. The Second Circuit's analysis of the competitive dynamics of *Amex*'s two-sided credit-card platform is therefore inapplicable to CHS's motion and this litigation.

## III. CHS's Assertions About This Lawsuit and *Amex* Are Wrong

CHS's brief incorrectly identifies what it calls Plaintiffs' "four central arguments." In reality, these assertions are nothing other than mischaracterizations of Plaintiffs' claims and a baseless assertion that *Amex* has changed the legal standards for pleading a Section 1 claim.

### a. Plaintiffs have not alleged that all steering restrictions are unlawful

CHS wrongly asserts that Plaintiffs have alleged that all "restrictions on steering are inherently anticompetitive and violate § 1 of the Sherman Act." CHS Br. at 1. In fact, the plaintiffs in *Amex* did not allege that all steering restrictions are unlawful, and neither have Plaintiffs made such an assertion in this action. Instead, after a significant investigation, Plaintiffs alleged that CHS's specific use of steering restrictions is unlawful because they interfere with the competitive process and result in higher prices for Charlotte consumers.

Compounding its misreading of *Amex*, CHS also appears to suggest incorrectly that *Amex* gave a blanket endorsement to steering restrictions, thereby allowing a district court to reject a Section 1 steering restriction case as a matter of law. *See* CHS Br. at 9 ("As the Second Circuit

---

[2] General acute care inpatient hospital services are a well-established relevant market. *See, e.g., FTC v. Penn State Hershey Medical Center*, - F.3d - , No. 16-2365, 2016 WL 5389289, at *5 (3d Cir. Sept. 27, 2016); *Promedica Health Sys. v. FTC*, 749 F.3d 559, 561 (6th Cir. 2014).

5

explained, steering restrictions protect a company's 'legitimate interest' in the benefit of its bargain with a counter-party."). But *Amex* does not shield all steering restrictions across all industries from antitrust scrutiny. In fact, *Amex* recognized the economic value of steering, noting that "merchants across various industries regularly try to 'steer' their customers toward certain purchasing decisions via strategic product placement, discounts, and other deals…." *Amex* at *7. The court did not purport to hold that steering restrictions could never be anticompetitive – only that the government did not prove that Amex's restrictions were anticompetitive in the particular context of the credit-card industry. *Id.* That conclusion is erroneous, but even if it were not, it says nothing about the effect of CHS's steering restrictions, which involve different contractual language in a different industry that presents different competitive considerations, and that must be evaluated based on a fully-developed record.

### b. Plaintiffs have not "urged" this Court to apply a "quick look" analysis to the legality of CHS's steering restrictions

CHS also wrongly asserts that "the 'quick look' approach" has been "urged by the government here." CHS Br. at 1. Nowhere in Plaintiffs' Complaint or motion papers do they mention the term "quick look." And it would be premature at the pleadings stage to ask this Court to employ a quick look. Quick look is the name given to a truncated method of establishing a violation under the rule of reason that is used when, because of the nature of the challenged action, only a minimal amount of evidence is needed to make out a *prima facie* case. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999) (describing "the quality of proof required"). This lawsuit is not at the proof stage; it is at the pleadings stage. The Court thus need not make any determination about the applicability of a quick look analysis to deny CHS's Rule 12(c) motion.

6

### c. Plaintiffs have alleged actual anticompetitive effects

CHS quotes *Amex* for the proposition that a plaintiff can carry its burden by showing an actual effect on competition "in the form of 'reduced output, decreased quality, [or] supracompetitive pricing.' " CHS Br. at 1-2 (quoting *Amex*) (alteration in CHS's brief).[3] But then it wrongly asserts that Plaintiffs have not alleged such an effect and rely only on allegations of "harm to the competitive process." *Id.* at 2.

As an initial matter, harm to the competitive process *is* an actual anticompetitive effect, whether the restraint at issue is horizontal or vertical. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-62 (1986) (holding that "disrupt[ing] the proper functioning of the price-setting mechanism of the market" is an anticompetitive effect); *Dickson v. Microsoft*, 309 F.3d 193, 206 (4th Cir. 2002) ("To have an anticompetitive effect, conduct must harm the competitive process and thereby harm consumers.") (internal citations and quotation marks omitted). *Amex* does not – and cannot – overrule this controlling Supreme Court and Fourth Circuit precedent.

Moreover, contrary to CHS's assertion, Plaintiffs also have alleged actual anticompetitive effects on price and output for patients and the insurers who pay for their health care. In Paragraph 14 of the Complaint, Plaintiffs allege that when insurers have steered in spite of CHS's restrictions, consumers have paid less for health care. And in Paragraph 27 of the Complaint, Plaintiffs allege that "[a]s a result of this reduced competition due to CHS's steering restrictions, individuals and employers in the Charlotte area pay higher prices" and have less product choice. These are allegations of *actual ongoing harm*: CHS's steering restrictions result

---

[3] CHS's brief misrepresents what the Second Circuit said in *Amex*. The panel said that "*Examples* of actual anticompetitive effects *include* reduced output, decreased quality, and supracompetitive pricing" rather than the categorical statement which CHS suggests. *Amex* at *10 (emphases added).

7

in Charlotte consumers paying more for health care. Compl. ¶¶ 8-10, 12, 14, 15, 25, 27; *see also* Pl. Opp. Br. at 15-16.

### d. *Amex* does not change Section 1's indirect method of proof or its pleading requirements

CHS mistakenly argues that *Amex* increases the burden on a plaintiff using indirect methods of anticompetitive effects and market power:

> [T]he Second Circuit held that to indirectly prove that restrictions on steering violate Section 1, the government could not simply allege that a defendant had "market power" solely on the basis of market share, barriers to entry and consumer loyalty. Rather, the government must show (and allege) that the challenged conduct is inherently anticompetitive or offer another reason to believe that the challenged restrictions could harm competition.

CHS Br. at 2.

On using the indirect method of asserting anticompetitive effects, CHS's recitation of the legal standard is confusing and incorrect. As *Amex* explained, a plaintiff need only assert that (a) defendant has market power sufficient to harm competition and (b) there is "some other ground for believing that the challenged behavior could harm competition." *Amex* at *10. Plaintiffs have adequately alleged both elements. *E.g.,* Compl. ¶¶ 3-4, 23-24, 26, 34 (market power); ¶¶ 5-7, 10, 12-14, 25-28 (could harm competition); *see* Pl. Opp. Br. at Part IV.B.

On market power, CHS mistakenly asserts that *Amex* overruled precedent holding that high market shares are a sufficient basis to infer market power. CHS Br. at 2, 8. *Amex* explicitly recognized that "market power may be inferred based on market share." *Amex* at *15 ("One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market." (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.)). In this case, Plaintiffs' Complaint alleges that CHS has approximately a 50% market share in a market with high entry barriers. Never in its nearly 70

8

pages of briefing does CHS argue that its 50% market share is insufficient to plead market power.

Amex's market share was much less (26.4%). Thus, the district court also relied on "the amplifying effect of cardholder insistence." *Amex* at *16 (quoting *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 190-91 (E.D.N.Y. 2015)). Here, however, Plaintiffs' allegations of 50% market share (and barriers to entry) alone are sufficient to plead market power. *See, e.g., Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930, 937 (7th Cir. 2000) (market power with 20-49% share). To show that the Complaint plausibly pleads CHS's market power, Plaintiffs do not need any amplifying effect from the power of CHS's customers' insistence. Thus, this Court need not consider any customer "insistence" factor to deny CHS's motion.

In any event, the *Amex* court's assertion that customer insistence "supports a *lack* of market power," *Amex* at *17 (emphasis in original), is erroneous because it conflates the question of whether market power exists with the separate question of how market power came into existence. Only the former is relevant for purposes of this analysis. As courts in this Circuit have made clear, market power typically "hinges on whether a company has a large enough market share to control prices in the relevant market." *Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp.*, 748 F. Supp. 344, 355 (M.D.N.C. 1990), *aff'd*, 964 F.2d 335 (4th Cir. 1992), *aff'd sub nom. Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). The reasons *why* a firm such as CHS has obtained market power – whether it was by acquiring competitors, offering desirable services, or other factors – are immaterial. If a defendant possesses the ability "to raise prices above those that would be charged in a competitive market," it has market power. *NCAA v. Bd. of Regents of Univ.y of Oklahoma*, 468 U.S. 85, 109 n.38

9

(1984). Plaintiffs have alleged that CHS has such power over pricing here. *E.g.,* Compl. ¶¶ 3-4, 23-24, 26, 34. No more is necessary at this stage.[4]

## CONCLUSION

CHS's reliance on *Amex* – a case that was decided *after* fact and expert discovery and a trial – is misplaced and premised on a fundamental misreading of the rationale and holding in *Amex*. As established in Plaintiffs' opposition to CHS's Rule 12(c) motion, Plaintiffs' allegations are more than sufficient to state a plausible claim that CHS's steering restrictions are a continuing violation of Section 1 of the Sherman Act. Therefore, the Court should deny CHS's Rule 12(c) motion and enable the litigation to proceed.

---

[4] CHS's notion that consumer demand (or "preference") can disprove market power also sets the laws of economics on their head. A seller could not impose a price increase – or charge any price at all – in the absence of consumer demand for its product. Accordingly, far from supporting a lack of market power, consumer demand is inherent in the exercise of market power. As noted above, Plaintiffs are not alleging that the naked existence of market power states a Section 1 claim but rather that the existence of market power is a predicate to the finding of a Section 1 violation where additional factors are also present. Thus, plaintiffs need not allege CHS's market power arose from any illegitimate action.

Dated: October 25, 2016

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

*s/John Read*  
JOHN R. READ  
KARL D. KNUTSEN  
RICHARD MARTIN  
PAUL TORZILLI  

Antitrust Division  
U.S. Department of Justice  
450 Fifth Street, N.W., Suite 4100  
Washington, D.C. 20530  
(202) 514-8349 (phone)  
(202) 514-7308 (fax)  
Paul.Torzilli@usdoj.gov  

*s/Paul B. Taylor*  
PAUL B. TAYLOR  
Assistant United States Attorney  
Chief, Civil Division  
N.C. Bar Number 10067  
Room 233, U.S. Courthouse  
100 Otis Street  
Asheville, NC 28801-2611  
(828) 271-4661(phone)  
paul.taylor@usdoj.gov  

FOR PLAINTIFF THE STATE OF NORTH CAROLINA:

ROY COOPER  
Attorney General of North Carolina  

*s/K.D. Sturgis*  
K.D. STURGIS  
Special Deputy Attorney General  
North Carolina Department of Justice  
N.C. Bar Number 9486  
P.O. Box 629  
Raleigh, NC 27602  
Tel. (919) 716-6011  
Fax (919) 716-6050  
ksturgis@ncdoj.gov

# CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of October, 2016 the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEFING ON *UNITED STATES v. AMERICAN EXPRESS*** was served via the Court's CM/ECF system as follows:

James P. Cooney III
Debbie W. Harden
Mark J. Horoschak
Brian Hayles
Michael Fischer
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
E-mail: jcooney@wcsr.com
E-mail: dharden@wcsr.com
E-mail: mhoroschak@wcsr.com
E-mail: bhayles@wcsr.com
E-mail: mfischer@wcsr.com

Richard A. Feinstein
Nicholas A. Widnell
Hampton Dellinger
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington DC 20015
(202) 274-1152 (direct)
Email: hdellinger@bsfllp.com
Email: rfeinstein@bsfllp.com
Email: nwidnell@bsfllp.com
*Attorneys for Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System*

                                            */s Paul Torzilli*
                                            Paul Torzilli