# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:16-cv-00311-RJC-DCK

| | |
|---|---|
| **UNITED STATES OF AMERICA and THE STATE OF NORTH CAROLINA,** )<br>)<br>**Plaintiffs,** )<br>)<br>v. )<br>)<br>**THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY d/b/a CAROLINAS HEALTHCARE SYSTEM,** )<br>)<br>**Defendant.** )<br>_____ ) | **ORDER** |

**THIS MATTER** comes before the Court on Defendant's Motion for Judgment on the Pleadings, (Doc. No. 10), and the Memorandum in Support, (Doc. No. 11); Plaintiffs' Opposition to Defendant's Motion, (Doc. No. 25); Plaintiffs' Reply Memorandum in Support of Their Motion, (Doc. No. 31); Defendant's Supplemental Memorandum, (Doc. No. 37); Plaintiffs' Supplemental Memorandum, (Doc. No. 38); and Defendant's Suggestion of Subsequently Decided Authority, (Doc. No. 39). Additionally, before the Court is Defendant's Motion to Exclude or Alternatively to Strike Extraneous Materials regarding Exhibit 2 of Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings, (Doc. No. 29) ("Motion to Exclude"); Defendant's Memorandum in Support of its Motion to Exclude, (Doc. No. 30); Plaintiffs' Response in Opposition to the Motion to Exclude, (Doc. No. 32); and Defendant's Reply in Support of its Motion to Exclude, (Doc. No. 36). The motions are ripe for adjudication.

I.  **BACKGROUND**

For most, the world of healthcare is a perplexing one sought to be avoided, but frequently necessary.  Health insurance only adds complexity, including factors such as co-pays, deductibles, in-network providers, and out-of-network providers.  And while these complexities may have benefits, they also present difficulties, frequently to consumers who become limited by who can provide their healthcare and how much it will cost.  This case involves the relationship between hospital system and insurance company, and how that relationship affects everyday patients and consumers.  At its core, this case asks whether a hospital system's contractual restrictions on insurance companies operate as an unreasonable restraint on trade, specifically, can a hospital authority's contract with insurance companies include "steering" restrictions that limit insurance companies' ability to inform their customers about, or incentivize them to use, other health-service providers which may be able to provide better or more affordable service.

Defendant Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas HealthCare System ("Defendant" or "CHS") is a not-for-profit corporation providing healthcare services with its principal place of business in Charlotte, North Carolina.  (Doc. No. 1, ¶ 1; Doc. No. 8, ¶ 1).  CHS operates ten acute-care hospitals in the Charlotte area, the largest of which is the Carolinas Medical Center.  (Id.).  CHS is the largest hospital system in the Charlotte area; it has a fifty percent share of the relevant market and its next closest competitor has half the number of acute-care hospitals and less than half the revenue.  (Doc. No. 1, ¶ 2).

Like other hospital authorities, Defendant enters into contracts with insurance companies governing the purchase and sale of, among other things, general acute care inpatient hospital services.  (Id. ¶ 17).  General acute care inpatient hospital services include the basic services that people typically receive from hospitals—broadly and generally speaking, medical and surgical

diagnostic and treatment services, including everything from obstetrics to cardiac services. (Id. ¶ 19). Insurers then provide coverage for those services via different insurance plans offered for purchase to consumers.

According to the Complaint filed by the United States of America and the State of North Carolina (collectively, "Plaintiffs" or the "Government") on June 9, 2016, CHS's contracts with insurance companies frequently if not always prohibit certain competitive behavior. (Id. ¶¶ 15–16). One of these competitive behaviors is steering. (Id. ¶12). Examples of steering in the health insurance industry include tiered networks, which may give consumers lower coinsurance payments or better quality healthcare services if they use a healthcare provider from a higher tier, and narrow-network insurance plans, which may give consumers lower premiums and out-of-pocket expense in exchange for choosing from a smaller list of healthcare providers. (Doc. No. 1, ¶¶ 8–9); see, e.g., (Doc. No. 8-3). Plaintiffs also allege that Defendant uses its contracts with insurance companies to restrict the flow of information to consumers, specifically, that Defendant limits the ability of insurance companies to share comparative cost and quality information with consumers. (Id. ¶ 13).

Defendant CHS maintains and enforces steering restrictions in its contracts with at least Aetna Health of the Carolinas, Inc., Blue Cross Blue Shield of North Carolina, Cigna Healthcare of North Carolina, Inc., and United Healthcare of North Carolina, Inc., which collectively insure more than eighty-five percent of the commercially-insured residents in the Charlotte area. (Id. ¶¶ 15–16). The steering restrictions with each insurer vary, but range from an outright prohibition to granting CHS the right to terminate the contract if the insurer steers patients. (Id. at 16). The Government alleges that regardless of their precise wording, each of these restrictions consistently create disincentives and deter insurers from providing patients with full information

about healthcare options, including price and cost comparisons across healthcare providers. (Id.). In other words, an insurance company may be restricted from telling one of its enrollees that he or she could receive certain treatment for less money or from a better healthcare provider. Although insurance companies do not want these restrictions, they feel compelled to agree to them in order to maintain their relationships with CHS because of its market power the largest hospital in the area. (Id. ¶ 26).

The effect on the market, according to the Complaint, is that CHS's restrictions reduce competition in the Charlotte area, which in turn causes higher prices for health insurance, fewer healthcare plans available, less available information that would allow consumers to compare prices and plans, and generally less efficient healthcare plans. (Id. ¶¶ 14, 25, and 27). In a nutshell, the Government alleges that both consumers and insurers are directly harmed by CHS's essentially mandatory steering restrictions. (Id. ¶ 27). CHS instituted and continues this practice without a procompetitive purpose, but instead to protect itself from price competition, maintain higher prices, and preserve a dominant position in the market, according to the Government. Thus, the Government contends, CHS has violated federal law—Section 1 of the Sherman Act, which prohibits agreements that unreasonably restrain trade. (Id. ¶¶ 33–39).

In response to the allegations outlined above, CHS timely filed an Answer to the Government's Complaint and a Motion for Judgment on the Pleadings on August 8, 2016. (Doc. Nos. 8, 10). That motion is currently before the Court, in conjunction with CHS's Motion to Exclude, which was filed in relation to the Motion for Judgment on the Pleadings. (Doc. No. 29).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss brought under Rule 12(b)(6).  Occupy Columbia v. Haley, 738 F.3d 107, 115 (4th Cir. 2013).  That standard tests "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  The complaint will survive if it contains enough facts "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Facial plausibility means allegations that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  Twombly, 550 U.S. at 545 (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984)).  Additionally, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (quoting Twombly, 550 U.S. at 555-56).  Nonetheless, a court is not bound to accept as true legal conclusions couched as factual allegations.  Papasan v. Allain, 478 U.S. 265, 286 (1986).  Courts cannot weigh the facts or assess the evidence at this stage, but a complaint entirely devoid of any facts supporting a given claim cannot proceed.

Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Academy Alumni Ass'n, Inc., 2 F. Supp. 3d 758, 767-68 (D. Md. 2014). Furthermore, the court "should view the complaint in the light most favorable to the plaintiff," drawing reasonable inferences in its favor. Mylan Labs, Inc. v. Matkar, 7 F.3d 1130, 1134 (4th Cir. 1993). Judgment on the pleadings may be granted when the undisputed facts show that the moving party is entitled to judgment as a matter of law. Bradley v. Ramsey, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004) (citing Moore's Federal Practice, § 12.38 (3d ed.)).

A court may consider the complaint, answer, and any materials attached to those pleadings or motions for judgment on the pleadings "so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see also Fed. R. Civ. P. 10(c) ("[A]n exhibit to a pleading is part of the pleading for all purposes."). Any factual allegations contained in an answer are only taken as true if they do not conflict with the complaint and have not been denied by plaintiff. Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011) (quoting Jadoff v. Gleason, 140 F.R.D. 330, 331 (M.D.N.C. 1991)). When an answer does not require a responsive pleading, the allegations are assumed denied. Id. (citing Jadoff, 140 F.R.D. at 332); Fed. R. Civ. P. 8(b)(6).

### III. DISCUSSION

    a. Defendant's Motion to Exclude or Alternatively Strike Exhibit 2 of Plaintiffs' Response in Opposition to Defendant's Motion for Judgment on the Pleadings

As an initial matter, the Court must address Defendant's Motion to Exclude. (Doc. No. 29). Defendant argues that the Court should exclude from its review and decision-making process regarding the Motion for Judgment on the Pleadings Plaintiffs' Exhibit 2 attached to their opposition to Defendant's Motion for Judgment on the Pleadings. (Id.). Exhibit 2, (Doc.

No. 25-3), contains 305 pages that seem to consist of academic articles and other literature regarding steering in the healthcare industry, which Plaintiffs submit to show the benefits of steering, and conversely, support their allegations concerning the anti-competitive effects of restricting steering. (Doc. No. 32 at 2). Plaintiffs contend that Exhibit 2 was only submitted in their opposition to address Defendant's assertions that Plaintiffs' allegations regarding steering were "unprecedented," "conjecture and supposition," and "implausible." (Id.; Doc. No. 11 at 2, 6).

In addition to the complaint, the answer, and any exhibits attached thereto that are integral and authentic, the Court may "properly take judicial notice of matters of public record." Philips, 572 F.3d at 180 (citations omitted); see, e.g., Papasan, 478 U.S. at 283. Courts can generally take judicial notice of facts that cannot be trumped by judicial review. Clatterbuck v. City of Charlottesville, 708 F.3d 549, 558 (4th Cir. 2011) (citation omitted), rev'd on other grounds. Examples include formal legislative history, case law and statutes, publicly available statistics on a government website. See, e.g., Hall v. Virginia, 385 F.3d 421, 424 (4th Cir. 2004); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998); Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1312 (4th Cir. 1995), judgment vacated on other grounds, 517 U.S. 1206 (1996), readopted, 101 F.3d 325 (4th Cir.1996), cert. denied, 520 U.S. 1204 (1997). On the other hand, publicly available information that could be questioned or proven incorrect or lacking credibility should not be recognized by judicial notice. See, e.g., Clatterbuck, 708 F.3d at 557–58 (finding that a quote from a citizen speaking at a city council meeting was not a fact, but an opinion that does not qualify for judicial notice). Ultimately, the Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby

converting the motion, or to reject it or simply not consider it." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). See Forshaw Indus., Inc. v. Insurco, Ltd., 2 F. Supp. 3d 772, 782 (W.D.N.C. 2014).

Exhibit 2 falls more into the second category than the first. That is, Exhibit 2 contains information which may very well be credible and useful, but is not the type of reliable factual information that qualifies for judicial notice. Indeed, the articles, and reports and surveys are authored by private sources and may be subject to credibility questions. In short, Exhibit 2 does not contain the type of information of which courts can take judicial notice, and therefore, the Court excludes Exhibit 2 from its evaluation of Defendant's Motion for Judgment on the Pleadings.[1]

  b. <u>Defendant's Motion for Judgment on the Pleadings</u>

Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that impose an unreasonable restraint on trade. 15 U.S.C. § 1 (2004). Thus, to prove a violation of Section 1, a plaintiff must establish two elements: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002); see N. Carolina State Bd. of Dental Examiners v. Fed. Trade Comm'n, 717 F.3d 359, 371 (4th Cir. 2013), aff'd, 135 S. Ct. 1101 (2015). Because Defendant does not contest

---

[1] Plaintiffs also argue that Defendant did not meet and confer with opposing counsel before filing the Motion to Strike in violation of LCvR 7.1. (Doc. No. 32 at 3). As Plaintiffs note, meeting and conferring serves the important purpose of eliminating issues, narrowing disputes, preserving judicial resources, and the Court would add, not wasting client resources. (Id.). As Defendant conversely notes, failure to meet and confer does not prevent the Court from ruling on the motion. (Doc. No. 36 at 3 n.1). The Court also recognizes that LCvR 7.1(B) does not speak directly to procedural or evidentiary motions in connection with a Rule 12 motion, which is precluded from the meet-and-confer requirements of LCvR 7.1. Nevertheless, the Court encourages the parties to meet and confer as the rules require, and when in doubt, meet and confer in the hope of a more efficient and cordial litigation process.

the first element, the Court will focus its discussion as the parties have—on the standard governing unreasonable restraints of trade.

"Unreasonable restraints of trade are evaluated under one of two tests. In the rare cases where the unreasonable restraint on trade is so obvious, such as price fixing, courts may find the alleged restraint is per se unreasonable. See Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007); Oksanen v. Page Memorial Hosp., 945 F.2d 696, 708 (4th Cir. 1991). But in the majority of cases, courts apply the rule of reason when determining whether conduct is an unreasonable restraint on trade. Leegin, 551 U.S. at 907; Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 59 (1977). More specifically, vertical restraints of trade[2] are typically reviewed under the rule of reason. Leegin, 551 U.S. at 907 ("Vertical price restraints are to be judged according to the rule of reason."); Cont'l T.V., 433 U.S. at 59 ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under [§] 1 of the Act.").

Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Cont'l T.V., 433 U.S. at 49. The court must ask "whether the restraint imposed is such as merely regulates and thereby promotes competition or whether it is such as may suppress or even destroy competition." Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918). Thus, a restraint is unreasonable when "its anticompetitive effects outweigh its

---

[2] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988). Neither party contests that the agreements involved here involve vertical restraints.

procompetitive effects." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341 (1990); see Robertson v. Sea Pines Real Estate Cos., Inc., 679 F.3d 278, 291 (4th Cir. 2012).

At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets." W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 100 (3d Cir. 2010) (citations omitted). "Anticompetitive effects include increased prices, reduced output, and reduced quality." Id. (citations omitted). Plaintiffs can show anticompetitive effects in one of two ways—an actual adverse effect on competition or sufficient market power to cause an adverse effect on completion. Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998). The Court will refer to these two avenues as direct harm and indirect harm.

To prove an unreasonable restraint through evidence of direct harm, a plaintiff must offer "proof of actual detrimental effects, such as a reduction of output." Fed. Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 460–61 (1986) (citation omitted). Other examples of actual harm include increased prices and decreased quality. W. Penn Allegheny Health Sys., 627 F.3d at 100. In the alternative, plaintiffs can opt for the indirect method through which a plaintiff must show that defendant has sufficient market power such that the alleged restraint "has the potential for genuine adverse effects on competition." Indiana Fed'n of Dentists, 476 U.S. at 460. Market power is defined as "the power to force a purchaser to do something that he would not do in a competitive market." Eastman Kodak Co. v. Image Technical Services, Inc., et al., 504 U.S. 451, 464 (1992). But, "market power, while necessary to show adverse effect indirectly, alone is insufficient." Tops Markets, 142 F.3d at 97 (citation omitted). Plaintiffs must show market power plus "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the

defendant's behavior or the structure of the interbrand market." Id. (citing K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995); Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560, 1573 (11th Cir. 1983)).

The Government alleges that the relevant market is "the sale of general acute care inpatient hospital services to insurers" in the Charlotte area—the Charlotte Combined Statistical area as defined by the U.S. Office of Management and Budget. (Doc. No. 1, ¶¶ 17, 21). At this stage, Defendant does not appear to contest the Government's definition of the relevant market. Accordingly, at issue is solely whether Plaintiffs alleged facts sufficient to state plausibly that Defendant's steering restrictions were an unreasonable restraint on trade, or in other words, that they had an adverse effect on competition in the relevant market.

Although CHS phrases its argument as the Government failing to allege facts that show actual competitive harm, its argument reads more in the vein of a summary judgment motion requiring the Government to prove competitive harm. That is not the Government's burden at this stage. Some of the Government's allegations do ring of the threadbare recitals and conclusory statements barred by Twombly and Iqbal. For example, the Government alleges that CHS's steering restrictions "lessen competition," "likely reduce the prices paid," and "do not have any procompetitive effects." (Doc. No. 1, ¶¶ 25, 28). Without more, those allegations would be problematic. But the Government goes further:

> [I]ndividuals and employers in the Charlotte area pay higher prices for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely. . . . Charlotte area patients incur higher out-of-pocket costs for their healthcare.

(Id. ¶ 27). Defendant contests the truth of these factual allegations[3]—and may be correct in doing so—but at the pleading stage, a judge must accept as true all of the factual allegations contained in the complaint and "will assume that the plaintiffs can prove the facts that they allege in their complaint . . . ." Estate Const. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 221 (4th Cir. 1994). Accepted as true, these allegations are specifically the type of allegation that states a direct anticompetitive effect and a plausible claim for relief under Section 1 of the Sherman Act. See W. Penn Allegheny Health Sys., 627 F.3d at 100 ("Anticompetitive effects include increased prices, reduced output, and reduced quality.") (citations omitted). They are not legal conclusions baldly and only stating that CHS's steering restricts unreasonably restrain trade, nor are they allegations of theoretical harm stating that CHS's actions "could," "might," or "potentially" cause actual harm. See Tops Markets, 142 F.3d at 96 (holding that plaintiff did not adequately allege an actual adverse effect because it stated that the conduct could have resulted in prices "potentially" being higher as opposed to "actually" being higher); Estate Const. Co., 14 F.3d at 222 (affirming dismissal of a Section 1 anti-trust claim where plaintiffs vaguely alleged that defendants "conspired . . . to restrain trade unreasonably" without more specifics).

Admittedly, determining whether a restraint on trade is unreasonable is a fact-intensive inquiry. The Supreme Court noted as much in Board of Trade of City of Chicago v. United States when it outlined the factors the Court must consider when determining the legality of a restraint on trade:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or

---

[3] Among other things, CHS argues that steering restrictions are beneficial and procompetitive, CHS's prices are higher due to a superior product and consumer loyalty, insurance companies are still able to steer, no insurance companies have asked to remove steering restrictions from contracts, and CHS has never refused to eliminate these provisions. (Doc. No. 11 at 3–5, 9–12, 17–18).

> even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

246 U.S. at 238. In the healthcare context specifically, the Court "should consider, among other things, the facts peculiar to the health care industry, the effect of the activities on health providers, and the impact of the activities on costs to the ultimate consumer. The history of the restraint and the purpose or end sought are also relevant facts." Ratino v. Med. Serv. of D.C. (Blue Shield), 718 F.2d 1260, 1272 (4th Cir. 1983) (citing Chicago Bd. of Trade, 246 U.S. at 238).

Resolution of these fact-intensive inquiries requires discovery, and perhaps ultimate decision by a fact-finder. Indeed, many of the cases Defendant cites regarding unreasonable restraints on trade were resolved at the summary judgment or trial stage and survived Rule 12 motions. For example, in Robertson v. Sea Pines Real Estate Cos., Inc., the Fourth Circuit stated at the motion to dismiss stage the court's task is "limited" before ultimately concluding "[w]e cannot know at this early stage whether plaintiffs will ultimately prevail. Whether defendants' conduct indeed violated the Sherman Act is a question to be answered on remand." 679 F.3d 278, 284, 291 (4th Cir. 2012) (affirming the district court's decision to deny defendants' motion to dismiss). Indeed, the detail of the allegations in Robertson were comparable to the case at hand. Where plaintiff alleged that the rules at issue "were not reasonably necessary to achieve the procompetive benefits" but defendants raised "potential legitimate business purposes that may justify the rules as promoting competition," the Fourth Circuit concluded that:

> At this early stage in the litigation, we are not in a position to weigh the alleged anticompetitive risks . . . against their procompetitive justifications. The rule of reason inquiry is best conducted with the benefit of discovery and we thus express

>no view on the merits of the litigation beyond recognizing the sufficiency of the complaints.

Id. at 292. Similarly here CHS has raised serious and robust questions about the purposes, effects, and legality of its contractual steering restrictions and steering restrictions generally, but those questions are best resolved after the benefit of discovery, allowing the fact finder to evaluate the purposes and competitive effects within the specific context of the Charlotte-area healthcare system and insurance industry. In short, under clearly established Fourth Circuit precedent, Plaintiffs have alleged direct evidence of market harm with enough specificity that their claim for a violation of 15 U.S.C. § 1 is plausible.

Similarly, Plaintiffs have sufficiently alleged facts that plausibly could support the conclusion via the indirect method that CHS's steering restraints are an unreasonable restraint on trade. First, Plaintiffs adequately allege that Defendant has significant market power, stating that "CHS is the dominant hospital system in the Charlotte area, with approximately a 50 percent share of the relevant market," and has more than twice the revenue of its next closest competitor and ten times the revenue of its second closest competitor. (Doc. No. 1 at ¶ 2). See Eastman Kodak, 504 U.S. at 470 n.15 ("[M]arket power is often inferred from market share."); see, e.g., United States v. Visa U.S.A., Inc., 344 F.3d 229, 239–40 (2d Cir. 2003) (finding market power where defendants had 47% and 26% shares in the relevant market); Toys "R" Us, Inc. v. Fed. Trade Comm'n, 221 F.3d 928, 930 (7th Cir. 2000) (finding market power where defendant had a 20% national market share in sales and 35–49% market share in certain regions). Plaintiffs further allege that "[a]n insurer selling health insurance plans to individuals and employers in the Charlotte area must have CHS as a participant in at least some of its provider networks, in order to have a viable health insurance business in the Charlotte area." (Id. ¶ 24). See ProMedica Health Sys., Inc. v. Fed. Trade Comm'n, 749 F.3d 559, 570 (6th Cir. 2014) ("[A] network which

does not include a hospital provider that services almost half the county's patients in one relevant market, and more than 70% of the county's patients in another relevant market, would be unattractive to a huge swath of potential members."). And, Plaintiffs allege that significant barriers to entering the market of hospital system exists, noting the time and expense burdens of building a reputation, attracting doctors and patients, and building and licensing facilities. (Doc. No. 1, ¶ 37).

Moreover, Plaintiffs allege that insurance companies would prefer not to have restrictions on steering in their contracts, but are unable to negotiate those provisions out of their contracts with Defendant because of Defendant's significant role in the market. (Id. ¶ 26) ("For years, insurers have tried to negotiate the removal of steering restrictions from their contracts with CHS, but cannot because of CHS's market power."). By the Supreme Court's definition, this clearly demonstrates CHS's market power. Eastman Kodak, 504 U.S. at 464 ("Market power is the power to force a purchaser to do something that he would not do in a competitive market.").

Plaintiffs' complaint is full of reasons to believe CHS's market power has the "potential for genuine adverse effects on competition." Indiana Fed'n of Dentists, 476 U.S. at 460. First, Plaintiffs allege Defendant can charge prices that are higher than competitive levels and has "long had a reputation for being a high-priced healthcare provider." (Doc. No. 1, ¶¶ 3, 4). Regarding CHS's steering restrictions, Plaintiffs state that steering typically lowers health care expenses, threatens CHS's high prices and revenues, induces price competition, impedes insurers from incentivizing less-expensive or high quality alternative providers, and incentivizes providers to be efficient and innovative. (Id. ¶¶ 5–7, 10). Plaintiffs further allege the potential adverse effects that absent these steering restrictions, "likely reduce the prices paid . . . by insurers" and "insurers would likely steer consumers to lower-cost providers more than their

current contracts with CHS presently permit." (Id. ¶¶ 25, 26). Contrary to Defendant's allegation, Plaintiffs tie these effects directly to CHS's market power by alleging that insurers would prefer not to have steering restrictions in their contracts but are unable to remove them because of the necessity to include CHS in their plans. (Id. ¶ 26).

Defendant relies heavily on United States v. American Express Co., a recent Second Circuit decision, to argue, among other things, that Plaintiffs have not alleged facts sufficient to present a plausible claim of harm to competition proven by indirect evidence. 838 F.3d 179 (2d Cir. 2016). Indeed, both Defendant and Plaintiffs requested to and did file supplemental briefing on the case because the Second Circuit decision, which reversed the Eastern District of New York's decision, came down while Defendant's Motion for Judgment on the Pleadings was pending. (Doc. Nos. 34, 35, 37, and 38).

At the outset, the Court will make several observations regarding the weight and influence the Am. Express case has on this Court's decision. First, the Court is not bound by the Second Circuit's decision, though it does consider the decision instructive because, at least according to Defendant, Am. Express represents "the only other case in which the government has challenged steering restrictions as anticompetitive under § 1 of the Sherman Act." (Doc. No. 37 at 2). Second, the Am. Express opinion involved a different product and a different market (credit cards in a global market). As discussed above, when evaluating allegedly unreasonable trade restraints, courts must consider the history and details of the market at issue. See Ratino, 718 F.2d at 1272. Finally, Am. Express did not address the pleading requirements for alleged violations under Section1; rather, the Second Circuit's opinion related to what the government needed to prove to establish liability at the trial stage. Indeed, the Sherman Act claims survived

summary judgment and the Second Circuit's decision involved the review of a 150-page district court opinion formulated after a seven-week bench trial. (Doc. No. 38 at 3).

Nevertheless, Defendant contends that under Am. Express Plaintiffs' argument that Defendant's market share, high barriers to entry, and significant consumer loyalty to Defendant show market power lacks merit.[4] (Doc. No. 37 at 8–10). First, Defendant argues that consumer loyalty, "results not from market power, but instead from competitive benefits on the [consumer] side." (Id. at 8) (quoting Am. Express, 838 F.3d at 202) (bracketed language not in original). But this misrepresents the narrowness of the Second Circuit's analysis which related specifically to the loyalty of credit card holders to specific credit cards. The Second Circuit reasoned that customer loyalty in that context did not support a finding of market power because credit card companies establish loyalty by increasing card rewards, which effectively is a price reduction— i.e., not a unilateral price increase. See Am. Express, 838 F.3d at 202–03. The Second Circuit's opinion does not speak to whether customer loyalty in the context of hospital systems is evidence of market power and the ability to increase prices unilaterally. CHS also argues that the Government's theory that steering restrictions impair the competitive process by suppressing incentives to offer lower prices was rejected by the Second Circuit and cannot be relied on by the Government anymore. (Doc. No. 37 at 9). The Second Circuit held that, in the context of the credit card industry, companies have a "legitimate interest" in preventing steering and that there

---

[4] Defendant also argues that Am. Express precludes the Court from finding that restrictions on steering are inherently anti-competitive and from applying the "quick-look" approach to Plaintiffs' competitive harm allegations. (Doc. No. 37 at 1). Since the Court does neither in this opinion, it will not address those arguments further. Finally, Defendant levies an unpersuasive argument regarding what must be alleged to establish an actual adverse effect on competition. (Id. at 2). Above, the Court has already explained the applicable and governing law regarding actual adverse effects at the pleading stage. The Am. Express opinion did not change that standard.

is "no monopolisitc danger in this purpose." Am. Express, 838 F.3d at 204.  In other words, the credit-card steering restrictions at issue had procompetitive benefits without competitive harms.  Again, the Second Circuit's analysis is deeply rooted in the details and dynamics of the credit-card industry, using specific hypothetical examples from that industry to prove its point.  Importantly, this Court has not been presented with facts yet enabling it to conclude whether CHS's steering restrictions have procompetitive or anticompetitive effects.  The Government plausibly contends that they have anticompetitive effects while CHS asserts that they have procompetitive effects.  This factual dispute, like the one in Am. Express, must be evaluated with the benefit of discovery before this Court can make a pronouncement such as the one the Second Circuit made.

A plaintiff's bar at the pleading stage is not a high one and it also is not a meaningless one.  Nevertheless, a plaintiff does not have to raise probable claims—indeed, a complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (citation omitted).  The Government here has met its initial burden.  It has alleged a facially plausible claim that Defendant CHS violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, it has alleged both elements of its claim adequately, including facts that, if proven true, would provide direct and indirect evidence of an adverse effect on competition caused by Defendant's steering restrictions that it imposes on insurance companies.  Accordingly, Defendant's Motion for Judgment on the Pleadings is denied.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion to Exclude, or Alternatively to Strike Extraneous Materials, (Doc. No. 29), is **GRANTED**. The Court excluded Exhibit 2 of Plaintiffs' Response in Opposition to Defendant's Motion for Judgment on the Pleadings from its review and consideration for the purposes of resolving the Motion for Judgment on the Pleadings; and

2. Defendant's Motion for Judgment on the Pleadings, (Doc. No. 10), is **DENIED**.

Signed: March 30, 2017

Robert J. Conrad, Jr.
United States District Judge