UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-00311-RJC-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA and ) <br> THE STATE OF NORTH CAROLINA, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE CHARLOTTE-MECKLENBURG ) <br> HOSPITAL AUTHORITY d/b/a ) <br> CAROLINAS HEALTHCARE SYSTEM, ) <br> ) <br> Defendant. ) <br> _____ ) | **ORDER** |

## FINAL JUDGMENT

**THIS MATTER** comes before the Court on Plaintiff United States' Unopposed Motion for Entry of Modified Proposed Final Judgment, (Doc. No. 98), and the parties' associated briefs and exhibits. WHEREAS, Plaintiffs, the United States of America and the State of North Carolina (collectively "Plaintiffs"), filed their Complaint on June 9, 2016; Plaintiffs and Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health f/k/a Carolinas HealthCare System (collectively the "Parties"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law;

AND WHEREAS, this Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, the Plaintiffs and Defendant agree to be bound by the provisions of this Final Judgment pending its approval by this Court;

AND WHEREAS, the essence of this Final Judgment is to enjoin Defendant from prohibiting, preventing, or penalizing steering as defined in this Final Judgment;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

The Court has jurisdiction over the subject matter of and each of the Parties to this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.

## II. DEFINITIONS

For purposes of this Final Judgment, the following definitions apply:

A. "Benefit Plan" means a specific set of health care benefits and Healthcare Services that is made available to members through a health plan underwritten by an Insurer, a self-funded benefit plan, or Medicare Part C plans. The term "Benefit Plan" does not include workers' compensation programs, Medicare (except Medicare Part C plans), Medicaid, or uninsured discount plans.

B. "Carve-out" means an arrangement by which an Insurer unilaterally removes all or substantially all of a particular Healthcare Service from coverage in a Benefit Plan during the performance of a network-participation agreement.

C. "Center of Excellence" means a feature of a Benefit Plan that designates Providers of certain Healthcare Services based on objective quality or quality-and-price criteria in order to encourage patients to obtain such Healthcare Services from those designated Providers.

D. "Charlotte Area" means Cabarrus, Cleveland, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Stanly, and Union counties in North Carolina and Chester, Lancaster, and York counties in South Carolina.

E. "Co-Branded Plan" means a Benefit Plan, such as Blue Local with Carolinas HealthCare System, arising from a joint venture, partnership, or a similar formal type of alliance or affiliation beyond that present in broad network agreements involving value-based arrangements between an Insurer and Defendant in any portion of the Charlotte Area whereby both Defendant's and Insurer's brands or logos appear on marketing materials.

F. "Defendant" means The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health f/k/a Carolinas HealthCare System, a North Carolina hospital authority with its headquarters in Charlotte, North Carolina; and its directors, commissioners, officers, managers, agents, and employees; its successors and assigns; and any controlled subsidiaries (including Managed Health Resources), divisions, partnerships, and joint ventures, and their directors, commissioners, officers, managers, agents, and employees; and any Person on whose behalf Defendant negotiates contracts with, or consults in the negotiation of contracts with, Insurers. For purposes of this Final Judgment, an entity is controlled by

Defendant if Defendant holds 50% or more of the entity's voting securities, has the right to 50% or more of the entity's profits, has the right to 50% or more of the entity's assets on dissolution, or has the contractual power to designate 50% or more of the directors or trustees of the entity. Also for purposes of this Final Judgment, the term "Defendant" excludes MedCost LLC and MedCost Benefits Services LLC, but it does not exclude any Atrium Health director, commissioner, officer, manager, agent, or employee who may also serve as a director, member, officer, manager, agent, or employee of MedCost LLC or MedCost Benefit Services LLC when such director, commissioner, officer, manager, agent, or employee is acting within the course of his or her duties for Atrium Health. MedCostLLC and MedCost Benefits Services LLC will remain excluded from the definition of "Defendant" as long as Atrium does not acquire any greater ownership interest in these entities than it has at the time that this Final Judgment is lodged with the Court.

G. "Healthcare Provider" or "Provider" means any Person delivering any Healthcare Service.

H. "Healthcare Services" means all inpatient services (*i.e.*, acute-care diagnostic and therapeutic inpatient hospital services), outpatient services (*i.e.*, acute-care diagnostic and therapeutic outpatient services, including but not limited to ambulatory surgery and radiology services), and professional services (*i.e.*, medical services provided by physicians or other licensed medical professionals) to the extent offered by Defendant and within the scope of services covered on an in-network basis pursuant to a contract between Defendant and an Insurer.

"Healthcare Services" does not mean management of patient care, such as through population health programs or employee or group wellness programs.

I. "Insurer" means any Person providing commercial health insurance or access to Healthcare Provider networks, including but not limited to managed-care organizations, and rental networks (*i.e.*, entities that lease, rent, or otherwise provide direct or indirect access to a proprietary network of Healthcare Providers), regardless of whether that entity bears any risk or makes any payment relating to the provision of healthcare. The term "Insurer" includes Persons that provide Medicare Part C plans, but does not include Medicare (except Medicare Part C plans), Medicaid, or TRICARE, or entities that otherwise contract on their behalf.

J. "Narrow Network" means a network composed of a significantly limited number of Healthcare Providers that offers a range of Healthcare Services to an Insurer's members for which all Providers that are not included in the network are out of network.

K. "Penalize" or "Penalty" is broader than "prohibit" or "prevent" and is intended to include any contract term or action with the likely effect of significantly restraining steering through Steered Plans or Transparency. In determining whether any contract provision or action "Penalizes" or is a "Penalty," factors that may be considered include: the facts and circumstances relating to the contract provision or action; its economic impact; and the extent to which the contract provision or action has potential or actual procompetitive effects in the Charlotte Area.

L. "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity.

M. "Reference-Based Pricing" means a feature of a Benefit Plan by which an Insurer pays up to a uniformly-applied defined contribution, based on an external price selected by the Insurer, toward covering the full price charged for a Healthcare Service, with the member being required to pay the remainder. For avoidance of doubt, a Benefit Plan with Reference-Based Pricing as a feature may permit an Insurer to pay a portion of this remainder.

N. "Steered Plan" means any Narrow Network Benefit Plan, Tiered Network Benefit Plan, or any Benefit Plan with Reference-Based Pricing or a Center of Excellence as a component.

O. "Tiered Network" means a network of Healthcare Providers for which (i) an Insurer divides the in-network Providers into different sub-groups based on objective price, access, and/or quality criteria; and (ii) members receive different levels of benefits when they utilize Healthcare Services from Providers in different sub-groups.

P. "Transparency" means communication of any price, cost, quality, or patient experience information directly or indirectly by an Insurer to a client, member, or consumer.

### III. APPLICABILITY

This Final Judgment applies to Defendant, as defined above, and all other Persons in active concert with, or participation with, Defendant who receive actual notice of this Final Judgment by personal service or otherwise.

### IV. PROHIBITED CONDUCT

A. The contract language reproduced in Exhibit A is void, and Defendant shall not enforce or attempt to enforce it. The contract language reproduced in Exhibit B shall not be used to prohibit, prevent, or penalize Steered Plans or Transparency, but could remain enforceable for protection against Carve-outs. For the Network Participation Agreement between Blue Cross and Blue Shield of North Carolina and Defendant's wholly-owned subsidiary Managed Health Resources, effective January 1, 2014, as amended, Defendant shall exclude from the calculation of total cumulative impact pursuant to Section 6.14 of that agreement any impact to Defendant resulting from Blue Cross and Blue Shield of North Carolina disfavoring Defendant through Transparency or through the use of any Steered Plan.

B. For Healthcare Services in the Charlotte Area, Defendant will not seek or obtain any contract provision which would prohibit, prevent, or penalize Steered Plans or Transparency including:

  1. express prohibitions on Steered Plans or Transparency;

  2. requirements of prior approval for the introduction of new benefit plans (except in the case of Co-Branded Plans); and

3. requirements that Defendant be included in the most-preferred tier of Benefit Plans (except in the case of Co-Branded Plans). However, notwithstanding this Paragraph IV(B)(3), Defendant may enter into a contract with an Insurer that provides Defendant with the right to participate in the most-preferred tier of a Benefit Plan under the same terms and conditions as any other Charlotte Area Provider, provided that if Defendant declines to participate in the most-preferred tier of that Benefit Plan, then Defendant must participate in that Benefit Plan on terms and conditions that are substantially the same as any terms and conditions of any then-existing broad-network Benefit Plan (*e.g.*, PPO plan) in which Defendant participates with that Insurer. Additionally, notwithstanding Paragraph IV(B)(3), nothing in this Final Judgment prohibits Defendant from obtaining any criteria used by the Insurer to (i) assign Charlotte Area Providers to each tier in any Tiered Network; and/or (ii) designate Charlotte Area Providers as a Center of Excellence.

C. Defendant will not take any actions that penalize, or threaten to penalize, an Insurer for (i) providing (or planning to provide) Transparency, or (ii) designing, offering, expanding, or marketing (or planning to design, offer, expand, or market) a Steered Plan.

## V. PERMITTED CONDUCT

A. Defendant may exercise any contractual right it has, provided it does not engage in any Prohibited Conduct as set forth above.

B. For any Co-Branded Plan or Narrow Network in which Defendant is the most-prominently featured Provider, Defendant may restrict steerage within that Co-Branded Plan or Narrow Network. For example, Defendant may restrict an Insurer from including at inception or later adding other Providers to any (i) Narrow Network in which Defendant is the most-prominently featured Provider, or (ii) any Co-Branded Plan.

C. With regard to information communicated as part of any Transparency effort, nothing in this Final Judgment prohibits Defendant from reviewing its information to be disseminated, provided such review does not delay the dissemination of the information. Furthermore, Defendant may challenge inaccurate information or seek appropriate legal remedies relating to inaccurate information disseminated by third parties. Also, for an Insurer's dissemination of price or cost information (other than communication of an individual consumer's or member's actual or estimated out-of-pocket expense), nothing in the Final Judgment will prevent or impair Defendant from enforcing current or future provisions, including but not limited to confidentiality provisions, that (i) prohibit an Insurer from disseminating price or cost information to Defendant's competitors, other Insurers, or the general public; and/or (ii) require an Insurer to obtain a covenant from any third party that receives such price or cost information that such

third party will not disclose that information to Defendant's competitors, another Insurer, the general public, or any other third party lacking a reasonable need to obtain such competitively sensitive information. Defendant may seek all appropriate remedies (including injunctive relief) in the event that dissemination of such information occurs.

## VI. <u>REQUIRED CONDUCT</u>

Within fifteen (15) business days of entry of this Final Judgment, Defendant, through its designated counsel, must notify in writing Aetna, Blue Cross and Blue Shield of North Carolina, Cigna, MedCost, and UnitedHealthcare, that:

A. This Final Judgment has been entered (enclosing a copy of this Final Judgment) and that it prohibits Defendant from entering into or enforcing any contract term that would prohibit, prevent, or penalize Steered Plans or Transparency, or taking any other action that violates this Final Judgment; and

B. For the term of this Final Judgment Defendant waives any right to enforce any provision listed in Exhibit A and further waives the right to enforce any provision listed in Exhibit B to prohibit, prevent, or penalize Steered Plans and Transparency.

# VII. COMPLIANCE

    A.    It shall be the responsibility of the Defendant's designated counsel to undertake the following:

    1.    within fifteen (15) calendar days of entry of this Final Judgment, provide a copy of this Final Judgment to each of Defendant's commissioners and officers, and to each employee whose job responsibilities include negotiating or approving agreements with Insurers for the purchase of Healthcare Services, including personnel within the Managed Health Resources subsidiary (or any successor organization) of Defendant;

    2.    distribute in a timely manner a copy of this Final Judgment to any person who succeeds to, or subsequently holds, a position of commissioner, officer, or other position for which the job responsibilities include negotiating or approving agreements with Insurers for the purchase of Healthcare Services, including personnel within the Managed Health Resources subsidiary (or any successor organization) of Defendant; and

    3.    within sixty (60) calendar days of entry of this Final Judgment, develop and implement procedures necessary to ensure Defendant's compliance with this Final Judgment. Such procedures shall ensure that questions from any of Defendant's commissioners, officers, or employees about this Final Judgment can be answered by counsel (which may be outside counsel) as the need arises. Paragraph 21.1 of the Amended Protective Order Regarding Confidentiality shall not be interpreted to prohibit outside counsel from answering such questions.

B. For the purposes of determining or securing compliance with this Final Judgment, or any related orders, or determining whether the Final Judgment should be modified or vacated, and subject to any legally-recognized privilege, from time to time authorized representatives of the United States or the State of North Carolina, including agents and consultants retained by the United States or the State of North Carolina, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division or the Attorney General for the State of North Carolina, and on reasonable notice to Defendant, be permitted:

1. access during Defendant's office hours to inspect and copy, or at the option of the United States, to require Defendant to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendant, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendant's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendant.

C. Within 270 calendar days of entry of this Final Judgment, Defendant must submit to the United States and the State of North Carolina a written report setting forth its actions to comply with this Final Judgment, specifically describing (1) the status of all negotiations between Managed Health Resources (or any

successor organization) and an Insurer relating to contracts that cover Healthcare Services rendered in the Charlotte Area since the entry of the Final Judgment, and (2) the compliance procedures adopted under Paragraph VII(A)(3) of this Final Judgment.

D. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division or the Attorney General for the State of North Carolina, Defendant shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

E. The United States may share information or documents obtained under Paragraph VII with the State of North Carolina subject to appropriate confidentiality protections. The State of North Carolina shall keep all such information or documents confidential.

F. No information or documents obtained by the means provided in Paragraph VII shall be divulged by the United States or the State of North Carolina to any Person other than an authorized representative of (1) the executive branch of the United States or (2) the Office of the North Carolina Attorney General, except in the course of legal proceedings to which the United States or the State of North Carolina is a party (including grand jury proceedings), for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

G. If at the time that Defendant furnishes information or documents to the United States or the State of North Carolina, Defendant represents and

identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States and the State of North Carolina shall give Defendant ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

  H.  For the duration of this Final Judgment, Defendant must provide to the United States and the State of North Carolina a copy of each contract and each amendment to a contract that covers Healthcare Services in the Charlotte Area that it negotiates with any Insurer within thirty (30) calendar days of execution of such contract or amendment. Defendant must also notify the United States and the State of North Carolina within thirty (30) calendar days of having reason to believe that a Provider which Defendant controls has a contract with any Insurer with a provision that prohibits, prevents, or penalizes any Steered Plans or Transparency.

## VIII. RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any Party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

# IX. ENFORCEMENT OF FINAL JUDGMENT

A. The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendant agrees that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of the decree and the appropriateness of any remedy therefor by a preponderance of the evidence, and Defendant waives any argument that a different standard of proof should apply.

B. The Parties hereby agree that the Final Judgment should be interpreted using ordinary tools of interpretation, except that the terms of the Final Judgment should not be construed against either Party as the drafter. The parties further agree that the purpose of the Final Judgment is to redress the competitive harm alleged in the Complaint, and that the Court may enforce any provision of this Final Judgment that is stated specifically and in reasonable detail, *see* Fed. R. Civ. P. 65(d), whether or not such provision is clear and unambiguous on its face.

C. In any enforcement proceeding in which the Court finds that Defendant has violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with such other relief as may be appropriate. In connection with any successful effort by the United States to enforce this Final Judgment against Defendant, whether litigated or resolved prior to litigation, Defendant agrees to reimburse the United States for the

fees and expenses of its attorneys, as well as any other costs including experts' fees, incurred in connection with that enforcement effort, including in the investigation of the potential violation.

## X. EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry, except that after five (5) years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendant that the continuation of the Final Judgment is no longer necessary or in the public interest.

## XI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The Parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, any comments thereon, and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest.

## XII. CONCLUSION

**IT IS THEREFORE ORDERED THAT** Plaintiff United States' Unopposed Motion for Entry of Final Judgment, (Doc. No. 98), is **GRANTED**.

Signed: April 24, 2019

Robert J. Conrad, Jr.
United States District Judge

## Exhibit A

Aetna

Section 2.8 of the Physician Hospital Organization Agreement between and among Aetna Health of the Carolinas, Inc., Aetna Life Insurance Company, Aetna Health Management, LLC, and Defendant states in part:

> "Company may not . . . steer Members away from Participating PHO Providers other than instances where services are not deemed to be clinically appropriate, subject to the terms of Section 4.1.3 of this Agreement."

In addition, Section 2.11 of the above-referenced agreement states in part:

> "Company reserves the right to introduce in new Plans . . . and products during the term of this Agreement and will provide PHO with ninety (90) days written notice of such new Plans, Specialty Programs and products. . . . For purposes under (c) and (d) above, Company commits that Participating PHO Providers will be in-network Participating Providers in Company Plans and products as listed on the Product Participation Schedule. If Company introduces new products or benefit designs in PHO's market that have the effect of placing Participating PHO Providers in a non-preferred position, PHO will have the option to terminate this Agreement in accordance with Section 6.3. Notwithstanding the foregoing, if Company introduces an Aexcel performance network in PHO Provider's service area, all PHO Providers will be placed in the most preferred benefit level. As long as such Plans or products do not directly or indirectly steer Members away from a Participating PHO Provider to an alternative Participating Provider for the same service in the same level of care or same setting, the termination provision would not apply."

Blue Cross and Blue Shield of North Carolina

The Benefit Plan Exhibit to the Network Participation Agreement between Blue Cross and Blue Shield of North Carolina and Defendant (originally effective January 1, 2014), as replaced by the Fifth Amendment, states in part:

> "After meeting and conferring, if parties cannot reach agreement, then, notwithstanding Section 5.1, this Agreement will be considered to be beyond the initial term, and you may terminate this Agreement upon not less than 90 days' prior Written Notice to us, pursuant to Section 5.2."

Cigna

Section II.G.5 of the Managed Care Alliance Agreement between Cigna HealthCare of North Carolina, Inc. and Defendant states in part:

> "All MHR entities as defined in Schedule 1 will be represented in the most preferred benefit level for any and all CIGNA products for all services provided under this Agreement unless CIGNA obtains prior written consent from MHR to exclude any MHR entities from representation in the most preferred benefit level for any CIGNA product. . . . As a MHR Participating Provider, CIGNA will not steer business away from MHR Participating Providers."

Medcost

Section 3.6 of the Participating Physician Hospital Organization agreement between Medcost, LLC and Defendant states in part:

> "Plans shall not directly or indirectly steer patients away from MHR Participating Providers."

UnitedHealthcare

Section 2 of the Hospital Participation Agreement between UnitedHealthcare of North Carolina, Inc. and Defendant states in part:

> "As a Participating Provider, Plan shall not directly or indirectly steer business away from Hospital."

# Exhibit B

Cigna

Section II.G.5 of the Managed Care Alliance Agreement between Cigna HealthCare of North Carolina, Inc. and Defendant states in part:

> "CIGNA may not exclude a MHR Participating Provider as a network provider for any product or Covered Service that MHR Participating Provider has the capability to provide except those carve-out services as outlined in Exhibit E attached hereto, unless CIGNA obtains prior written consent from MHR to exclude MHR Participating Provider as a network provider for such Covered Services."

UnitedHealthcare

Section 2 of the Hospital Participation Agreement between UnitedHealthcare of North Carolina, Inc. and Defendant states in part:

> "Plan may not exclude Hospital as a network provider for any Health Service that Hospital is qualified and has the capability to provide and for which Plan and Hospital have established a fee schedule or fixed rate, as applicable, unless mutually agreed to in writing by Plan and Hospital to exclude Hospital as a network provider for such Health Service."

In addition, Section 3.6 of the above-referenced agreement states in part:

> "During the term of this Agreement, including any renewal terms, if Plan creates new or additional products, which product otherwise is or could be a Product Line as defined in this Agreement, Hospital shall be given the opportunity to participate with respect to such new Product Line."